```
07 CV 7245
JUDGE KARAS
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

J.G. and J.G., on behalf of J.G.,

                          Plaintiffs,                    **COMPLAINT**

      --against--

Board of Education of the Briarcliff Manor
Union Free School District,                       **Docket No. ___ CV ___**

                           Defendant.

-----------------------------------------------------------x

    Plaintiffs, J.G. and J.G., on behalf of, J.G. by their attorneys, Mayerson & Associates, as and for their Complaint, allege and state the following:

    1. Plaintiff J.G. is a female child who has been diagnosed with a specific learning disability in addition to social and emotional needs, that makes her eligible to receive special education services. J.G.'s eligibility for special education services has been stipulated to by the parties (See *infra* at part 12).

    2. J.G. was at all relevant times a student within the Briarcliff Manor Union Free School District's purview, entitled to all rights, entitlements, and procedural safeguards mandated by applicable law and statutes including, but not limited to, the Individuals with Disabilities Education Improvement Act (hereinafter "IDEIA"), 20 U.S.C. § 1400 et. seq., the pertinent implementing regulations promulgated under the Code of Federal Regulations, Article 89 of the New York State Education Law (hereinafter "Article 89") and Part 200 of the Regulations of the Commissioner of the New York State Education Department (hereinafter "the Commissioner's Regulations").

    3. Plaintiffs J.G. and J.G. are J.G.'s parents and are residents of the State of New York, residing at all relevant times at an address within the Briarcliff Manor Union Free School

District, and presently residing at 6 Peach Tree Lane, Briarcliff Manor, Westchester County, NY 10510.

4. J.G. and her parents, J.G. and J.G., are not expressly named herein by their given names because of the privacy guarantees provided in the IDEA statute, as well as in the Family Educational Rights Privacy Act, 20 U.S.C. 1232(g), and 34 C.F.R. 99.

5. The Defendant Briarcliff Manor Union Free School District (hereinafter "the District"), upon information and belief, is a duly constituted school district organized under the laws of the State of New York.

6. This Court, pursuant to 20 U.S.C. § 1415(i)(2)(A), 28 U.S.C. §1331 and §1367 has jurisdiction of this action without regard to the amount in controversy. Venue is proper in that plaintiffs and defendants all reside in or are situated within this judicial district.

7. This action is brought pursuant to the provisions of 20 U.S.C. § 1400, et. seq., more commonly known as the IDEIA and, in particular, 20 U.S.C. § 1415(i)(2)(A), in order to seek (a) a modified *de novo* review and reversal of (i) an Impartial Hearing Officer's (hereinafter "IHO") January 14, 2007 Decision (Exhibit A) and (ii) the State of New York State Review Officer's (hereinafter "SRO") April 16, 2007 Decision (hereinafter "SRO Decision")(Exhibit B), (b) a determination that J.G. met the applicable Second Circuit standard for reimbursement and compensatory relief, (c) an order directing defendant to reimburse plaintiffs, as requested, and provide compensatory services, and (d) an order granting plaintiffs leave to file a fee application pursuant to the fee shifting provision of the statute.

8. Pursuant to the IDEIA statute, as well as the New York State Education Law, all school agencies within the State are required to offer each eligible student with a disability a free appropriate public education (hereinafter "FAPE") that is tailored to meet his or her individual needs.

9. The Supreme Court recently held in <u>Winkelman v. Parma City Sch. Dist.</u>, 127 S. Ct. 1994, 2003 (U.S. 2007) that parents have their own statutory entitlements under IDEIA that correspond to their children's entitlements.

10. The District is a local education agency that is statutorily obligated under the IDEIA, as well as the laws of the State of New York, to provide J.G., a student with a disability, with a FAPE.

11. The FAPE required under IDEIA necessarily will be different for each child, as IDEIA expressly rejects any "one size fits all" approach or restrictions that preclude the genuine individualization of a student's educational program.

12. On June 13, 2005, an initial meeting of the Committee on Special Education (hereinafter "CSE") was held, with the parents of J.G. in attendance. District personnel initially resisted the eligibility of J.G. for special education despite her diagnosis of a specific learning disability. J.G.'s parents stated their objection to this eligibility denial. The District's personnel eventually grudgingly conceded that J.G. was in fact eligible for special education based on her learning disability.

13. By letters of June 21, 2005 and August 2, 2005, the parents of J.G. informed the District that they could not accept J.G.'s IEP due to its significant defects, including, but not limited to, the lack of either Lindamood-Bell or Orton-Gillingham instruction, which had been recommended to address J.G.'s needs and the lack of services to address J.G.'s needs in the area of mathematics. Further, the IEP lacked any services to address J.G.'s diagnosed social and emotional needs.

14. On December 7, 2005, plaintiffs filed for due process to challenge, both procedurally and substantively, J.G.'s IEPs for the 2005-2006 school year. Plaintiffs sought a declaration that J.G. had been denied a FAPE, as well as <u>Burlington/Carter</u> reimbursement relief for the cost of tuition and transportation incurred when placing J.G. in an appropriate placement at the Windward

3

School, a respected and well-known school with experience educating students with disabilities. J.G.'s parents also sought compensatory relief to compensate J.G. for the services missed by J.G. due to the District's disregard for her diagnosed disabilities during the 2004-2005 and 2005-2006 school years and the Summer of 2005.

15. In determining whether parents of a disabled child are entitled to reimbursement for a unilateral placement and/or program, such as the Windward School, courts look to whether the local educational agency offered a FAPE (Prong I); and whether the services provided by the parents were "appropriate" under the IDEA (Prong II). School Comm. of Burlington v. Dept. of Educ. of Mass., 471 U.S. 359, 369-370, 105 S.Ct. 1996, 2002-2003 (1985); Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 12-14, 114 S.Ct. 361, 364-366 (1993); Frank G. and Dianne G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356 (2d Cir. 2006). Assuming that the first two "prongs" are met, the only other issue remaining to be adjudicated is whether or not equitable considerations support the parents' claim (Prong III).

16. The IHO's January 14, 2007 Decision held that the District had violated key procedural protections that were accorded to J.G.'s parents, but then subverted the applicable statutory and regulatory mandates in holding that these violations did not amount to a deprivation of a FAPE. After reducing the applicable Prong I standards to let the District off the hook, the IHO then repeatedly applied an erroneous and unduly high standard, which contradicted the standards established by the Second Circuit in Frank G. in analyzing whether J.G.'s private placement was appropriate for purposes of Prong II. 459 F.3d at 364.

17. The SRO's April 16, 2007 Decision rubber stamped the IHO's Prong I (FAPE) determination, glossing over and expanding upon the numerous legal and factual errors included in the IHO decision. The SRO was so dismissive, he even declined to analyze whether J.G.'s placement at the Windward School was appropriate for the purposes of Prong II.

4

18. Material violations of the procedural protections provided parents by IDEA and state law amount to a denial of FAPE. <u>Bd. of Educ. v. Rowley</u>, 458 U.S. 176, 206 (U.S. 1982); <u>McLaughlin v. Holt Pub. Sch. Bd. of Educ.</u>, 320 F.3d 663, 669 (6th Cir. 2003).

19. Both the Supreme Court and Congress have placed utmost importance on the procedural protections afforded students by the IDEA. <u>Rowley</u>, 458 U.S. at 205 (holding that "the importance Congress attached to these procedural safeguards cannot be gainsaid").

20. Procedural violations that result in a serious infringement on the parents' opportunity to "meaningfully participate" in the IEP formulation process amount to a denial of a FAPE. <u>Winkelman</u>127 S. Ct. 1994 at 2003; <u>Deal v. Hamilton County. Bd. of Educ.</u>, 392 F.3d 840 (6th Cir. 2004), *cert denied* 546 U.S. 936 (2005); <u>T.P. v. Mamaroneck Union Free Sch. Dist.</u>, 2007 U.S. Dist. LEXIS 35288, *19 (D.N.Y. 2007); <u>See also W.A. v. Pascarella</u>, 153 F.Supp.2d 144, 153 (D. Conn. 2001). The IHO and SRO both cited decisional law establishing this precedent in their decisions, yet ignored or subverted the very same precedent in reaching the erroneous conclusion that the District had not denied J.G. a FAPE.

21. The federal regulations implementing IDEIA state that a local education agency "*must* take steps to *ensure* that one or both of the parents of a child with a disability are *present* at *each* IEP Team meeting.*" 34 C.F.R. §300.3229(a).

22. The regulations further require that the District "(1) Notify parents of the meeting early enough to ensure that they will have an opportunity to attend; and (2) Schedule the meeting at a mutually agreed time and place." 34 C.F.R. §300.3229(a). The District fulfilled neither of these legal obligations.

23. The Commissioner's Regulations further mandate that "the student **must receive** notification **in writing** at least five days prior to the meeting." 8 NYCRR Sec. 200.5[a][3].(c).

24. Having been on notice of the parent's discontent with J.G.'s IEP since June, 2005, The District informed the parents of J.G. by letter *dated* August 5, 2005 (and *received* on *Saturday*,

5

August *6*) that an IEP meeting would be held on August 9, 2005, just *two* business days later, at a time and place unilaterally chosen by the District. The District's "notice" was thus clearly not in compliance with the express mandates of both federal and state regulations. Both the IHO and SRO acknowledge this fact.

25. J.G.'s parents requested a reasonable adjournment so that they could be present at J.G.'s IEP with the participation of another teacher. Evidence was adduced establishing that the District *rejected* J.G.'s parents' reasonable request for an adjournment and wrongfully proceeded without J.G.'s parents physically attending the meeting.

26. Plaintiffs maintain, particularly in light of Winkelman, 127 S. Ct. at 2003, and Deal, 392 F.3d at 840, that there can be no more serious or more fundamental intrusion on the parents' right to meaningfully participate in the formulation of the IEP than to entirely exclude parents from the meeting at which the IEP is formulated.

27. Faced with express statutory, regulatory, and decisional mandates, both the IHO and SRO contorted the facts and lowered legal standards to establish that J.G.'s was not denied a FAPE.

28. The IHO administered a lowered legal standard in her analysis under Prong I. Although the plaintiffs urge that deprivation of notice and the indefensible rejection of a first-time reasonable adjournment request are not "reasonable," regulatory, statutory, and decisional law make no mention of a "reasonableness" standard. Rather, they all contain express and clear mandates to which local education agencies *must* adhere.

29. The IHO supported her finding that the District had fulfilled the requirements of this legally-unfounded standard with two factual misrepresentations. First, the IHO stated that "the parents had actual notice prior to five days," but failed to suggest what this notice entailed or how it was provided. IHO decision at 17. The facts and testimony established that the *actual* notice, including the final date, time, and place of the meeting, was received on Saturday, August 6, leaving the parents *one* business day to secure the attendance of critical team members.

Second, the IHO merely parrots the erroneous statement, contained in the District-drafted August 9, 2005 IEP, that J.G.'s parents *declined* to attend the IEP meeting (when the truth was that J.G.'s parents asked for an adjournment). IHO Decision at 18. To establish this "fact," the IHO only cites the unilaterally drafted IEP and ignores extensive evidence adduced at the hearing, from witnesses called by both parties, establishing that the parents did not *decline* to attend, but rather, that they were deprived of sufficient notice and that their very reasonable first-time request for adjournment was rejected.

30. The SRO implicitly rejected the "reasonableness" standard of the IHO and replaced it with the proper standard, noting that "a school district may only conduct a meeting without the parents' participation if it is unable to convince the parents that they should attend; in which case the district must have a detailed record of its various attempts to arrange a mutually agreed upon time and place for the meeting." SRO Decision at 10.

31. The evidence unequivocally established that this is not a case in which the District was "unable to convince the parents that they should attend." Rather, the parents called for the meeting and desired to attend, but had been provided inadequate notice and could not secure necessary team members' participation. The factual record is also devoid of any evidence establishing that the District has a "detailed record" of "various attempts" to mutually agree on a date, time, and place for the meeting. In reality, the District offered <u>one</u> time and place, on insufficient notice, and then rejected the parents' (first-time) attempts to agree on a different time.

32. Faced with this reality, the SRO, who was not present at the hearing, appears to have realized that unfounded nature of the IHO's factual analysis and attempted to "paste together" a factual interpretation that would support the IHO's conclusion that, despite the clear and severe procedural violations of the District, J.G. was not denied a FAPE.

7

33. The SRO thus made the illogical argument that J.G.'s parents' attendance at the June IEP meeting meant that they had "input" into the IEP formulation process. Such participation is not *meaningful* in light of J.G.'s parents' *rejection of the IEP that was formulated at that meeting*, which they had the legal right and the factual justification to do.

34. The SRO then disingenuously suggested that J.G.'s parents had meaningful participation at the August 9th IEP meeting because the "team" was "aware" of *some* of their concerns and discussed them. Application of this low standard guts the very procedural protections afforded by federal and state law, rendering them meaningless. Applying this kind of low standard would allow school districts to exclude parents at subsequent IEP meetings.

35. Further, the SRO inexplicably misstated several key facts, established through the testimony of witnesses called by both parties, to further in his creative attempt to justify a legally unsupportable stance. First, the SRO states that J.G.'s parents had agreed to an IEP meeting on a set date and at a set time and place over the phone, whereas the evidence during the hearing established that no such specific date, time or place was agreed upon. Second, the SRO misstates that J.G.'s parents "*declined*" the offer to allow their desired team members, or the parents themselves, to participate by phone. Rather, the evidence established that the parents justifiably stated that such an arrangement could not be worked out on such inadequate notice.

36. The SRO also suggests that the District's assurance that the IEP would be revised consistent with its understanding of the parents' concerns was sufficient means of "parental participation." The absurd nature of this argument and its shocking disregard for the value of procedural safeguards cannot be overstated.

37. The creative efforts of the IHO and SRO to conclude that J.G.'s parents had a sufficient measure of participation in the IEP process cannot be supported legally or factually. Proper and impartial application of the facts to the *legal standards* must find that J.G.'s parents were denied any semblance of *meaningful* participation.

38. Further, plaintiffs reject the IHO's stated, yet unsupported accusation that aspects of the testimonial evidence were not credible. Moreover, "credibility" is irrelevant where the violations in the present case are cut-and-dry procedural and substantive violations that are documented by hard evidence that does not necessitate further testimonial support.

39. Both the IHO and SRO found that the District had expressly violated the regulatory, statutory, and decisional law. Both the IHO and SRO, however, failed to provide J.G. any remedy for these violations.

40. The District's unilateral August 9, 2005 IEP meeting was itself wrought with further procedural violations, including extensive and impermissible "predetermination."

41. As a matter of law, predetermination of at least one very significant component of an IEP services and/or placement by a local education agency impermissibly excludes parents from meaningful participation in the IEP development process and amounts to a serious FAPE deprivation. Deal, 392 F.3d 840; T.P. v. Mamaroneck Union Free Sch. Dist., 2007 U.S. Dist. LEXIS 35288, *19 (D.N.Y. 2007). The evidence adduced at the hearing included admissions by District officials that none of the individual objectives or goals listed in the resulting IEP were actually developed or discussed at the August 9th meeting. This high degree of predetermination further prevented the parents of J.G., as well as other team members, from meaningfully participating in the formulation of the IEP.

42. The August 9th meeting also included a parent member who *knew* the family of J.G., seriously compromising the family's privacy *and* lacked the sufficient presence of a general education teacher. The parents of J.G. had previously waived the right to the attendance of a parent member, but were not afforded the opportunity in regard to the August 9th meeting.

43. Further, the August 9, 2005 IEP was substantively deficient, as it was not "reasonably calculated" to meet J.G.'s needs. The IEP contained vague (and pre-determined) objectives and goals, an entirely subjective means of measuring progress, insufficient mathematics

interventions, no express modifications of the general mathematics curriculum, and <u>no</u> social or emotional services (despite available evidence that such services were required).

44. The IHO states that the parents' substantive IEP concerns are "implausible," but fails to make any mention of how these genuine, factually-based concerns were deficient. The SRO, again recognizing the shortcomings of the IHO decision, vaguely lists various aspects of the IEP as support for the IEP's appropriateness, but does not sufficiently establish that the offered services adequately or appropriately address J.G.'s specific needs. Both Decisions are deficient in their analysis of the substantive merits of the District's unilaterally-developed August 9, 2005 IEP.

45. The IHO Decision is riddled with numerous other errors, red herrings, and misapplications of the law, including the devotion of much of the space in her confusing and brief legal analysis to a discussion of whether J.G.' suffers from dyslexia. Though the evidentiary record included multiple reports (admitted without objection by respondent) stating that J.G. had dyslexia, and the IHO, on page 19 of her Decision, appears to state (in a grammatically incoherent manner) that there was testimony at the hearing that J.G. had a dyslexic disability, the IHO then contradicts herself just a page later, stating that "there is no evidence in the record nor testimony that J. is dyslexic." IHO Decision at 19-20.

46. Regardless of the IHO's confusion regarding dyslexia, the District and J.G.'s parents had *agreed* on June 13, 2005 that J.G. was a student with a disability. Further, the Windward School has ample experience educating students with learning disabilities. Despite the extensive evidence, J.G.'s dyslexia was thus a non-issue.

47. Upon information and belief, compounding the SRO's erroneous analysis was an apparent bias and appearance of impropriety on the part of the SRO, who is currently under active investigation. The allegations against the SRO are discussed in a recent article appearing on the front page of the Wall Street Journal (Exhibit C), and concern:

10

- Evidence that the SRO decided approximately 86% of appeals partially or fully in favor of the local education agencies in 2006 and 2007, even though parents apparently won approximately 54% of impartial hearings in 2005-2006,
- The statements of former SRO agency staff members (who had apparently quit or been fired) claiming that the SRO frequently overruled them whenever they prepared decisions in favor of parents, and
- Evidence that the SRO's already compromised independence and required impartiality have been further compromised by an ongoing romantic relationship with an assistant counsel for the New York State Education Department.

48. The allegations reported in the Wall Street Journal are serious ones that erode public confidence in the integrity of the system and, if at all true, they also should be considered as part of any duty this Court might otherwise have to give "due deference" to the underlying administrative fact-finding. Plaintiffs had no knowledge of the SRO's apparent bias and other related problems until *after* the SRO had ruled.

49. For Prong II purposes, the IHO's analysis of the appropriateness of J.G.'s parents' private placement ignored the less stringent standard established by the Second Circuit in Frank G., when it held that "parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a free appropriate public education." 459 F.3d at 364. The proper test merely requires that the placement be "likely ["reasonably calculated"] to produce progress, not regression." Id. The weight of the evidence overwhelmingly established that J.G.'s unilateral placement met this less stringent standard. The SRO did not even bother to conduct a Prong II analysis.

50. While the Department failed to offer J.G. a FAPE, the placement at the Windward School unilaterally selected for J.G. by her parents was, in fact, appropriate under the Frank G. standards. 459 F.3d at 364.

51. Specifically, J.G.'s unilateral program was tailored to enable J.G. to make meaningful educational gains, pursuant to Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Weschester Cty v. Rowley, 458 U.S. 176 (1982).

52. The IHO impermissibly based her decision not to reimburse J.G.'s extended day program in part on her unsubstantiated concern about the *sources* of information regarding the appropriateness of the Windward School placement. The testimony of *independent* consultant Kathleen Kelly, the recommendations of Carol Leeds Riven, M.S., and the February, 2005 Psychological Evaluation of Dr. Sylvia Epstein, provided ample evidence of the Windward School's appropriateness. The Frank G. standards contain no restriction on the sources of evidence that may be used to meet the less stringent burden placed on the parents. By information and belief, there is no such restriction included in any relevant decisional law or statutory or regulatory authority.

53. The IHO's further questioning of the alleged "restrictiveness" of the Windward School placement, included in her Prong II analysis, is also misguided. Though plaintiffs provided ample evidence that the Windward School placement educated J.G. in her least restrictive environment, where, as here, there has been a material Prong I FAPE deprivation, the parents' choice of unilateral placement may be *more* restrictive than the school district's recommended placement and still be reimbursable. As the Second Circuit ruled in Frank G., "parents may not be subject to the same mainstreaming requirements as a school board." Accordingly, "...the issue of whether a unilateral placement is appropriate "...turns on whether a placement...is reasonably calculated to enable the child to receive educational benefits." Frank G., 459 F.3d at 364.

54. It was undisputed below that J.G. is properly classified has having a learning disability. The Windward School, a special school for children with learning disabilities, certainly was "reasonably calculated" to provide educational benefits to J.G. Not only was the Windward

12

School placement reasonably "calculated" to provide educational benefits, the evidence demonstrated that J.G. made excellent progress in the Windward School during the 2005-2006 school year.

55. As a result of the District's failure to adequately address, or even acknowledge, J.G.'s disabilities, J.G. was and still is entitled, by law, to compensatory services, covering the 2004-2005 school year and the Summer of 2005, in addition to the 2005-2006 school year. No compensatory relief was ordered by the IHO or SRO.

56. Further, the evidence introduced during the hearing amply establishes that the equities further support J.G. and J.G.'s claim for reimbursement. Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996). J.G.'s parents were cooperative, unobstructive, and forthcoming, they acted reasonably, and they provided due notice of their claims. Throughout the process, the parents of J.G. expressed reasonable concerns regarding the appropriateness and sufficiency of the services offered their daughter by the District.

WHEREFORE, it is respectfully requested that this Court:

(a) reverse, in part, the April 16, 2007 Decision of the SRO and the January 14, 2007 Decision of the IHO;

(b) declare that defendant failed to offer J.G. a FAPE for the 2004-2005 and 2005-2006 school year, as well as the Summer of 2005.

(c) declare that J.G.'s privately secured placement for the 2005-2006 school year was appropriate and that the associated tuition and transportation costs are reimbursable under applicable Prong II standards, and that the equities favor J.G. under Prong III and do not preclude or diminish a reimbursement award;

(d) order that the defendant reimburse J.G. and J.G. for the actual incurred costs of J.G.'s private placement at the Windward School for the 2005-

2006 school year and the associated transportation, and provide J.G. by way of compensatory damages with the full services J.G. should have received during the 2004-2005 and 2005-2006 school year, as well as the Summer of 2005;

(e) declare plaintiffs to be the "substantially prevailing" parties;

(f) grant leave to plaintiffs' counsel to submit a fee application for purposes of statutory attorneys' fees and other recoverable costs at the administrative level, the SRO level, and in this action, pursuant to the express fee-shifting provisions of the federal IDEIA statute and <u>A.R. v. N.Y. City Dep't of Educ.</u>, 407 F.3d 65, 75 (2d Cir. 2005); and

(g) grant plaintiffs such other, further and different relief as may be just under the circumstances.

Dated: New York, New York
August 14, 2007

_____
Gary S. Mayerson
Mayerson & Associates
330 West 38th Street, Suite 600
New York, New York 10018
212.265.7200
212.265.1735 (fax)

14