Hearing Officer's Findings of Fact and Decision

Case No.

_____

## NAMES AND TITLES OF PERSONS WHO APPEARED

FOR THE STUDENT:

| | |
|---|---|
| Mayerson & Association | Attorney for the Parent |
| Mr. Gangi | Parent (7/18/06 p. 572) |
| Mrs. Gangi | Parent (7/18/06 p. 639) |
| Kathleen Kelly | Educational Consultant (5/24/06 p. 38) |
| Lydia Lavin | Pupil Personnel (5/24/06 p. 139; 6/15/06; 7/17/06) |
| Marcelle Fumosa | Reading Teacher (6/15/06 p. 236) |
| Mr. G | Father (7/18/06 p. 572) |

FOR THE DISTRICT:

| | |
|---|---|
| Jeffrey Schiro<br>Kuntz, Spagnuolo, Scapoli & Shapiro | District's Attorney |
| Alison Collins | First grade Teacher (9/21/06 p. 668) |
| Claudia C. Sullivan | Second grade Teacher ( 9/21/06 p. 787) |

## FINDINGS OF FACT AND DECISION

Case Number:

Student's Name:                          Jillian Gangi

Student's date of birth:                 June 27, 1998

District:                                Briarcliff Manor Union
                                         Free School District

Hearing Requested by:                    Parent

Date of Hearing:                         5/24, 6/15, 7/17, 7/18, 9/21
                                         11/1/06

Hearing Officer:                         Mary Noe, Esq.

**HEARING OFFICER'S FINDINGS OF FACT and DECISION**

Case Number:

The Parents by their attorney requested an impartial hearing on December 7, 2005 and I was appointed on December 14, 2005.   There were several control dates after the resolution period agreed upon by both parties.  Joint motions to extend the compliance date were granted.  Gary Mayerson Esq. represented the Parents and the District was represented by Jeffrey Shiro Esq..

J is a 6 year old student classified as learning disabled currently attending second grade at the Winward School.   The Parents seek compensatory education for '04 – '05 school year and tuition reimbursement for the '05 – '06 school year.

The parents presented their case first.


THE STUDENT'S CASE

*Kathleen Kelly,* a retired special education teacher working as an educational consultant testified on behalf of the Parents. (T. 38)  Ms. Kelly has been working as an educational consultant for one year and has no financial connection with the Windward School.  (p. 47)  Winward is a special education school.  (T. 124)

Ms. Kelly observed J on March 20, 2006 at the Winward School for approximately two hours and fifteen minutes and wrote a report.  (T. 48, 53, Exh. D) Winward is a school that groups homogeneously. The class has approximately five students a majority of the time.  (T. 55)  The staff student ratio varies, six students to one teacher at times, five to one  and at other times three to one, which often provides J with

3

immediate feedback. (T. 73, 109, 110)  J's teacher is certified in Orton-Gillingham. (T. 111) J demonstrated the same ability level of the majority of the other students. (T. 58)

Ms. Kelly first observed the teacher dictating words to the children they were somewhat familiar with in their readings and prior lessons. The students were preparing for competency tests. The teacher reminded the students of various strategies to use in verbalizing the words such as air writing the words and then writing them on paper. (T. 50) The students then converted the words into contractions. (T. 51) The students then chose a column of words, practiced reading them, wrote them and read them again. (T. 51) The class was separated into groups of three and each child read a paragraph aloud and then answered comprehension questions. (T. 52) The students had the equivalent of 3rd grade skills. (T. 114)

Ms. Kelly spoke with J's homeroom teacher. The teacher and assistant teacher felt that J was initially very introverted and did not interact. She was quiet, shy and fragile. (T. 54, 55) The teacher, Mrs. Haslem spends lots of time with J and J is now raising her hand independently and doesn't get upset if she is incorrect. J seemed very comfortable in the environment. (T. 57)

Ms. Haslem and the other teachers thought J had progressed tremendously in academics and socially since she started at the school. (T. 60, 61) Ms. Kelly's opinion was that J has made tremendous progress. (T. 128) Ms. Kelly testified that assuming what the teachers have reported and what she witnessed, she thinks the curriculum was challenging and appropriate. (T. 68) J's fluency was average. (T. 123)

Ms. Kelly testified that J's objectives as specified on J's IEP dated June 13, 2005 were inappropriate because if the student's present functioning levels are unknown then

4

goals cannot be appropriate without specifying what is being targeted. (T. 96) Ms. Kelly

became aware of J's baselines from the evaluation of Dr. Epstein dated February 2005.

(T. 107)  Based on the evaluation, J was struggling to become an emergent reader. (T.

126) Ms. Haslem did not say J was pre-tested. (T. 126)

　　　Ms. Kelly testified that she had not seen J's first grade report card.  After

reviewing it she stated that there were generic terms and no proof that the indicated check

mark really meant that J was meeting expectations and questioned whose expectations

and whether J was meeting state standards as well as the possibility of the

professionalism of the teacher. (T. 133)

　　　*Dr. Lydia Lavin*, director of pupil personnel was called as a witness for the parent.

The district's process for arranging a CSE review which occurred in this case is that

Barbara Waters, Dr. Lavin's secretary, calls the parents with several dates to choose

considers the parent's availability and arranges a date to accommodate everyone.  She

then sends out the notice.  (T. 155 – 156)

　　　The parents were convinced that J had a disability.  They presented information

and the committee reached a consensus that there was a disability. (T. 471)  Even though

J made progress, J would benefit from special education. (T. 483)   On June 13, 2005

there was a CSE meeting and an IEP was created which classified J as learning disabled.

Ms. Collins, J's teacher reported that J could not do her seat work at that meeting. (T.

387) The recommendation was for a special class in English and language arts. (T. 189)

There would be direct instructions in a special class setting for ninety minutes of the

school day.  The rest of the day the student would be in a regular education class. (T.

473) On the Wood Range Achievement test J's reading score is 94, an average score.  (T.

482) J's score in spelling is in the average range. (T. 485) J is very strong in math. On

the Wide Range Achievement Test she scored 108, which is in the average range. (T.

497) On July 22, 2005 the IEP was sent to the parents. (T. 188) The parents requested

that the IEP needed to be amended because they felt that the services of the special class

math should be included. (T. 172) On August 2, 2005 the district received a letter from

the family rejecting the June 13, 2005 IEP and notifying the district that J will attend a

private school. (Exh. L) On August 3, 2005, Barbara called the family, left a message on

their answering machine regarding availability. (T. 175) On August 4, 2005 the mother

indicated that August 9th was an acceptable date. (T. 558) The district wrote a letter to

the parents on August 5th arranging a CSE meeting to be held on August 9, 2005 at 1:00

p.m. (Exh. 8) Dr. Lavin stated that the August 5th letter does not give the required five

day notice. (T. 534) On August 8th Dr. Lavin had a telephone conversation with the

parent that he wanted the tutor to be present and she would not be available until late

August and then the parents were leaving for vacation on August 15, 2005 and he wanted

the meeting in September. Dr. Lavin testified that she offered two meetings but needed

to have a meeting prior to school starting so that an IEP would be in place. (T. 182) Dr.

Lavin stated that the father indicated that he saw no sense of any meeting since he had no

intention of sending his daughter to the school. (T. 195, 416) On August 9, 2005 a CSE

meeting was held and math was added to the IEP. (Exh. B, T. 189) The father was

called during the meeting but could not participate because they didn't have the right

people. (T. 417) The parents also requested that the psychologist who did the testing be

present at the meeting. (T. 418) Speech and language goals were deleted because they

were added in error "a strike of the wrong key." (T. 190) The parents did not attend the

August 9, 2005 CSE meeting and the Committee added the service they requested. Another meeting was never set after Labor Day. (T. 193)

*Marcelle Fumosa*, a reading teacher at Todd Elementary School was called as a witness for the parent. Ms. Fumosa is in the regular education setting. The program is an extension of the regular education classes. (T. 370)

Ms. Fumosa testified that one indicator of reading difficulties may be a child that has phonological awareness problems. Letter reversals is also a red flag but common at the kindergarten, first grade levels. (T. 239, 240) In the beginning of the '04 – '05 school year the teacher, Mrs. Collins noticed some observations regarding J's reading. In September '04 Mrs. Collins gave the Developmental Reading Assessment (DRA). (T. 321) At that point in the year, the parents didn't want J pulled out for support. (T. 242) The parents notified the school that J would be going for outside services. (Exh. U, T. 247, 323)

Ms. Fumosa did not work with J during kindergarten. (T. 248) In Ms. Fumosa's opinion J would be a child that she would recommend for Phonological Awareness program in kindergarten. (T. 253)

Ms. Fumosa does not recommend students to the CSE, she reports her findings to the teacher who would refer the child to the Committee. (T. 254)

In November '04, the parent wanted to go ahead with the reading program. (T. 355) Ms. Fumosa testified that she worked with J every day after November the first grade, '04 – '05 school year. (T. 256) J's area of weakness was decoding. (T. 260) J's strength was comprehension. (T. 261) In January, J was at an frustrated 1st grade level in sight words, in June she was at an instructional 1st grade level. J's comprehension was

independent on level one. (T. 340) In January J was not fluent and reading very choppy. By June she was able to instructionally decode a 1st grade passage and her comprehension was independent. (T. 343)

During the year the parents asked Ms. Fumosa to contact J's tutor. The tutor provided information on the skills she was working on so that they could coordinate activities. Ms. Fumosa would explain what she was working on so the tutor would form some of her instructions. (T. 284)

J made tremendous progress based on Ms. Fumosa's Quality Reading Inventory assessments (QRI). (Exh. U1, T 291) It is administered one to one. (T. 299) By June 13, 2005 Ms. Fumosa administered two QRIs.

In January, J had five miscues on the first grade level and in June she made two miscues. (T. 301)

*Mr. G*, the parent testified he recognized that J had some king of a disability late in kindergarten and then early in the first grade. (T. 573) J had a hard time reading simple words, difficult time expressing her thoughts and was falling behind her siblings and her peers. (T. 573)

In first grade, J was being tutored two to three times a week. (T. 574)

Mr. G testified that the fundamental reason he does not agree with the district's recommendation was because the IEP did not address all of J's weaknesses. The type of program was something different than what other outside professionals had recommended. There was no mathematical areas addressed in this particular IEP. (T. 609) Additionally, J would be out for one and a half hours per day for services when she needed a much more intensive program. The overriding factors were the students that

8

were in the special education class did not have the same learning disabilities that J had.

(T. 610)

A decision regarding the tuition at Windward had to be made by August 1st. (T.

611)

J has been making tremendous strides in her ability to read, comprehend and

communicate her thoughts. (T. 617)

<u>Highlighted Parent's documents admitted into evidence:</u>

*Parent's Exh. 4, District's Exh B* -    On the IEP dated August 9, 2005 the district

recommended that J attend a special class in English Language Arts and Math 15:1 ratio

daily, two hours for English Language Arts and one hour for Math.    The IEP states

"Student's weak short term auditory memory negatively impacts academic performance";

<u>Current Academic Levels/Abilities states</u>:  "Student presents with average receptive and
expressive language skills with a relative weakness in short term auditory memory which
may cause difficulty with the ability to learn new written or spoken vocabulary.  Student
can write independently, but cannot always read back which she has written.  She is
impulsive and fidgety when writing.  Student has difficulty with remembering addition
and subtraction concepts, as well as utilizing vocabulary in math word problems."  (Exh.
4 p.2 of 6)

Listed on the 9/9/05 IEP are Standardized test results, CELF.  J's social and emotional

levels and abilities are within age appropriate expectations.  (Exh. 4 p. 3 of 6)

*Parent's Exh. 10* - The IEP dated June 13, 2005 the CSE recommend "Special Class

English Language Arts in a 12:1 ratio once daily for one hour 30 minutes";

Current Levels/Abilities is identical to the 9/9/05 IEP except the last sentence does not

appear.

Under "Attendance" the parents were present.  "Ms. McKeever indicated that the scores
on speech and language evaluation were in the average range and working memory was
average.  Did not notice any word retrieval difficulties.  A Collins reports that J's

9

comprehension skills are above average and she follows directions.  She needs assistance on task and need to become more independent.  She can write independently but cannot always read back what she wrote.  See impulsivity and fidgeting in writing.  Seems to be something "not clicking" with decoding.  M. Fumusa indicates that J had made tremendous progress since January.  She is internalizing and applying strategies being taught."

*Parent Exh 19, District's Exhibit O* - The Briarcliff Manor Union Free School District

Speech and Language Assessment was conducted in May 2005 by Alyssa McKeever

M.A., CCC-SLP

Under "Observations"  Ms. McKeever stated that "J explained to the examiner that she

would be attending a different school next year and then would come back to Todd."

The results of the CELF-4 testing is as follows:

| | |
|---|---|
| Core Language | average |
| Receptive Language | above average |
| Expressive Language | average |
| Language Content | above average |
| Language Structure | average |
| Working memory | average |
| Concepts & following directions | above average |
| Word classes | high average |
| Sentence structure | average |
| Number repetition | average |
| Familiar sequence | average |
| Word structure | high average |
| Recalling sentences | average |
| Formulated sentences | average |
| Expressive vocabulary | above average |

CTOPP

| | |
|---|---|
| Phonological memory | average |
| Rapid naming | average |
| Create another word | average |
| Blending words | average |
| Sound matching | low average |
| Memory for digits | below average |
| Nonword repetition | average |
| Rapid color naming | low average |
| Rapid object naming | average |

Ms. McKeever in her report states "Overall, J presents as a child with average receptive and expressive language skills with a relative weakness, although still considered age appropriate, in auditory memory skills."

*Parent's Exh 24, District's Exh Q* - A psychologist Dr. Sylvia H. Epstein psychological evaluation dated 2/3, 2/8, 2/14/05 was admitted into evidence. The summary of test results are as follows: Weschsler Intelligence Scale:

| | |
|---|---|
| Verbal Comprehension | average |
| Perceptual reasoning | average |
| Working memory | average |
| Processing Speed | superior range |
| Full Scale IQ | bright normal range |

Results on the Ravens, a non verbal measure of reasoning abilities were at the 90th percentile and "suggest that she has more potential then demonstrated on the *WISC-IV*." (Exh. 24 p. 3)

Educational Achievement Reading Readiness: "J is able to sound blend, recognize the missing elements of words, discriminate word pairs and identify the differences in pictures, letters and words. She had a hard time when presented with the Reversal Frequency Test and was asked to cross out the incorrect symbols...J lacks mastery on the easiest consonant vowel consonant words. As a result, she has not automatic way of attacking regularly appearing words. Even in context, she was unable to read the easiest passage....

Arithmetic: "J has good understanding of basic concepts and applications but she has a hard time with simple basic addition."

Emotional Functioning: "J is well aware of her struggle to achieve and seems most concerned about 'homework'." (Exh. 24 p. 4)

Summary: " J...has the readiness skills necessary for beginning reading. Despite her good intelligence, she has a weak short term auditory memory and has not acquired the basic decoding skills usually mastered in first grade." J is a candidate for daily, individual, intensive, (three hours a day), Lindamood Bell or Orton Gillingham remediation." (Exh. 24 p. 5)

*Parent's Exh H* - A letter from Michael Traister, MD (Pediatric & Adolescent Medicine) dated August 14, 2005 states in part:

"However, during First Grade, academic year 2004 -2005, J experienced great difficulty in learning to read.... I had previously referred J to Glen Kreielsheimer, PhD for a complete psycho-educational testing. It is quite apparent after this evaluation that J suffers from a learning disorder, DYSLEXIA. (315.02 developmental dyslexia)

THE DISTRICT'S CASE

*Alison Collins,* a regular education teacher at Todd Elementary School testified on behalf of the school district.

J was her student during the '04 – '05 school year. There were 20 or 21 students and Ms. Collins and an aide. (T. 670)

In the fall, J was always a very had working and motivated student. She exhibited some difficulties in blending words together. She knew some of the sounds and the letters but had trouble putting it together and saying the words completely. She seemed to have a difficult time with some of the reading. (T. 674) J was able to complete her work with help. She needed some support. (T. 675)

A Reading Assessment, Developmental Reading Assessment (DRA) and phonemic scoring sheet were done on the same day, September 24, 2004. (T. 680) The child does the writing themselves. The assessments are administered on each child individually. (T. 678) J tested on a pre-primer level. (T. 696) J had difficulty with level 3, it was instructional however she did not have fluency. (T. 697) J seemed to be struggling with reading. J tested with 83 percent accuracy. (T. 872) Ms. Collins believed J could definitely use some support based on the assessment and classroom observations. (T. 705) Ms. Collins contacted the parents but they were concerned about the amount of time out of the class and declined the reading support program. (T. 709)

12

J lacked confidence in some areas. It wasn't something Ms. Collins was concerned about. (T. 746) J was a bit quiet and shy but it did not prevent her from making friends or socializing in the class. (T. 747)

On October 13th, J was given a writing assessment. (T. 702) In January J showed growth in the areas of details and spelling. (T. 734)

In January '05 the Form A, Level P Informal Reading Inventory (IRI) was given. J frustrated on level one so Ms. Collins went to the next lower level, pre-primer. (T. 701) J frustrated on decoding. (T. 712)

Ms. Collins spoke with J's tutor about her progress and the work she was doing in class. (T. 714) The tutor used very similar methods to Ms. Collins. (T. 886)

J's writing got better in January. J was stronger in math than she was in reading. (T. 720) J had one or two reversals which is typical and she seemed to be meeting the expectations. (T. 721) There was no prompting on the assessment tests. (T. 854)

In June '05 J knew some of her math facts automatically but she still needed to use the number line. She knew her coins. (T. 723) The Committee's analysis of the DBQ in June '05 was that J was doing fine. (T. 730) In the June assessment J was on a first grade reading level. (T. 947)

J started the school year in a pre-primer level and she left, her DRA level was the first grade which was appropriate. She grew in the areas of writing, reading and spelling. (T. 737) J was having difficulty completing her work on time. (T. 752) J's weakness was handwriting. She had some difficulty with both letter and number formation. (T. 859) J's handwriting made some improvement over the year. (T. 904)

*Claudia Sullivan* testified on behalf of the district. Ms. Sullivan is a second grade special education teacher at the Todd Elementary School. (T. 787) Ms. Sullivan's master's degree was based on Orton-Gillingham. (T. 801)

Ms. Sullivan testified in last year's class the children were either learning disabled or speech and language impaired. (T. 789) In the class Ms. Sullivan has another certified teacher with her. (T. 790) Ms. Sullivan would have been J's teacher for language arts and math. (T. 796)

<u>Highlighted District's documents admitted into evidence:</u>

*District's Exh 5* - A letter from the parents to the district dated August 11, 2005. The letter states in part "Our object is to meet J's educational needs in an orderly manner. We will not be intimidated into a meeting because of its convenience..."

*District's Exh. 9* - A letter from the parents to the district dated August 2, 2005. The letter in part states that "We have received your IEP regarding our daughter J and have determined that it is inadequate in meeting her needs...J is also weak in basic mathematical functions...You will recall at our meeting on June 13, 2005 that our preference is to keep J at Todd School...Her progress in first grade was marginal...."

*District's Exh. 12* - On the Special Programs Progress Report J received the following scores in January: "usually" on listens effectively, follows directions, works independently, organizes self and materials and shows self confidence; "consistently" on works cooperatively in groups. J received the following scores in June: "consistently on listens effectively, follows directions, works independently, organizes self and materials and "usually" on shows self confidence.

*District's Exh 14* -  A letter dated June 21, 2005 from the parents to the district.  The parents *inter alia* state that included in the letter is a review by Carol Leeds Riven.  "She discusses J's learning disability as dyslexia, her progress over the year and recommendations regarding future programs."

*District's Exh 18* - Ms. Deborah Ciardully observed J on May 4, 2005 and wrote a report. Her report indicates "she appeared a bit fidgety…J did not participate in the group discussion."


## DISCUSSION

The Parent requests reimbursement for tuition for the 2005 – 2006 school year and compensatory education for '04 – '05.

A board of education may be required to pay for educational services obtained for a student by the student's parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (School Committee of the Town of Burlington v. Department of Education, Massachusetts, 471 U.S. 359 [1985]).

The first issue to be addressed is whether the parents were given the statutory notice of the CSE meeting of August 9th.

State regulation requires that a minimum of five days notice be given of a CSE meeting (8 NYCRR 200.5 [a][3]). (c) *Notice of meetings.*

(1) Whenever the committee on special education proposes to conduct a meeting related to the development or review of a student's IEP, or the provision of a free appropriate public education to the student, the parent must receive notification in writing at least five days prior to the meeting. The meeting notice may be provided to the parent less than five

days prior to the meeting to meet the timelines in accordance with Part 201 of this Title and in situations in which the parent and the school district agree to a meeting that will occur within five days. The parent may elect to receive the notice of meetings by an electronic mail (e-mail) communication if the school district makes such option available.

Mr. G testified that on August 1st a decision regarding the tuition at Windward had to be made. (T. 611) On August 2nd [Tuesday] the parents wrote to the district after receiving the IEP and in the letter state that the recommended program is inadequate in meeting J's needs and her progress in first grade was marginal. The parents specify a weakness in basic mathematical functions and state that J will be attending a private school.

Upon receipt of the letter, the district attempts to reconvene another CSE. Ms. Lavin's secretary called and Mrs. G who gave the date of August 9th. (T. 533) Mr. G testified that he believed his wife was asked to consent to an August 9th CSE date. (T. 600) Mrs. G testified she never received a telephone call prior to the August 9th date. (T. 642) Mr. G testified the family was going on vacation on August 14th. (T. 529, 534) The date the parents requested was after school started and any change to the IEP had to be made before the school year started. (T. 533) The parent testified he received the August 4 and August 5 letter on Friday, August 5, 2006. (T. 602) Therefore the parents received the notice four days prior to the CSE meeting.

The parent testified that he did not attend the August 9th CSE meeting because the reading tutor Carol Riven and Dr. Epstein were unavailable on that date. (T. 594) It is unclear why the parent needed a reading tutor to address math and why Dr. Epstein would participate in the August meeting but not in June meeting.

I find the parent's testimony regarding notice of the August 9th hearing to be confusing and not credible.

16

However, the notice was clearly not served within the statutory time period and therefore defective.

To meet its burden of showing that it had offered to provide a FAPE to a student, the board of education must show (a) that it complied with the procedural requirements set forth in the IDEA, and (b) that the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Bd. of Educ. v. Rowley, 458 U.S. 176, 206, 207 [1982]). Not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]). If a procedural violation has occurred, relief is warranted only if the violation affected the student's right to a FAPE (J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 [2d Cir. 2000]), e.g., resulted in the loss of educational opportunity (Evans v. Bd. of Educ., 930 F. Supp.83, 93-94 [S.D.N.Y. 1996]), seriously infringed on the parents' opportunity to participate in the IEP formulation process (see W.A. v. Pascarella, 153 F. Supp.2d 144, 153 [D. Conn. 2001]; Brier v. Fair Haven Grade Sch. Dist., 948 F. Supp. 1242, 1255 [D. Vt. 1996]), or compromised the development of an appropriate IEP in a way that deprived the student of educational benefits under that IEP (Arlington Cent. Sch. Dist. v. D. K., 2002 WL 31521158 [S.D.N.Y. Nov. 14, 2002]).

The District must provide a reasonable opportunity for parental participation in IEP meetings, but may conduct such meetings without parental participation if it is unable to convince a parent to attend and has made reasonable attempts to gain parental participation. 20 U.S.C. § 1414(d)(1)(B)(I); 34 C.F.R. § 300.345(d).

The procedural error of written notice four days prior to the meeting instead of five days when the parents had actual notice prior to five days did not compromise the

student's ability to receive FAPE. The August 9th IEP indicates that the parents were contacted by phone and declined to participate. (Parent's Exh. D)   The parent's testimony regarding the district's recommendation is implausible.  The parent states the IEP did not address all of J's weaknesses, the type of program was something different than what other outside professionals had recommended, there was no mathematical areas addressed in this particular IEP,  (T. 609)  J would be out for one and a half hours per day for services when she needed a much more intensive program but the overriding factors were the students that were in the special education class did not have the same learning disabilities that J had.  (T. 610)

The parent's claim of lack of participation of writing the goals and objectives during the June CSE meeting contradicts their own letter sent to the district dated June 21, 2006. (Parent's Exh. M)

The parent failed to establish that the Windward school is appropriate because there was not one document offered into evidence reflecting J's current program at the Windward school, including class size, classwork or evaluation.  No one from the Windward school testified.  Kathleen Kelly, the parent's educational evaluator observed J at Windward school one time for two hours and fifteen minutes. (T. T. 48, 53)  Ms. Kelly's testimony was inconclusive based on a two hour observation during an entire school year.  Her reports from J's teacher could not be challenged.  Although the parents testified as to J's progress, the parent testified that he compared J to her siblings and peers or other Brownies. (T. 574, 619)  The parents reliance on Dr. Epstein's evaluation is unsupported by the results of that evaluation.

During the hearing there was testimony suggesting that J with a dyslexic disability. The parents had an independent evaluation by a psychologist Dr. Sylvia H. Epstein. The results reported by Dr. Epstein on the Weschsler Intelligence Scale subtests in three areas are average, one superior range and one bright normal range. In Arithmetic: "J has good understanding of basic concepts and applications but she has a hard time with simple basic addition." Despite these test results, Dr. Epstein recommends " J...has the readiness skills necessary for beginning reading. Despite her good intelligence, she has a weak short term auditory memory and has not acquired the basic decoding skills usually mastered in first grade." J is a candidate for daily, individual, intensive, (three hours a day), Lindamood Bell or Orton Gillingham remediation. (id) Dr. Epstein's recommendation does not comport with the results of the evaluation.

Ms. McKeever, a Speech and Language Pathologist tested J in May 2005. On the CELF testing J scored in 9 subtest areas average; 4 subtest areas above average; 2 subtest areas high average. On the CTOPP testing J scored in 6 subtest areas average; 1 subtest area below average and 2 subtest areas low average. Overall Ms. McKeever found J as a child with average receptive and expressive language skills with a relative weakness, although still considered age appropriate, in auditory memory skills.

What is most puzzling is a letter from J's pediatrician Dr. Michael Traister dated August 14, 2005 referring to Glen Kreielsheimer, PhD who does a complete psycho-educational testing and from the testing Dr. Traister concludes J has dyslexia (315.02 developmental dyslexia). Dr. Traister never testified nor is there an evaluation from Dr. Kreielsheimer in evidence.

Carol Riven, J's reading tutor during the '04 – '05 school year did not testify however Parents Exh. N is a statement dated June 16, 2005 wherein Ms. Riven states "It takes a dyslexic child much longer to work independently; Jillian is working on an instructional level.  As a dyslexic youngster…." There has been no testimony or evidence Ms. Riven bases her conclusions that J is dyslexic submitted.

There is no evidence in the record nor testimony that J is dyslexic.  Both the parent and the district's evaluations do not reflect a below average student.

The district's recommendation for reading and arithmetic in a separate setting would address J's need appropriately.  It is unclear how restrictive the Windward's school environment since there was no testimony regarding class profiles, program or instruction.

The petitioner's request for compensatory education is unwarranted. Compensatory education is relief awarded under the IDEA to remedy past violations. *See Phil v. Mass. Dep't. of Educ.,* 9 F.3d 184, 188 (1st Cir.1993).

It is hereby ORDERED the parent's request for tuition reimbursement and compensatory education is denied.

Dated:  January 14, 2007

_____
MARY NOE ESQ.

20

Impartial Hearing Officer

**PLEASE TAKE NOTICE**

     Within 30 days of the receipt of this decision, the parent and/or Board of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.  Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

     Directions and forms for filing an appeal are included with this decision.

21

PARENT'S EXHIBIT

| | | |
|---|---|---|
| A | Demand for Due Process | 2 pages |
| B | IEP '05 –'06 | 6 |
| C | Letter 7/22/05 | 6 |
| D | K. Kelly Observation | 2 |
| E | Letter 12/21/05 | 1 |
| F | Notice 8/30/05 | 1 |
| G | Letter 8/18/05 | 2 |
| H | Letter 8/14/05 | 1 |
| I | Letter 8/11/05 | 1 |
| J | Notice 8/5/05 | 1 |
| K | Letter 8/4/05 | 1 |
| L | Letter 8/2/05 | 1 |
| M | Letter 6/21/05 | 2 |
| N | Observation by Riven | 1 |
| O | Letter 6/8/05 | 9 |
| P | Notice 6/7/05 | 1 |
| Q | Dr. Epstein's Psych. Eval | 6 |
| R | Work Product | 2 |
| S | K. Kelly's Resume | 1 |
| T | Invoice, check | 6 |
| U | Notes | |
| U1 | Phonological Awareness | 7 |
| V | Notes | |
| W | Assessments 1/05 | 3 |
| X | Assessments 6/9/05 | 4 |
| Y | CSE Procedure | |
| Z | *ID only* Notes | |
| AA | *ID only* | |

DISTRICT'S EXHIBITS

| | | |
|---|---|---|
| 1 | School calendar | 1 |
| 2 | Class profile | 12 |
| 3 | Withdrawn | |
| 4 | Letter 8/18/05 | 8 |
| 5 | Letter 8/11/05 | 2 |
| 6 | IEP 8/9/05 | 6 |
| 7 | Notice 8/5/05 | 1 |
| 8 | Letter 8/4/05 | 1 |
| 9 | Letter 8/2/05 | 2 |
| 10 | Notice 7/22/05 | 7 |
| 11 | Report | 1 |
| 12 | Progress Report | 1 |
| 13 | Report Card | 2 |

| 14 | Letter | 3 |
| 15 | Parent Member declined | 1 |
| 16 | Notice 6/7/05 | 2 |
| 17 | Notice 6/1/05 | 2 |
| 18 | Classroom Observation | 1 |
| 19 | Assessment 5/05 | 8 |
| 20 | Memo 3/18/05 | 1 |
| 21 | Consent 3/17/05 | 1 |
| 22 | Notice 3/17/05 | 3 |
| 23 | Letter 3/17/05 | 3 |
| 24 | Evaluation | 6 |
| 25 | Letter 12/14/04 | 1 |
| 26 | Physical Exam 10/29/04 | 1 |
| 27 | Letter 9/04 | 1 |
| 28 | | |
| 29 | | |
| 30 | Questions grade 1 | 6 |
| 31 | Reading Assessment 6/8/05 | 7 |
| 32 | Writing Assessment 6/7/05 | 2 |
| 33 | Reading List | 2 |
| 34 | Writing Assessment 1/11/05 | 1 |
| 35 | Writing Assessment 10/13/04 | 1 |
| 36 | Math Assessment 1/7/05 | 4 |
| 37 | DRA Assessment 9/24/04 | 1 |
| 38 | Score Sheet 9/24/04 | 1 |
| 39 | Reading Assessment 9/04 | 1 |
| 40 | Writing Rubric | 1 |
| 41 | Kindergarten Report card | 1 |
| 42 | Progress Report | 1 |
| 43 | Math Assessment 6/2/05 | 3 |