

# The University of the State of New York

### The State Education Department
State Review Officer

No. 07-017

Application of a CHILD WITH A DISABILITY, by her parents, for review of a determination of a hearing officer relating to the provision of educational services by the Board of Education of the Briarcliff Manor Union Free School District

**Appearances:**
Mayerson & Associates, attorney for petitioners, Gary S. Mayerson, Esq., of counsel

Kuntz, Spagnuolo, & Murphy, P.C., attorney for respondent, Leah L. Murphy, Esq., of counsel

### DECISION

Petitioners appeal from the decision of an impartial hearing officer which denied their request to be reimbursed for their daughter's tuition and transportation costs at the Windward School (Windward) for the 2005-06 school year. The appeal must be dismissed.

At the commencement of the impartial hearing on May 24, 2006, petitioners' daughter was seven years old and attending second grade at Windward where petitioners unilaterally placed their daughter on August 1, 2005 for the 2005-06 school year (see Tr. pp. 611-12). Windward has not been approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities (8 NYCRR 200.1[d], 200.7]). Petitioners' daughter reportedly has average receptive and expressive language skills with a relative weakness in auditory memory (Dist. Ex. 19 at p. 8; Parent Ex. O at p. 9). She demonstrates weaknesses in decoding (Tr. p. 306; Dist. Ex. 10 at p. 6) and spelling (Tr. pp. 727, 809) and requires a number line or other prompt to solve basic math facts (Tr. pp. 768-70, 945-46). The child is able to write independently but not always able to read back what she has written (Dist. Ex. 10 at p. 4). The child has difficulty with handwriting and letter formation (Tr. pp. 727, 774). She has difficulty completing her work on time and at times lacks self-confidence (Tr. pp. 750; Dist. Ex. 6 at p. 4; Parent Ex. B at p. 4). The child's private pediatrician reported that based on previous psychoeducational testing it was "quite apparent" that the child had "dyslexia"; however, the previous testing is not included in the record (Parent Ex. H). The child's eligibility for special education programs and classification as a student with a learning disability are not in dispute (see 8 NYCRR 200.1[zz][6]).

Petitioners' daughter was "screened" prior to the 2003-04 school year as part of respondent's process for all incoming kindergarten students (Tr. p. 432). No significant deficits or weaknesses were noted that would have led to the child being referred for special education services (Tr. pp. 433-35). In October 2003 the child was administered the Phonological Awareness Test as part of respondent's regular education kindergarten program (Tr. pp. 243-45). On the test protocol the examiner noted that the child had trouble identifying letter names and sounds (Tr. pp. 251-52; Parent Ex. U1). The child was referred to respondent's phonological awareness program, a kindergarten reading support program that addressed phonological awareness and prereading skills (Tr. pp. 245, 247-48, 350-51). Petitioners, however, declined to have their daughter participate in the program because they didn't want her pulled out of the regular classroom for a portion of the school day (Tr. pp. 351-52, 366). During the 2003-04 school year, the child received "building" level speech services 30 minutes a week to address articulation concerns (Dist. Ex. 42; see Tr. p. 434).

At the beginning of the 2004-05 school year, the child's first grade teacher conducted an assessment of the child's reading skills using the Developmental Reading Assessment (DRA) (Tr. pp. 678-79, 694). The child's instructional reading level was judged to be level 3, pre-primer (Tr. p. 696). The teacher reported that the child read word by word and her reading lacked fluency (Tr. p. 697). Based on additional assessment and observation the teacher reported that the child exhibited some difficulty in blending sounds, as well as difficulty with spelling and writing (Tr. pp. 674-75, 679-81). The teacher reported that the child needed to work on word spacing, handwriting and identifying vowel sounds, which was typical in the beginning of first grade (Tr. pp.680-81). The child's teacher concluded that the child could use some support in reading and that she was a "good candidate" for respondent's first grade reading support program (Tr. pp. 705-09). In or about September 2004 respondent's first grade teacher contacted petitioners to inform them that she thought the child might benefit from the reading support program (Tr. p. 708-09). At that time petitioners declined to have their daughter participate in the program, citing concerns about the amount of time the child would be out of the classroom (Tr. pp. 242, 708-09; see also Tr. pp. 321-24).

Petitioners sought the services of a private tutor and in September 2004 the child began receiving private reading instruction twice a week using an Orton-Gillingham program (Parent Ex. N; see Dist. Ex. 14 at p. 1). The tutor reported that the child had not mastered all her letter sounds, had little capability for blending and was not able to read sight words with consistent accuracy (Parent Ex. N). The child's classroom teacher maintained contact with her private tutor throughout the 2004-05 school year (Tr pp. 284, 714, 927-28).

Following a November 2004 parent-teacher conference, petitioners agreed to have their daughter participate in the first grade reading support program (Tr. pp. 296, 346-48). The program consisted of one daily 45-minute pull-out session of reading support in a group (Tr. pp. 257-58, 706). The child's classroom teacher reported that the child's reading skills were assessed in January 2005 using the Qualitative Reading Inventory (QRI) (Tr. pp. 296-97, 710-11). Administration of the QRI revealed that the child had difficulty decoding words and comprehending passages at the primer level (Tr. pp. 339, 711-712; Parent Ex. W). However, the child was able to read primer level sight words at the independent level (Tr. pp. 338-39; Parent Ex. W). The teacher reported that between September 2004 and January 2005 the child's writing

skills had improved and her ideas were a bit more elaborate (Tr. pp. 718, 734; Dist. Ex. 40). Although the child's spelling had improved (Tr. p. 734; Dist. Ex. 40), she continued to exhibit difficulty with spelling and letter formation (Tr. p. 718). The child was meeting grade level expectations in mathematics (Tr. pp. 720-21).

In February 2005 they sought a private psychological evaluation to assess the child's current level of functioning and intellectual potential (Dist. Ex. 24 at p. 2; Parent Ex. Q at p. 2). Administration of the Wechsler Intelligence Scale for Children - Fourth Edition (WISC-IV) yielded the following composite (and percentile) scores: verbal comprehension 106 (66th), perceptual reasoning 108 (70th), working memory 107 (68th), processing speed 126 (96th), and full scale IQ score of 114 (82nd) (id.). The child's test scores were in the average to superior range of intellectual functioning (id.). The Wide Range Achievement Test - Revised (WRAT-R) was administered to the child to measure her academic achievement skills (Dist. Ex. 24 at p. 3; Parent Ex. Q at p. 3). The child achieved standard (and percentile) scores of 94 (34th) for reading, 101 (53rd) for spelling and 108 (70th) for arithmetic (id.). The private psychologist reported that as measured by the WRAT-R and Gallistel Ellis Test of Coding Skills, the child's performance on measures of structural analysis indicated that she lacked mastery of the easiest consonant vowel consonant words and as a result had no automatic way of attacking regularly appearing words (Dist. Ex. 24 at p. 5, Parent Ex. Q at p. 5).

According to the private psychologist, petitioners' daughter was unable to reproduce the Bender Gestalt designs in a satisfactory manner, but her recall of five out of nine was "good" (Dist. Ex. 24 at p. 4; Parent Ex. Q at p. 4). The child struggled with impulsivity, integration of the figures and angularization (id.) The private psychologist also noted that the results of the Boston Naming Test precluded word finding difficulties, but the child struggled to express herself and searched for words in general conversation (id.). In addition, the child had difficulty repeating sentences and word sequences (Dist. Ex. 24 at pp. 2, 3). Assessment of the child's math skills using the Key Math test yielded percentile (and grade equivalent) scores of 79 (2.1) for basic concepts, 79 (1.1) for operations, and 55 (1.9) for applications (id.). The private psychologist reported that petitioners' daughter had a "good understanding" of basic mathematical concepts and applications, but that she had a "hard time" with simple basic addition (Dist. Ex. 24 at p. 5; Parent Ex. Q at p. 5). The private psychologist indicated that despite the child's intelligence, she had a weak short-term auditory memory and had not acquired the basic decoding skills usually mastered in first grade and he offered diagnoses of "reading disorder" and "disorder of written language" (Dist. Ex. 24 at p. 6; Parent Ex. Q at p. 6). The psychologist opined that the child needed to be taught to read and write using a rule-based, sequenced, structured, linguistic phonetic, multisyllabic approach (id.). In addition, the private psychologist opined "that the child [was] a candidate for daily, individual, intensive, (three hours a day), Lindamood Bell or Orton[-]Gillingham remediation" (id.).

By letter dated March 17, 2005, petitioners referred their daughter to respondent's committee on special education (CSE) for an initial evaluation (Dist. Ex. 23). An observation of petitioners' daughter was conducted on May 4, 2005 (Dist. Ex. 18). During the observation the child was noted to have difficulty copying words correctly to her paper and required the teacher's assistance to complete her work (id.).

That same month respondent's speech-language pathologist conducted a speech and language assessment of the child (Dist. Ex. 19 at p. 1; Parent Ex. O at p. 2). Respondent's speech-language pathologist administered the Clinical Evaluation of Language Fundamentals - Fourth Edition (CELF-IV) and the Comprehensive Test of Phonological Processing (CTOPP) (id.). Results on the CELF-IV included standard (and percentile) scores of 106 (66th) in the Core Language Index, 113 (81st) in the Receptive Language Index, 101 (53rd) in the Expressive Language Index, 119 (90th) in the Language Content Index, 103 (58th) in the Language Structure Index, and 100 (50th) in the Working Memory Index (Dist. Ex. 19 at pp. 2-3; Parent Ex. O at pp. 3-4). Administration of the CTOPP yielded the following composite (and percentile) scores: phonological awareness 100 (50th), phonological memory 91 (27th) and rapid naming 91 (27th). The speech-language pathologist characterized the child's performance on tasks of phonological memory as "weak" and noted a deficit in this area could affect both listening and reading comprehension for complex sentences (Dist. Ex. 19 at p. 6). The speech-language pathologist also identified rapid naming as an area of relative weakness for the student (Dist. Ex. 19 at pp. 7, 8). The therapist noted that the efficient retrieval of phonological information was necessary to decode unfamiliar words and therefore affected reading fluency (Dist. Ex. 19 at pp. 6, 7-8; Parent Ex. O at pp. 7, 8-9). Respondent's speech-language pathologist concluded that the child's cumulative scores in the areas of general receptive and expressive language skills were in the average range, with testing revealing a relative weakness in short-term auditory memory (Dist. Ex. 19 at p. 7; Parent Ex. O at p. 8). She recommended that information be presented to the child in smaller units, repeated and rephrased as necessary, and that the child be provided with multimodal methods of teaching reading instruction (Dist. Ex. 19 at p. 8; Parent Ex. O at p. 9).

Respondent's CSE, by letter dated June 7, 2005, scheduled an initial CSE meeting for petitioners' daughter on June 13, 2005 (Parent Ex. P). According to CSE meeting minutes, the reading support teacher reported that the child had made "tremendous progress" since January and that she was internalizing and applying strategies being taught (Dist. Ex. 10 at p. 6; Parent Ex. C at p. 5). The child's classroom teacher indicated that the child had difficulty with decoding, could write independently but not always read back what she had written, and needed to become more independent (id.). The CSE recommended that petitioners' daughter be classified as a student with a learning disability and that she attend second grade in a general education program at its elementary school with a 12:1 special class in English/language arts for an hour and a half per day during the 2005-06 school year (Dist. Ex. 10 at pp. 3-4; Parent Ex. C at pp. 2-3). The June 13, 2005 individualized education program (IEP) indicated that the child should be taught using a program with a multimodal approach throughout the day with new information "chunked" into smaller components (Dist. Ex. 10 at p. 3; Parent Ex. C at p. 2).

The child's classroom teacher reported that by the end of the 2004-05 school year the child's DRA level was at the first grade level, which was appropriate (Tr. pp. 737, 947-48; Parent Ex. X). The teacher described the child's writing as more creative and reported that over the course of the school year the child's spacing and ability to correctly spell sight words in writing had improved (Tr. pp. 726-27). She noted that the child continued to need some assistance with the formation of letters and some spelling (Tr. p. 727). According to the teacher the child had a "good handle" on place value, could identify coins and was able to tell time (Tr. p. 723). The

child knew some of her math facts automatically; however, still needed to use a number line (Tr. p. 723).

By letter dated June 16, 2005, the private special educator, who had been providing private reading instruction to the child since September 2004, stated that petitioners' daughter had "made strides" in learning phonograms; however, as her classroom teacher had pointed out, she was the only child in her class who could not do her seatwork independently (Parent Ex. N). The private special educator opined that petitioners' daughter should "be given the benefit of reading instruction utilizing a sequential Orton-Gillingham program" (id.).

By letter dated August 2, 2005 to respondent's director of pupil personnel services, petitioners advised that they disagreed with their daughter's June 13, 2005 IEP and were withdrawing the child from the school district (Dist. Ex. 9 at p. 1; see Dist. Ex. 10 at pp. 3-7; Parent Ex. C at pp. 2-6). Petitioners' letter stated that the IEP neither recommend Lindamood-Bell or Orton-Gillingham instruction nor sufficiently rigorous English/language arts instruction to address their daughter's reading needs (Dist. Ex. 9 at p. 1). They also asserted that the IEP did not address their daughter's needs in basic mathematical functions (id.). The letter also advised that petitioners intended to re-enroll their child in respondent's school district at the earliest opportunity possible (id.).

For the purpose of discussing petitioners' concerns about the proposed IEP, an assistant to respondent's director of pupil personnel services called petitioners on August 3, 2005 and left a voice message suggesting possible dates for reconvening a CSE meeting (Tr. pp. 172-75, 178, 416; see Dist. Ex. 8). The director of pupil personnel services called petitioners the following day, August 4, 2005, and spoke with the child's father. During that telephone conversation, the parties agreed that both petitioners and respondent would be available on either Tuesday or Wednesday the following week for a CSE meeting (Tr. p. 179-80; see Parent Ex. V at p. 1). Respondent's director of pupil personnel services, by letter dated August 4, 2005, advised petitioners that she tentatively arranged for a CSE meeting to be conducted on Tuesday, August 9, 2005 (Dist. Ex. 8). By letter dated August 5, 2005, respondent advised petitioners of the time that the August 9, 2005 CSE would take place (Dist. Ex. 7). Respondent's director of pupil personnel services spoke to the child's father again on August 8, 2005 (Tr. p. 182). During this telephone conversation, the child's father requested an adjournment of the CSE meeting until sometime in September, indicating that he wanted the child's private tutor to participate, that the private tutor was not available until late in August, and that family was going on vacation on August 14, 2005 (Tr. p. 181-82). The father further noted that because petitioners' daughter was not going to attend respondent's recommended placement he did not "see any sense of being there" (Tr. p. 182-83, 414-16; Parent Ex. V at p. 2). According to respondent's director of pupil personnel services, during this conversation she advised the child's father that respondent was prepared to meet on August 9, 2005 having made arrangements for the special education teacher to return from Cape Cod, that the child's private tutor and petitioners could participate by telephone, that respondent was interested in revising the IEP to provide additional services to address petitioners' concerns, that respondent was required to have a revised IEP completed before the start of the school year, and that respondent was willing to convene two CSE meetings, one on August 9, 2005 and the other in September 2005, if necessary (Tr. pp. 181-82, 195-96, 414-18; 492-93, 534). Respondent's director of pupil personnel services also advised

that the child's private tutor and her first grade teacher at respondent's school were in constant communication and that they were on the "same page" regarding the child's program (Tr. p. 183; Parent Ex. V at p. 2).

Respondent's CSE reconvened on August 9, 2005 to address petitioners' concerns with their daughter's June 13, 2005 IEP (Dist. Ex. 6 at p. 4; Parent Ex. B at p. 4). The August 9, 2005 CSE attendance notes indicate that petitioners were contacted by telephone, but declined to participate at the August 9, 2005 CSE meeting (Dist. Ex. 6 at p. 4; Parent Ex. B at p. 4; see Parent Ex. V at p. 2). The child's father also conveyed over the telephone that he wanted the private psychologist that evaluated the child to be present for the CSE meeting (Tr. p. 417).

The August 9, 2005 CSE meeting continued in the absence of the child's parents. For the 2005-06 school year, respondent's CSE recommended that petitioners' daughter remain classified as a student with a learning disability (Dist. Ex. 6 at p. 1; Parent Ex. B at p. 1). The CSE recommended that she attend second grade in a general education program at its elementary school with a 15:1 special class in English/language arts for two hours per day (Dist. Ex. 6 at p. 1; Parent Ex. B at p. 1), which was half an hour more than what had been recommended by the CSE at its June 13, 2005 CSE meeting (see Dist. Ex. 10 at p. 3; Parent Ex. C at p. 2). The CSE additionally recommended that petitioners' daughter attend a 15:1 special class in math for an hour per day (Dist. Ex. 6 at p. 1; Parent Ex. B at p. 1). The August 9, 2005 IEP noted that the child should receive instruction in an educational program that used a multimodal approach with new information "chunked" into smaller components and that there should be immediate positive reinforcement throughout the day (id.).

By letter dated August 11, 2005, petitioners informed respondent that they would be seeking an award of tuition reimbursement for the 2005-06 school year (Dist. Ex. 5 at p. 1; Parent Ex. I).

By due process complaint notice dated December 7, 2005, petitioners requested an impartial hearing for the purpose of, among other things, obtaining tuition reimbursement at Windward for the 2005-06 school year and compensatory education (Parent Ex. A). Petitioners contended, among other things, that respondent improperly convened a CSE meeting without parental participation and that respondent's recommended educational program failed to "adequately and meaningfully" address their daughter's educational needs (Parent Ex. A at p. 2). The impartial hearing commenced on May 24, 2006 and concluded on November 1, 2006, after six days of testimony. The impartial hearing officer rendered a decision on January 14, 2007.

The impartial hearing officer determined that respondent's CSE failed to notify petitioners at least five days prior to the August 9, 2005 CSE meeting of its intent to review their daughter's program and placement (IHO Decision at pp. 16-17; see 8 NYCRR 200.5[c]). However, the impartial hearing officer concluded that this error did not deny the child a free appropriate public education (FAPE)[1] (IHO Decision at pp. 17-18). She found that the child's

---

[1] The term "free appropriate public education" means special education and related services that -
    (A) have been provided at public expense, under public supervision and direction, and without charge;
    (B) meet the standards of the State educational agency;
    (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and
    (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

6

father's testimony regarding notice of the August 9, 2005 CSE meeting not credible (IHO Decision at p. 16). She declined to conclude that petitioners lack of attendance at the August 9, 2005 CSE meeting denied the child a FAPE. She also found petitioners' claim that they were denied effective participation in writing the goals and objectives during the June 13, 2005 CSE meeting to be unpersuasive (IHO Decision at p. 18). Substantively, the impartial hearing officer found that respondent's recommended educational program for the 2005-06 school year was reasonably calculated to enable the child to receive educational benefit by appropriately addressing her needs in reading and arithmetic (IHO Decision at p. 20). The impartial hearing officer also concluded that petitioners failed to demonstrate that Windward was an appropriate placement for the 2005-06 school year (IHO Decision at p. 18). The impartial hearing officer did not make a determination regarding whether equitable considerations supported petitioners' request for reimbursement. In addition, the impartial hearing officer denied petitioners' claim for compensatory education (IHO Decision at p. 20).

Petitioners contend on appeal that the impartial hearing officer erred in concluding both that respondent offered the child a FAPE for the 2005-06 school year and that petitioners failed to demonstrate that Windward was an appropriate placement for the 2005-06 school year. Petitioners assert that respondent failed to offer a FAPE to their daughter for the 2005-06 school year, that Windward was an appropriate placement for the 2005-06 school year, that equitable considerations support a claim for tuition reimbursement, and they request reimbursement for their daughter's tuition and transportation costs at Windward for the 2005-06 school year.

First, I note that petitioners do not appeal from the part of the impartial hearing officer's decision which denied their request for compensatory education (see IHO Decision at p. 20). An impartial hearing officer's decision is final and binding upon the parties unless appealed to the State Review Officer (34 C.F.R. § 300.510[a]; 8 NYCRR 200.5[k]). Consequently, this part of the decision is final and binding (Application of a Child with a Disability, Appeal No. 06-094; Application of a Child Suspected of Having a Disability, Appeal No. 06-092; Application of a Child with a Disability, Appeal No. 06-085; Application of a Child with a Disability, Appeal No. 04-024; Application of a Child with a Disability, Appeal No. 03-108; Application of a Child with a Disability, Appeal No. 02-100; Application of a Child with a Disability, Appeal No. 02-073).

The central purpose of the Individuals with Disabilities Education Improvement Act (IDEA) (20 U.S.C. §§ 1400-1482)[2] is to ensure that students with disabilities have available to them a FAPE (20 U.S.C. § 1400[d][1][A]; see Schaffer v. Weast, 126 S. Ct. 528, 531 [2005]; Bd. of Educ. v. Rowley, 458 U.S. 176, 179-81, 200-01 [1982]; Frank G. v. Bd. of Educ., 459 F.3d 356, 371 [2d Cir. 2006]). A FAPE includes special education and related services designed to meet the student's unique needs, provided in conformity with a comprehensive written IEP (20

---

(20 U.S.C. § 1401[9]).

[2] On December 3, 2004, Congress amended the IDEA; however, the amendments did not take effect until July 1, 2005 (see Individuals with Disabilities Education Improvement Act of 2004 (IDEA 2004), Pub. L. No. 108-446, 118 Stat. 2647). As the relevant events in the instant appeal took place after the effective date of the 2004 amendments, the provisions of the IDEA 2004 apply and the citations contained in this decision are to the amended statute.

U.S.C. § 1401[9][D]; 34 C.F.R. § 300.17; see 20 U.S.C. § 1414[d]; 34 C.F.R. § 300.22).[3] The federal and state statutes and regulations concerning the education of children with disabilities provide for a collaborative process between parents and school districts in planning and providing appropriate special education services (see Schaffer, 126 S. Ct. at 532; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192-93 [2d Cir. 2005]).

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359 [1985]; Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Cerra, 427 F.3d at 192). In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (Burlington, 471 U.S. at 370-71). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP" (id. at pp. 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 C.F.R. § 300.148).

Pursuant to the IDEA, reimbursement for parental private school placement may be reduced if parents do not provide notice of the unilateral placement at the most recent CSE meeting prior to their removal of the child from public school, or by written notice ten business days before such removal (see 20 U.S.C. § 1412[a][10][C][iii][I]). Under this statutory provision, a reduction or denial in tuition reimbursement is discretionary (Application of the Bd. of Educ., Appeal No. 03-062; Application of a Child with a Disability, Appeal No. 01-054; Application of a Child with a Disability, Appeal No. 00-027); however, at least one circuit court of appeals has denied tuition reimbursement for lack of prior notice, noting that the provision "serves the important purpose of giving the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a free appropriate public education can be provided in the public schools" (Greenland Sch. Dist. v. Amy N., 358 F.3d 150, 160 [1st Cir. 2004]; see also Ms. M. v. Portland Sch. Committee, 360 F.3d 267 [1st Cir. 2004]).

The first step in reviewing a tuition reimbursement case is to determine whether the district offered to provide a FAPE to the student (see Mrs. C. v. Voluntown, 226 F.3d 60, 66 [2d Cir. 2000]). A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; Cerra, 427 F.3d at 192). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate

---

[3] The Code of Federal Regulations (34 C.F.R. Parts 300 and 301) has been amended to implement changes made to the Individuals with Disabilities Education Act, as amended by the Individuals with Disabilities Education Improvement Act of 2004. The amended regulations became effective October 13, 2006. In this case, none of the new provisions contained in the amended regulations are applicable because all the relevant events occurred prior to the effective date of the new regulations. However, for convenience, citations herein refer to the regulations as amended because the regulations have been reorganized and renumbered.

under the IDEA (<u>Grim v. Rhinebeck Cent. Sch. Dist.</u>, 346 F.3d 377, 381 [2d Cir. 2003]; <u>Perricelli v. Carmel Cent. Sch. Dist.</u>, 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]). If a procedural violation has occurred, relief is warranted only if the violation affected the student's right to a FAPE (<u>J.D. v. Pawlet Sch. Dist.</u>, 224 F.3d 60, 69 [2d Cir. 2000]). The IDEA directs that, in general, a decision by an impartial hearing officer shall be made on substantive grounds based on a determination of whether or not the child received a FAPE (20 U.S.C. § 1415[f][3][E][i]). Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a child did not receive a FAPE only if the procedural inadequacies (a) impeded the child's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE to the child, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; <u>see</u> 34 C.F.R. § 300.513[a][2]; <u>Matrejek v. Brewster Cent. School Dist.</u>, 2007 WL 210093, at *2 [S.D.N.Y. Jan. 9, 2007]). Also, an impartial hearing officer is not precluded from ordering a school district to comply with IDEA procedural requirements (20 U.S.C. § 1415[f][3][E][iii]).

The IDEA sets forth procedural safeguards that include providing parents an opportunity "to participate in meetings with respect to the identification, evaluation, and educational placement of the child" (20 U.S.C. § 1415[b][1]). Federal and state regulations governing parental participation require that school districts take steps to ensure that parents are present at their child's IEP meetings or are afforded the opportunity to participate (34 C.F.R. § 300.322; 8 NYCRR 200.5[d]; <u>see</u> <u>Mr. & Mrs. M v. Ridgefield Bd. of Educ.</u>, 2007 WL 987483 (D.Conn. Mar. 30, 2007). In deciding whether parents were afforded an opportunity to participate in the development of their child's IEP, courts have considered the extent of the participation (<u>Cerra</u>, 427 F.3d at 193 [finding meaningful parental participation when the student's mother attended numerous CSE meetings and a CSE meeting transcript reflected that she "participated actively" in the development of her daughter's IEP and was "frequently consulted for input about the CSE's proposed plan"]).

By definition, the IEP must be a written statement (20 U.S.C. § 1414[d][1][A][i]), and must be in effect at the beginning of each school year (20 U.S.C. § 1414[d][2][A]; <u>see</u> <u>also</u> 34 C.F.R. § 300.342[a]; <u>Cerra</u>, 427 F.3d at 194 [". . . the District fulfilled its legal obligations by providing the IEP before the first day of school."]). A district's failure to provide a child's parents with a timely IEP may afford a basis for concluding that the district did not offer an appropriate placement to the child (<u>Application of the Dept. of Educ.</u>, Appeal No. 06-057; <u>Application of a Child with a Disability</u>, Appeal No. 06-030; <u>Applications of the Board of Educ. and a Child with a Disability</u>, Appeal Nos. 00-091 and 01-018; <u>Application of a Child with a Disability</u>, Appeal No. 99-81).

The Second Circuit has determined that "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression'" and if the IEP affords the student with an opportunity greater than mere "trivial advancement" (<u>Cerra</u>, 427 F.3d at 195, quoting <u>Walczak v. Florida Union Free Sch. Dist.</u>, 142 F.3d 119, 130 [2d Cir. 1998]), in other words, is likely to provide some "meaningful" benefit (<u>Mrs. B. v. Milford Bd. of Educ.</u>, 103 F.3d 1114, 1120 [2d Cir. 1997]). The IDEA, however, does not require school districts to develop IEPs that maximize the potential of a student with a disability (<u>Rowley</u>, 458 U.S. at 197 n.21, 199; <u>see</u> <u>Grim</u>, 346 F.3d at 379; <u>Walczak</u>, 142 F.3d at

132). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. §§ 300.114, 300.116; 8 NYCRR 200.6[a][1]). The burden of persuasion in an administrative hearing challenging an IEP is on the party seeking relief (see Schaffer, 126 S. Ct. at 537 [finding it improper under the IDEA to assume that every IEP is invalid until the school district demonstrates that it is not]).

I will first address the procedural claims raised with respect to the August 9, 2005 CSE meeting. The impartial hearing officer determined that respondent's CSE did not provide written notice to petitioners, at least five days prior to the August 9, 2005 CSE meeting, of its intent to review their daughter's program and placement (IHO Decision at pp. 16-17; see 8 NYCRR 200.5[c]). The impartial hearing officer concluded that petitioners did not receive five days written notice, but that this error did not constitute a denial of the child's right to a FAPE (IHO Decision at pp. 17-18). I agree. Under the circumstances here, where the parties initially agreed by telephone on August 4, 2005 that August 9, 2005 was an agreeable date and discussed the purpose of the CSE meeting, and written notice was sent August 4, 2005, I find the delay in providing written notice of the CSE meeting to be de minimus error which did not deny the child a FAPE (20 U.S.C. § 1415[f][3][E][ii]; see 34 C.F.R. § 300.513[a][2]).

Petitioners contend that they were deprived of their right to meaningfully participate at the August 9, 2005 CSE meeting because the meeting took place without petitioners being present. If parents are unable to be physically present at a meeting, the district must use other methods to ensure their participation, such as telephone or video conference calls (34 C.F.R. § 300.322[c]; 8 NYCRR 200.5[d][1][iii]). A school district may only conduct a meeting without the parents' participation if it is unable to convince the parents that they should attend; in which case the district must have a detailed record of its various attempts to arrange a mutually agreed upon time and place for the meeting (34 C.F.R. § 300.322[d]; 8 NYCRR 200.5[d][3], [4]; see Application of a Child with a Disability, Appeal No. 03-082).

Given the totality of the circumstances presented in this case involving the formulation of an educational program for the child's 2005-06 school year, I concur with the impartial hearing officer and conclude that respondent's did not deny petitioners' child a FAPE by convening the August 9, 2005 CSE meeting in the absence of the child's parents. First, I note that the June 13, 2005 IEP formed the basis of the August 9, 2005 IEP and that petitioners effectively participated in the June 13, 2005 CSE meeting in which their child was determined eligible for special education services and a program for the 2005-06 school year was formulated (Parent Ex. M). The record reflects that not only did petitioners participate in the June 13, 2005 CSE meeting, but that their concerns which were raised were addressed. For example, the record shows that initially the June 13, 2005 CSE members determined that the child was ineligible for special education services, but at the urging of petitioners the members reconsidered and acquiesced to petitioners' request for a determination of eligibility for special education services (Parent Ex. M at pp. 1-2). In addition, upon learning of petitioners' discontentment with the IEP formulated as a result of the June 13, 2005 CSE meeting, and upon learning of petitioners' intent to make a unilateral private placement, respondent appropriately scheduled another CSE meeting for the purpose of addressing petitioners' additional concerns prior to the removal of the child from the public school (see Greenland, 358 F.3d at 160). Respondent contacted petitioners by telephone and arranged a mutually agreed upon time and place for the CSE meeting. Upon learning of

petitioners' subsequent request for an adjournment, in part because of an unavailability of the parents' experts to attend the meeting, respondent offered to make arrangements to allow petitioners and their experts to participate by telephone. Petitioners declined the offer. Petitioners also declined respondent's offer to convene two CSE meeting, one in August 2005 and one in September 2005 for the purpose of facilitating petitioners' concern regarding meeting attendance. Respondent also notified petitioners prior to the August 9, 2005 CSE meeting that the child's IEP would be revised consistent with petitioners' request for additional math instruction and their request for increased reading instruction. In addition, respondent spoke with the child's father by telephone as the August 9, 2005 CSE meeting was convening in an attempt to secure parental participation; however, the child's father declined to participate. Significantly, as discussed above, the record also reflects that petitioners declined participation in the August 9, 2005 CSE meeting because in their view the anticipated private placement obviated the need for a CSE meeting.

The August 9, 2005 CSE meeting did take place and resulted in the formulation of an IEP that implemented parent concerns expressed at the June 13, 2005 CSE meeting and additional concerns expressed subsequent to the June 13, 2005 CSE meeting. Under the circumstances, particularly given the parties' interest in revising the June 13, 2005 IEP, the need to have the revised IEP in place prior to the 2005-06 school year, the parents availability on August 9, 2005 and their unavailability for an extended time thereafter, I do not find that respondent acted inappropriately in declining the adjournment request. I find under the circumstances presented herein that the convening of the August 9, 2005 CSE meeting in the absence of parent attendance did not impede the child's right to a FAPE, did not significantly impede petitioners' opportunity to participate in the decision making process regarding the provision of a FAPE to their daughter, and did not cause a deprivation of educational benefits (see 20 U.S.C. § 1415[f][3][E][ii]; see also 34 C.F.R. § 300.513[a][2]). [4]

Petitioners also contend that the respondent failed to substantively offer a FAPE to their daughter for the 2005-06 school year. I concur with the impartial hearing officer that respondent offered the child an appropriate program for the 2005-06 school year (see IHO Decision at p. 20). An appropriate educational program begins with an IEP which accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs, and provides for the use of appropriate special education services (Application of the Bd. of Educ., Appeal No. 06-076; Application of a Child with a Disability, Appeal No. 06-059; Application of the Bd. of Educ., Appeal No. 06-029; Application of a Child with a Disability,

---

[4] The case presented herein is factually distinguishable from a recent United States District Court of Connecticut case where the District Court concluded that the school district impermissibly conducted a CSE meeting in the parent's absence after the district's failure to respond to a parent's request for an alternative meeting date (Mr. & Mrs. M v. Ridgefield Bd. of Educ., 2007 WL 987483 at * 6 [D.Conn., Mar. 30, 2007]). The following facts present in the instant case were not present before the Court in Ridgefield: 1) the parents indicated that there was no need for a subsequent CSE meeting given the upcoming private placement, 2) the school district established a meeting date based upon an initial agreement with the parents, 3) the scheduled CSE meeting which formulated the final IEP for an upcoming school year was a continuation of a prior CSE meeting in which the parents participated, 4) the availability of meeting dates was limited due to parent vacation plans, parent's expert's vacation plans, and the need to have a finalized IEP in the fast approaching upcoming school year, 5) the second CSE meeting was scheduled for the specific purpose of revising an IEP to incorporate specific requests put forth by the parents, 6) the school district offered an alternate September CSE date in addition to the August date, and 7) the parents were actually available for the August 9, 2005 CSE meeting.

Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9).

The private psychologist who evaluated the child in February 2005 indicated that although the child's test scores were in the average to superior range of intellectual functioning (Dist. Ex. 24 at p. 2; Parent Ex. Q at p. 2), she had a weak short-term auditory memory and had not acquired the basic decoding skills usually mastered in first grade (Dist. Ex. 24 at p. 6; Parent Ex. Q at p. 6). The private psychologist opined that petitioners' daughter had a "good understanding" of basic mathematical concepts and applications, but that she had a "hard time" with simple basic addition (Dist. Ex. 24 at p. 5; Parent Ex. Q at p. 5). By the end of the 2004-05 school year the child's instructional reading level, as measured by the DRA, was at the first grade level (Tr. p. 737; see also Tr. pp. 343, 947-48; Parent Ex. X). The child continued to demonstrate some difficulty with decoding (Tr. p. 306; Dist. Ex. 10 at p. 6) and also with spelling (Tr. pp. 727, 809). According to the classroom teacher, the child continued to need assistance with the formation of letters and help with handwriting skills (Tr. pp. 727, 774). The child's ability to solve basic equations involving addition and subtraction was inconsistent (Tr. pp. 768-70; Dist. Ex. 43); however, given a number line or something to prompt her, the child was able add and subtract math facts up to twelve (Tr. pp. 945-46). The child had difficulty completing her work on time (Tr. p. 750). With regard to social-emotional functioning, the child's teacher reported that the child was shy, but happy and willing to participate (Tr. p. 924). She acknowledged that the child lacked confidence at the beginning of the year but indicated by the end of the year it was not a problem (Tr. pp. 746-47, 925-26).

As noted above, petitioners rejected their daughter's June 13, 2005 IEP and indicated that the IEP did not contain Lindamood-Bell or Orton-Gillingham instruction to address their daughter's reading needs as recommended by petitioners' private evaluators (Dist. Ex. 9 at p. 1). Respondent's CSE reconvened on August 9, 2005 to address petitioners concerns with their daughter's June 13, 2005 IEP (Dist. Ex. 6 at p. 4; Parent Ex. B at p. 4). The August 9, 2005 IEP indicated that information needed to be presented to the child in small units and repeated and rephrased if necessary (Dist. Ex. 6 at p. 2; Parent Ex. B at p. 2) and that the English/language arts and math program should be taught using a multimodal approach with new information "chunked" into smaller components (Dist. Ex. 6 at p. 1; Parent Ex. B at p. 1). In addition, the August 9, 2005 IEP noted that verbal directions should be paired with verbal cues when possible (Dist. Ex. 6 at p. 3; Parent Ex. B at p. 3). The August 9, 2005 CSE recommended annual goals with objectives in the areas of reading for word recognition, decoding skills, and comprehension skills necessary to read and understand information (Dist. Ex. 6 at pp. 4-6; Parent Ex. B at pp. 4-6). This is consistent with the evaluative data that was available to the August 9, 2005 CSE (see Dist. Ex. 24 at p. 6; Parent Ex. Q at p. 6; see also Dist. Ex. 19 at p. 8; Parent Ex. O at p. 9). For the 2005-06 school year, respondent's CSE recommended that petitioners' daughter attend second grade in a general education program at its elementary school with a 15:1 special class in English/language arts for two hours per day (Dist. Ex. 6 at p. 1; Parent Ex. B at p. 1). This was half an hour more than what was recommended by the CSE at its June 13, 2005 CSE meeting (Dist. Ex. 10 at p. 3; Parent Ex. C at p. 2). The August 9, 2005 IEP indicated that the recommended second grade special education teacher had intensive training in Lindamood-Bell and Orton-Gillingham instruction (Dist. Ex. 6 at p. 4; Parent Ex. B at p. 4; see Tr. pp. 376-77).

Respondent's recommended second grade special education teacher (see Tr. p. 376) testified that she would have been the child's English/language arts and math special education teacher for the 2005-06 school year (Tr. p. 796). The recommended second grade special education teacher further testified that when the child entered her class she would have administered her own assessment to determine whether the child had mastered letters and sounds and whether she recognized words that began with those sounds (Tr. pp. 797-98). The recommended second grade special education teacher testified that her master's degree was "based" upon the Orton-Gillingham method (Tr. p. 801) and that she was certified in Lindamood-Bell (Tr. p. 819-20. Respondent's recommended second grade special education teacher testified that she used an "Orton-Gillingham approach" to reading in her class because it was structured and systematic and there would be immediate feedback and gratification (Tr. pp. 800-01). She further noted that the approach included components related to reading, writing, spelling and handwriting (Tr. p. 802).

Petitioners also rejected their daughter's June 13, 2005 IEP by indicating that the IEP did not address their daughter's needs in basic mathematical functions (Dist. Ex. 9 at p. 1). Respondent's CSE reconvened on August 9, 2005 to address this concern (Dist. Ex. 6 at p. 4; Parent Ex. B at p. 4). I agree with the impartial hearing officer that the special education program proposed in the August 9, 2005 IEP addressed the child's arithmetic needs (see IHO Decision at p. 20). The August 9, 2005 IEP indicated that the child had difficulty with remembering addition and subtraction concepts and utilizing vocabulary in math word problems (Dist. Ex. 6 at p. 2; Parent Ex. B at p. 2) and that she needed strategies to remember addition and subtraction concepts (Dist. Ex. 6 at p. 3; Parent Ex. B at p. 3). The August 9, 2005 CSE recommended an annual goal for mathematics and the child's IEP included objectives related to learning addition facts, understanding subtraction and time concepts and understanding computational and problem solving vocabulary (Dist. Ex. 6 at pp. 5-6; Parent Ex. B at pp. 5-6). This is consistent with the evaluative data that was available to the August 9, 2005 CSE (see Dist. Ex. 24 at p. 5; Parent Ex. Q at p. 5). For the 2005-06 school year, respondent's CSE recommended that petitioners' daughter attend a 15:1 special class in math for an hour per day (Dist. Ex. 6 at p. 1; Parent Ex. B at p. 1). Respondent's recommended second grade special education teacher (see Tr. p. 796) testified that her recommended math class used the same curriculum as the regular education program, but suggested she employed more manipulatives and hands on activities (Tr. pp. 806-07; see also Dist. Ex. 6 at p. 4). Despite petitioners absence from the August 9, 2005 CSE meeting, respondent's CSE added a special class in math that was requested by petitioners (see Dist. Ex. 9 at p. 1) and added an annual goal with objectives for the special class in math (Tr. p. 193; see Dist. Ex. 6 at pp. 1, 5-6; Parent Ex. B at pp. 1, 5-6).

Petitioners further contend their daughter's August 9, 2005 IEP does not address their daughter's social and emotional needs and allege that respondent's CSE erroneously concluded that there were no social and emotional needs to be addressed through special education services. The private psychologist indicated that the child was a friendly, cooperative youngster who sustained excellent eye contact and noted that the child was comfortable conversing about a variety of topics, which demonstrated the enriched environmental experiences to which she had been exposed (Dist. Ex. 24 at p. 2; Parent Ex. Q at p. 2). Respondent's school psychologist indicated to the August 9, 2005 CSE that although petitioners' daughter was eager to please, she was not confident and should be monitored for the onset of self-esteem concerns (Dist. Ex. 6 at

p. 4; Parent Ex. B at p. 4). Respondent's school psychologist noted that the child responded to positive praise and needed to be encouraged and supported (id.). Although the August 9, 2005 IEP indicated that there were no social and emotional needs to be addressed through special education services (Dist. Ex. 6 at p. 3; Parent Ex. B at p. 3), the IEP indicated that the child should be monitored for self-esteem concerns (Dist. Ex. 6 at p. 4; Parent Ex. B at p. 4) and should receive immediate positive reinforcement throughout the day (Dist. Ex. 6 at p. 1; Parent Ex. B at p. 1). I note that petitioners, who were present at the June 13, 2005 CSE meeting, did not object or represent to the June 13, 2005 CSE that their daughter exhibited any social or emotional needs that required special education services (see Dist. Ex. 10 at pp. 3-7; Parent Ex. C at pp. 2-6; see also Dist. Ex. 9 at p. 1). Petitioners have failed to demonstrate that respondent's CSE erroneously concluded that there were no social and emotional needs to be addressed through special education services at the time the August 9, 2005 IEP was formulated.

Based upon the information before me, I find that the program proposed in the August 9, 2005 IEP, at the time it was formulated, was reasonably calculated to enable the child to receive educational benefit (Viola v. Arlington Central School District, 414 F. Supp. 2d 366 at 382 [S.D.N.Y. 2006] [citing to J.R. v. Bd. of Educ. of the City of Rye Sch. Dist., 345 F. Supp. 2d 386, 395 n.13 [S.D.N.Y. 2004]; see Cerra, 427 F.3d at 195; see also Mrs. B., 103 F.3d at 1120; Application of a Child with a Disability, Appeal No. 06-112; Application of a Child with a Disability, Appeal No. 06-071; Application of the Bd. of Educ., Appeal No. 06-010; Application of a Child with a Disability, Appeal No. 05-021). In light of the foregoing, I concur with the impartial hearing officer for the reasons set forth above, that respondent offered the child an appropriate program for the 2005-06 school year. Having determined that the challenged IEP offered the child a FAPE for the 2005-06 school year, I need not reach the issue of whether Windward was appropriate, and the necessary inquiry is at an end (Voluntown, 226 F.3d at 66; Walczak, 142 F.3d at 134; Application of a Child with a Disability, Appeal No. 05-038; Application of a Child with a Disability, Appeal No. 03-058).

I encourage the parties to work cooperatively in planning and providing appropriate special education services to meet the needs of the child.

I have reviewed the petitioners' remaining contentions and find them to be without merit.

**THE APPEAL IS DISMISSED.**

Dated:    **Albany, New York**
          **April 16, 2007**                                    _____
                                                                PAUL F. KELLY
                                                                STATE REVIEW OFFICER