AO 440 (Rev. 10/93) Summons in a Civil Action - SDNY WEB 4/99

RECEIVED
SUPERINTENDENT'S OFFICE

SEP 19 2007

BRIARCLIFF MANOR
SCHOOL DISTRICT

# United States District Court

SOUTHERN **DISTRICT OF** NEW YORK

J.G. AND J.G. O/B/O J.G.,
Plaintiffs-Appellants,

RECEIVED
SUPERINTENDENT'S OFFICE

SEP 17 2007

BRIARCLIFF MANOR
SCHOOL DISTRICT

v.

BOARD OF EDUCATION OF THE BRIARCLIFF
MANOR UNION FREE SCHOOL DISTRICT,

Defendant

## SUMMONS IN A CIVIL CASE

CASE NUMBER:

07 CV 7245

# JUDGE KARAS

TO: (Name and address of defendant)

Board of Education
Briarcliff Manor Union Free School District
45 Ingham Road
Briarcliff Manor, Westchester County, NY 10510

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Mayerson & Associates (Attn: Gary S. Mayerson)
330 West 38th Street, Suite 600
New York, New York 10580

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of the summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

## J. MICHAEL McMAHON

CLERK

AUG 1 4 2007

DATE

(BY) DEPUTY CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

J.G. and J.G., on behalf of J.G.,

                              Plaintiffs,

        --against--

Board of Education of the Briarcliff Manor
Union Free School District,

                              Defendant.

--------------------------------------------------------------x

**COMPLAINT**

Docket No. ___

        Plaintiffs, J.G. and J.G., on behalf of, J.G. by their attorneys, Mayerson & Associates, as

and for their Complaint, allege and state the following:

        1.  Plaintiff J.G. is a female child who has been diagnosed with a specific learning disability,

in addition to social and emotional needs, that makes her eligible to receive special education

services.  J.G.'s eligibility for special education services has been stipulated to by the parties

(See *infra* at part 12).

        2.  J.G. was at all relevant times a student within the Briarcliff Manor Union Free School

District's purview, entitled to all rights, entitlements, and procedural safeguards mandated by

applicable law and statutes including, but not limited to, the Individuals with Disabilities

Education Improvement Act (hereinafter "IDEIA"), 20 U.S.C. § 1400 et. seq., the pertinent

implementing regulations promulgated under the Code of Federal Regulations, Article 89 of the

New York State Education Law (hereinafter "Article 89") and Part 200 of the Regulations of the

Commissioner of the New York State Education Department (hereinafter "the Commissioner's

Regulations").

        3.  Plaintiffs J.G. and J.G. are J.G.'s parents and are residents of the State of New York,

residing at all relevant times at an address within the Briarcliff Manor Union Free School

District, and presently residing at 6 Peach Tree Lane, Briarcliff Manor, Westchester County, NY 10510.

4.  J.G. and her parents, J.G. and J.G., are not expressly named herein by their given names because of the privacy guarantees provided in the IDEA statute, as well as in the Family Educational Rights Privacy Act, 20 U.S.C. 1232(g), and 34 C.F.R. 99.

5.  The Defendant Briarcliff Manor Union Free School District (hereinafter "the District"), upon information and belief, is a duly constituted school district organized under the laws of the State of New York.

6.  This Court, pursuant to 20 U.S.C. § 1415(i)(2)(A), 28 U.S.C. §1331 and §1367 has jurisdiction of this action without regard to the amount in controversy.  Venue is proper in that plaintiffs and defendants all reside in or are situated within this judicial district.

7.  This action is brought pursuant to the provisions of 20 U.S.C. § 1400, et. seq., more commonly known as the IDEIA and, in particular, 20 U.S.C. § 1415(i)(2)(A), in order to seek (a) a modified de novo review and reversal of (i) an Impartial Hearing Officer's (hereinafter "IHO") January 14, 2007 Decision (Exhibit A) and (ii) the State of New York State Review Officer's (hereinafter "SRO") April 16, 2007 Decision (hereinafter "SRO Decision")(Exhibit B), (b) a determination that J.G. met the applicable Second Circuit standard for reimbursement and compensatory relief, (c) an order directing defendant to reimburse plaintiffs, as requested, and provide compensatory services, and (d) an order granting plaintiffs leave to file a fee application pursuant to the fee shifting provision of the statute.

8.  Pursuant to the IDEIA statute, as well as the New York State Education Law, all school agencies within the State are required to offer each eligible student with a disability a free appropriate public education (hereinafter "FAPE") that is tailored to meet his or her individual needs.

9. The Supreme Court recently held in <u>Winkelman v. Parma City Sch. Dist.</u>, 127 S. Ct. 1994, 2003 (U.S. 2007) that parents have their own statutory entitlements under IDEIA that correspond to their children's entitlements.

10. The District is a local education agency that is statutorily obligated under the IDEIA, as well as the laws of the State of New York, to provide J.G., a student with a disability, with a FAPE.

11. The FAPE required under IDEIA necessarily will be different for each child, as IDEIA expressly rejects any "one size fits all" approach or restrictions that preclude the genuine individualization of a student's educational program.

12. On June 13, 2005, an initial meeting of the Committee on Special Education (hereinafter "CSE") was held, with the parents of J.G. in attendance. District personnel initially resisted the eligibility of J.G. for special education despite her diagnosis of a specific learning disability. J.G.'s parents stated their objection to this eligibility denial. The District's personnel eventually grudgingly conceded that J.G. was in fact eligible for special education based on her learning disability.

13. By letters of June 21, 2005 and August 2, 2005, the parents of J.G. informed the District that they could not accept J.G.'s IEP due to its significant defects, including, but not limited to, the lack of either Lindamood-Bell or Orton-Gillingham instruction, which had been recommended to address J.G.'s needs and the lack of services to address J.G.'s needs in the area of mathematics. Further, the IEP lacked any services to address J.G.'s diagnosed social and emotional needs.

14. On December 7, 2005, plaintiffs filed for due process to challenge, both procedurally and substantively, J.G.'s IEPs for the 2005-2006 school year. Plaintiffs sought a declaration that J.G. had been denied a FAPE, as well as <u>Burlington</u>/<u>Carter</u> reimbursement relief for the cost of tuition and transportation incurred when placing J.G. in an appropriate placement at the Windward

School, a respected and well-known school with experience educating students with disabilities. J.G.'s parents also sought compensatory relief to compensate J.G. for the services missed by J.G. due to the District's disregard for her diagnosed disabilities during the 2004-2005 and 2005-2006 school years and the Summer of 2005.

15. In determining whether parents of a disabled child are entitled to reimbursement for a unilateral placement and/or program, such as the Windward School, courts look to whether the local educational agency offered a FAPE (Prong I); and whether the services provided by the parents were "appropriate" under the IDEA (Prong II). School Comm. of Burlington v. Dept. of Educ. of Mass., 471 U.S. 359, 369-370, 105 S.Ct. 1996, 2002-2003 (1985); Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 12-14, 114 S.Ct. 361, 364-366 (1993); Frank G. and Dianne G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356 (2d Cir. 2006). Assuming that the first two "prongs" are met, the only other issue remaining to be adjudicated is whether or not equitable considerations support the parents' claim (Prong III).

16. The IHO's January 14, 2007 Decision held that the District had violated key procedural protections that were accorded to J.G.'s parents, but then subverted the applicable statutory and regulatory mandates in holding that these violations did not amount to a deprivation of a FAPE. After reducing the applicable Prong I standards to let the District off the hook, the IHO then repeatedly applied an erroneous and unduly high standard, which contradicted the standards established by the Second Circuit in Frank G. in analyzing whether J.G.'s private placement was appropriate for purposes of Prong II. 459 F.3d at 364.

17. The SRO's April 16, 2007 Decision rubber stamped the IHO's Prong I (FAPE) determination, glossing over and expanding upon the numerous legal and factual errors included in the IHO decision. The SRO was so dismissive, he even declined to analyze whether J.G.'s placement at the Windward School was appropriate for the purposes of Prong II.

18. Material violations of the procedural protections provided parents by IDEA and state law amount to a denial of FAPE. <u>Bd. of Educ. v. Rowley</u>, 458 U.S. 176, 206 (U.S. 1982); <u>McLaughlin v. Holt Pub. Sch. Bd. of Educ.</u>, 320 F.3d 663, 669 (6th Cir. 2003).

19. Both the Supreme Court and Congress have placed utmost importance on the procedural protections afforded students by the IDEA. <u>Rowley</u>, 458 U.S. at 205 (holding that "the importance Congress attached to these procedural safeguards cannot be gainsaid").

20. Procedural violations that result in a serious infringement on the parents' opportunity to "meaningfully participate" in the IEP formulation process amount to a denial of a FAPE. <u>Winkelman</u>127 S. Ct. 1994 at 2003; <u>Deal v. Hamilton County. Bd. of Educ.</u>, 392 F.3d 840 (6th Cir. 2004), *cert denied* 546 U.S. 936 (2005); <u>T.P. v. Mamaroneck Union Free Sch. Dist.</u>, 2007 U.S. Dist. LEXIS 35288, *19 (D.N.Y. 2007); <u>See also</u> <u>W.A. v. Pascarella</u>, 153 F.Supp.2d 144, 153 (D. Conn. 2001). The IHO and SRO both cited decisional law establishing this precedent in their decisions, yet ignored or subverted the very same precedent in reaching the erroneous conclusion that the District had not denied J.G. a FAPE.

21. The federal regulations implementing IDEIA state that a local education agency "*must* take steps to *ensure* that one or both of the parents of a child with a disability are *present* at *each* IEP Team meeting." 34 C.F.R. §300.3229(a).

22. The regulations further require that the District "(1) Notify parents of the meeting early enough to ensure that they will have an opportunity to attend; and (2) Schedule the meeting at a mutually agreed time and place." 34 C.F.R. §300.3229(a). The District fulfilled neither of these legal obligations.

23. The Commissioner's Regulations further mandate that "the student **must** *receive* notification **in writing** at least five days prior to the meeting." 8 NYCRR Sec. 200.5[a][3].(c).

24. Having been on notice of the parent's discontent with J.G.'s IEP since June, 2005, The District informed the parents of J.G. by letter *dated* August 5, 2005 (and *received* on *Saturday*,

August *6*) that an IEP meeting would be held on August 9, 2005, just *two* business days later, at a time and place unilaterally chosen by the District. The District's "notice" was thus clearly not in compliance with the express mandates of both federal and state regulations. Both the IHO and SRO acknowledge this fact.

25. J.G.'s parents requested a reasonable adjournment so that they could be present at J.G.'s IEP with the participation of another teacher. Evidence was adduced establishing that the District *rejected* J.G.'s parents' reasonable request for an adjournment and wrongfully proceeded without J.G.'s parents physically attending the meeting.

26. Plaintiffs maintain, particularly in light of <u>Winkelman</u>, 127 S. Ct. at 2003, and <u>Deal</u>, 392 F.3d at 840, that there can be no more serious or more fundamental intrusion on the parents' right to meaningfully participate in the formulation of the IEP than to entirely exclude parents from the meeting at which the IEP is formulated.

27. Faced with express statutory, regulatory, and decisional mandates, both the IHO and SRO contorted the facts and lowered legal standards to establish that J.G.'s was not denied a FAPE.

28. The IHO administered a lowered legal standard in her analysis under Prong I. Although the plaintiffs urge that deprivation of notice and the indefensible rejection of a first-time reasonable adjournment request are not "reasonable," regulatory, statutory, and decisional law make no mention of a "reasonableness" standard. Rather, they all contain express and clear mandates to which local education agencies *must* adhere.

29. The IHO supported her finding that the District had fulfilled the requirements of this legally-unfounded standard with two factual misrepresentations. First, the IHO stated that "the parents had actual notice prior to five days," but failed to suggest what this notice entailed or how it was provided. IHO decision at 17. The facts and testimony established that the *actual* notice, including the final date, time, and place of the meeting, was received on Saturday, August 6, leaving the parents *one* business day to secure the attendance of critical team members.

6

Second, the IHO merely parrots the erroneous statement, contained in the District-drafted August 9, 2005 IEP, that J.G.'s parents *declined* to attend the IEP meeting (when the truth was that J.G.'s parents asked for an adjournment). IHO Decision at 18. To establish this "fact," the IHO only cites the unilaterally drafted IEP and ignores extensive evidence adduced at the hearing, from witnesses called by both parties, establishing that the parents did not *decline* to attend, but rather, that they were deprived of sufficient notice and that their very reasonable first-time request for adjournment was rejected.

30. The SRO implicitly rejected the "reasonableness" standard of the IHO and replaced it with the proper standard, noting that "a school district may only conduct a meeting without the parents' participation if it is unable to convince the parents that they should attend; in which case the district must have a detailed record of its various attempts to arrange a mutually agreed upon time and place for the meeting." SRO Decision at 10.

31. The evidence unequivocally established that this is not a case in which the District was "unable to convince the parents that they should attend." Rather, the parents called for the meeting and desired to attend, but had been provided inadequate notice and could not secure necessary team members' participation. The factual record is also devoid of any evidence establishing that the District has a "detailed record" of "various attempts" to mutually agree on a date, time, and place for the meeting. In reality, the District offered <u>one</u> time and place, on insufficient notice, and then rejected the parents' (first-time) attempts to agree on a different time.

32. Faced with this reality, the SRO, who was not present at the hearing, appears to have realized that unfounded nature of the IHO's factual analysis and attempted to "paste together" a factual interpretation that would support the IHO's conclusion that, despite the clear and severe procedural violations of the District, J.G. was not denied a FAPE.

33. The SRO thus made the illogical argument that J.G.'s parents' attendance at the June IEP meeting meant that they had "input" into the IEP formulation process. Such participation is not *meaningful* in light of J.G.'s parents' *rejection of the IEP that was formulated at that meeting*, which they had the legal right and the factual justification to do.

34. The SRO then disingenuously suggested that J.G.'s parents had meaningful participation at the August 9th IEP meeting because the "team" was "aware" of *some* of their concerns and discussed them. Application of this low standard guts the very procedural protections afforded by federal and state law, rendering them meaningless. Applying this kind of low standard would allow school districts to exclude parents at subsequent IEP meetings.

35. Further, the SRO inexplicably misstated several key facts, established through the testimony of witnesses called by both parties, to further in his creative attempt to justify a legally unsupportable stance. First, the SRO states that J.G.'s parents had agreed to an IEP meeting on a set date and at a set time and place over the phone, whereas the evidence during the hearing established that no such specific date, time or place was agreed upon. Second, the SRO mis-states that J.G.'s parents "*declined*" the offer to allow their desired team members, or the parents themselves, to participate by phone. Rather, the evidence established that the parents justifiably stated that such an arrangement could not be worked out on such inadequate notice.

36. The SRO also suggests that the District's assurance that the IEP would be revised consistent with its understanding of the parents' concerns was sufficient means of "parental participation." The absurd nature of this argument and its shocking disregard for the value of procedural safeguards cannot be overstated.

37. The creative efforts of the IHO and SRO to conclude that J.G.'s parents had a sufficient measure of participation in the IEP process cannot be supported legally or factually. Proper and impartial application of the facts to the *legal standards* must find that J.G.'s parents were denied any semblance of *meaningful* participation.

8

38. Further, plaintiffs reject the IHO's stated, yet unsupported accusation that aspects of the testimonial evidence were not credible. Moreover, "credibility" is irrelevant where the violations in the present case are cut-and-dry procedural and substantive violations that are documented by hard evidence that does not necessitate further testimonial support.

39. Both the IHO and SRO found that the District had expressly violated the regulatory, statutory, and decisional law. Both the IHO and SRO, however, failed to provide J.G. any remedy for these violations.

40. The District's unilateral August 9, 2005 IEP meeting was itself wrought with further procedural violations, including extensive and impermissible "predetermination."

41. As a matter of law, predetermination of at least one very significant component of an IEP services and/or placement by a local education agency impermissibly excludes parents from meaningful participation in the IEP development process and amounts to a serious FAPE deprivation. Deal, 392 F.3d 840; T.P. v. Mamaroneck Union Free Sch. Dist., 2007 U.S. Dist. LEXIS 35288, *19 (D.N.Y. 2007). The evidence adduced at the hearing included admissions by District officials that none of the individual objectives or goals listed in the resulting IEP were actually developed or discussed at the August 9th meeting. This high degree of predetermination further prevented the parents of J.G., as well as other team members, from meaningfully participating in the formulation of the IEP.

42. The August 9th meeting also included a parent member who *knew* the family of J.G., seriously compromising the family's privacy *and* lacked the sufficient presence of a general education teacher. The parents of J.G. had previously waived the right to the attendance of a parent member, but were not afforded the opportunity in regard to the August 9th meeting.

43. Further, the August 9, 2005 IEP was substantively deficient, as it was not "reasonably calculated" to meet J.G.'s needs. The IEP contained vague (and pre-determined) objectives and goals, an entirely subjective means of measuring progress, insufficient mathematics

interventions, no express modifications of the general mathematics curriculum, and no social or emotional services (despite available evidence that such services were required).

44. The IHO states that the parents' substantive IEP concerns are "implausible," but fails to make any mention of how these genuine, factually-based concerns were deficient. The SRO, again recognizing the shortcomings of the IHO decision, vaguely lists various aspects of the IEP as support for the IEP's appropriateness, but does not sufficiently establish that the offered services adequately or appropriately address J.G.'s specific needs. Both Decisions are deficient in their analysis of the substantive merits of the District's unilaterally-developed August 9, 2005 IEP.

45. The IHO Decision is riddled with numerous other errors, red herrings, and misapplications of the law, including the devotion of much of the space in her confusing and brief legal analysis to a discussion of whether J.G.' suffers from dyslexia. Though the evidentiary record included multiple reports (admitted without objection by respondent) stating that J.G. had dyslexia, and the IHO, on page 19 of her Decision, appears to state (in a grammatically incoherent manner) that there was testimony at the hearing that J.G. had a dyslexic disability, the IHO then contradicts herself just a page later, stating that "there is no evidence in the record nor testimony that J. is dyslexic." IHO Decision at 19-20.

46. Regardless of the IHO's confusion regarding dyslexia, the District and J.G.'s parents had *agreed* on June 13, 2005 that J.G. was a student with a disability. Further, the Windward School has ample experience educating students with learning disabilities. Despite the extensive evidence, J.G.'s dyslexia was thus a non-issue.

47. Upon information and belief, compounding the SRO's erroneous analysis was an apparent bias and appearance of impropriety on the part of the SRO, who is currently under active investigation. The allegations against the SRO are discussed in a recent article appearing on the front page of the Wall Street Journal (Exhibit C), and concern:

- Evidence that the SRO decided approximately 86% of appeals partially or fully in favor of the local education agencies in 2006 and 2007, even though parents apparently won approximately 54% of impartial hearings in 2005-2006,
- The statements of former SRO agency staff members (who had apparently quit or been fired) claiming that the SRO frequently overruled them whenever they prepared decisions in favor of parents, and
- Evidence that the SRO's already compromised independence and required impartiality have been further compromised by an ongoing romantic relationship with an assistant counsel for the New York State Education Department.

48. The allegations reported in the Wall Street Journal are serious ones that erode public confidence in the integrity of the system and, if at all true, they also should be considered as part of any duty this Court might otherwise have to give "due deference" to the underlying administrative fact-finding. Plaintiffs had no knowledge of the SRO's apparent bias and other related problems until *after* the SRO had ruled.

49. For Prong II purposes, the IHO's analysis of the appropriateness of J.G.'s parents' private placement ignored the less stringent standard established by the Second Circuit in Frank G., when it held that "parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a free appropriate public education." 459 F.3d at 364. The proper test merely requires that the placement be "likely ["reasonably calculated"] to produce progress, not regression." Id. The weight of the evidence overwhelmingly established that J.G.'s unilateral placement met this less stringent standard. The SRO did not even bother to conduct a Prong II analysis.

50. While the Department failed to offer J.G. a FAPE, the placement at the Windward School unilaterally selected for J.G. by her parents was, in fact, appropriate under the Frank G. standards. 459 F.3d at 364.

51. Specifically, J.G.'s unilateral program was tailored to enable J.G. to make meaningful educational gains, pursuant to <u>Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Weschester Cty v. Rowley</u>, 458 U.S. 176 (1982).

52. The IHO impermissibly based her decision not to reimburse J.G.'s extended day program in part on her unsubstantiated concern about the *sources* of information regarding the appropriateness of the Windward School placement. The testimony of *independent* consultant Kathleen Kelly, the recommendations of Carol Leeds Riven, M.S., and the February, 2005 Psychological Evaluation of Dr. Sylvia Epstein, provided ample evidence of the Windward School's appropriateness. The <u>Frank G.</u> standards contain no restriction on the sources of evidence that may be used to meet the less stringent burden placed on the parents. By information and belief, there is no such restriction included in any relevant decisional law or statutory or regulatory authority.

53. The IHO's further questioning of the alleged "restrictiveness" of the Windward School placement, included in her Prong II analysis, is also misguided. Though plaintiffs provided ample evidence that the Windward School placement educated J.G. in her least restrictive environment, where, as here, there has been a material Prong I FAPE deprivation, the parents' choice of unilateral placement may be *more* restrictive than the school district's recommended placement and still be reimbursable. As the Second Circuit ruled in <u>Frank G.</u>, "parents may not be subject to the same mainstreaming requirements as a school board." Accordingly, "...the issue of whether a unilateral placement is appropriate "...turns on whether a placement...is reasonably calculated to enable the child to receive educational benefits." <u>Frank G.</u>, 459 F.3d at 364.

54. It was undisputed below that J.G. is properly classified has having a learning disability. The Windward School, a special school for children with learning disabilities, certainly was "reasonably calculated" to provide educational benefits to J.G. Not only was the Windward

School placement reasonably "calculated" to provide educational benefits, the evidence demonstrated that J.G. made excellent progress in the Windward School during the 2005-2006 school year.

55. As a result of the District's failure to adequately address, or even acknowledge, J.G.'s disabilities, J.G. was and still is entitled, by law, to compensatory services, covering the 2004-2005 school year and the Summer of 2005, in addition to the 2005-2006 school year. No compensatory relief was ordered by the IHO or SRO.

56. Further, the evidence introduced during the hearing amply establishes that the equities further support J.G. and J.G.'s claim for reimbursement. Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996). J.G.'s parents were cooperative, unobstructive, and forthcoming, they acted reasonably, and they provided due notice of their claims. Throughout the process, the parents of J.G. expressed reasonable concerns regarding the appropriateness and sufficiency of the services offered their daughter by the District.

WHEREFORE, it is respectfully requested that this Court:

    (a) reverse, in part, the April 16, 2007 Decision of the SRO and the January 14, 2007 Decision of the IHO;

    (b) declare that defendant failed to offer J.G. a FAPE for the 2004-2005 and 2005-2006 school year, as well as the Summer of 2005.

    (c) declare that J.G.'s privately secured placement for the 2005-2006 school year was appropriate and that the associated tuition and transportation costs are reimbursable under applicable Prong II standards, and that the equities favor J.G. under Prong III and do not preclude or diminish a reimbursement award;

    (d) order that the defendant reimburse J.G. and J.G. for the actual incurred costs of J.G.'s private placement at the Windward School for the 2005-

13

2006 school year and the associated transportation, and provide J.G. by way of compensatory damages with the full services J.G. should have received during the 2004-2005 and 2005-2006 school year, as well as the Summer of 2005;

(e) declare plaintiffs to be the "substantially prevailing" parties;

(f) grant leave to plaintiffs' counsel to submit a fee application for purposes of statutory attorneys' fees and other recoverable costs at the administrative level, the SRO level, and in this action, pursuant to the express fee-shifting provisions of the federal IDEIA statute and <u>A.R. v. N.Y. City Dep't of Educ.</u>, 407 F.3d 65, 75 (2d Cir. 2005); and

(g) grant plaintiffs such other, further and different relief as may be just under the circumstances.

Dated: New York, New York
       August 14, 2007

Gary S. Mayerson
Mayerson & Associates
330 West 38th Street, Suite 600
New York, New York 10018
212.265.7200
212.265.1735 (fax)

14

# EXHIBIT A

Hearing Officer's Findings of Fact and Decision

Case No.

---

## NAMES AND TITLES OF PERSONS WHO APPEARED

FOR THE STUDENT:

| | |
|---|---|
| Mayerson & Association | Attorney for the Parent |
| Mr. Gangi | Parent (7/18/06 p. 572) |
| Mrs. Gangi | Parent (7/18/06 p. 639) |
| Kathleen Kelly | Educational Consultant (5/24/06 p. 38) |
| Lydia Lavin | Pupil Personnel (5/24/06 p. 139; 6/15/06; 7/17/06) |
| Marcelle Fumosa | Reading Teacher (6/15/06 p. 236) |
| Mr. G | Father (7/18/06 p. 572) |

FOR THE DISTRICT:

| | |
|---|---|
| Jeffrey Schiro<br>Kuntz, Spagnuolo, Scapoli & Shapiro | District's Attorney |
| Alison Collins | First grade Teacher (9/21/06 p. 668) |
| Claudia C. Sullivan | Second grade Teacher ( 9/21/06 p. 787) |

## FINDINGS OF FACT AND DECISION

Case Number:

Student's Name:                      Jillian Gangi

Student's date of birth:             June 27, 1998

District:                            Briarcliff Manor Union
                                     Free School District

Hearing Requested by:                Parent

Date of Hearing:                     5/24, 6/15, 7/17, 7/18, 9/21
                                     11/1/06

Hearing Officer:                     Mary Noe, Esq.

**HEARING OFFICER'S FINDINGS OF FACT and DECISION**

Case Number:

The Parents by their attorney requested an impartial hearing on December 7, 2005 and I was appointed on December 14, 2005.   There were several control dates after the resolution period agreed upon by both parties.  Joint motions to extend the compliance date were granted.  Gary Mayerson Esq. represented the Parents and the District was represented by Jeffrey Shiro Esq..

J is a 6 year old student classified as learning disabled currently attending second grade at the Winward School.   The Parents seek compensatory education for '04 – '05 school year and tuition reimbursement for the '05 – '06 school year.

The parents presented their case first.


THE STUDENT'S CASE

*Kathleen Kelly*, a retired special education teacher working as an educational consultant testified on behalf of the Parents.  (T. 38)  Ms. Kelly has been working as an educational consultant for one year and has no financial connection with the Windward School.  (p. 47)  Winward is a special education school.  (T. 124)

Ms. Kelly observed J on March 20, 2006 at the Winward School for approximately two hours and fifteen minutes and wrote a report.  (T. 48, 53, Exh. D) Winward is a school that groups homogeneously. The class has approximately five students a majority of the time.  (T. 55) The staff student ratio varies, six students to one teacher at times, five to one  and at other times three to one, which often provides J with

3

immediate feedback. (T. 73, 109, 110)  J's teacher is certified in Orton-Gillingham. (T. 111)  J demonstrated the same ability level of the majority of the other students. (T. 58)

Ms. Kelly first observed the teacher dictating words to the children they were somewhat familiar with in their readings and prior lessons. The students were preparing for competency tests. The teacher reminded the students of various strategies to use in verbalizing the words such as air writing the words and then writing them on paper. (T. 50) The students then converted the words into contractions. (T. 51) The students then chose a column of words, practiced reading them, wrote them and read them again. (T. 51) The class was separated into groups of three and each child read a paragraph aloud and then answered comprehension questions. (T. 52) The students had the equivalent of 3rd grade skills. (T. 114)

Ms. Kelly spoke with J's homeroom teacher. The teacher and assistant teacher felt that J was initially very introverted and did not interact. She was quiet, shy and fragile. (T. 54, 55) The teacher, Mrs. Haslem spends lots of time with J and J is now raising her hand independently and doesn't get upset if she is incorrect.  J seemed very comfortable in the environment. (T. 57)

Ms. Haslem and the other teachers thought J had progressed tremendously in academics and socially since she started at the school. (T. 60, 61) Ms. Kelly's opinion was that J has made tremendous progress. (T. 128) Ms. Kelly testified that assuming what the teachers have reported and what she witnessed, she thinks the curriculum was challenging and appropriate. (T. 68) J's fluency was average. (T. 123)

Ms. Kelly testified that J's objectives as specified on J's IEP dated June 13, 2005 were inappropriate because if the student's present functioning levels are unknown then

goals cannot be appropriate without specifying what is being targeted. (T. 96)  Ms. Kelly

became aware of J's baselines from the evaluation of Dr. Epstein dated February 2005.

(T. 107)   Based on the evaluation, J was struggling to become an emergent reader. (T.

126) Ms. Haslem did not say J was pre-tested. (T. 126)

     Ms. Kelly testified that she had not seen J's first grade report card.  After

reviewing it she stated that there were generic terms and no proof that the indicated check

mark really meant that J was meeting expectations and questioned whose expectations

and whether J was meeting state standards as well as the possibility of the

professionalism of the teacher. (T. 133)

     *Dr. Lydia Lavin*, director of pupil personnel was called as a witness for the parent.

The district's process for arranging a CSE review which occurred in this case is that

Barbara Waters, Dr. Lavin's secretary, calls the parents with several dates to choose

considers the parent's availability and arranges a date to accommodate everyone.  She

then sends out the notice.  (T. 155 – 156)

     The parents were convinced that J had a disability.  They presented information

and the committee reached a consensus that there was a disability. (T. 471)  Even though

J made progress, J would benefit from special education. (T. 483)    On June 13, 2005

there was a CSE meeting and an IEP was created which classified J as learning disabled.

Ms. Collins, J's teacher reported that J could not do her seat work at that meeting.  (T.

387)  The recommendation was for a special class in English and language arts. (T. 189)

There would be direct instructions in a special class setting for ninety minutes of the

school day.  The rest of the day the student would be in a regular education class.  (T.

473)  On the Wood Range Achievement test J's reading score is 94, an average score. (T.

482) J's score in spelling is in the average range. (T. 485) J is very strong in math. On the Wide Range Achievement Test she scored 108, which is in the average range. (T. 497) On July 22, 2005 the IEP was sent to the parents. (T. 188) The parents requested that the IEP needed to be amended because they felt that the services of the special class math should be included. (T. 172)  On August 2, 2005 the district received a letter from the family rejecting the June 13, 2005 IEP and notifying the district that J will attend a private school. (Exh. L)  On August 3, 2005, Barbara called the family, left a message on their answering machine regarding availability. (T. 175)  On August 4, 2005 the mother indicated that August 9th was an acceptable date.  (T. 558)  The district wrote a letter to the parents on August 5th arranging a CSE meeting to be held on August 9, 2005 at 1:00 p.m. (Exh. 8)  Dr. Lavin stated that the August 5th letter does not give the required five day notice.  (T. 534)  On August 8th Dr. Lavin had a telephone conversation with the parent that he wanted the tutor to be present and she would not be available until late August and then the parents were leaving for vacation on August 15, 2005 and he wanted the meeting in September.  Dr. Lavin testified that she offered two meetings but needed to have a meeting prior to school starting so that an IEP would be in place. (T. 182)  Dr. Lavin stated that the father indicated that he saw no sense of any meeting since he had no intention of sending his daughter to the school.  (T. 195, 416)  On August 9, 2005 a CSE meeting was held and math was added to the IEP.  (Exh. B, T. 189)  The father was called during the meeting but could not participate because they didn't have the right people. (T. 417)  The parents also requested that the psychologist who did the testing be present at the meeting.  (T. 418)  Speech and language goals were deleted because they were added in error "a strike of the wrong key."  (T. 190)  The parents did not attend the

August 9, 2005 CSE meeting and the Committee added the service they requested. Another meeting was never set after Labor Day. (T. 193)

*Marcelle Fumosa*, a reading teacher at Todd Elementary School was called as a witness for the parent. Ms. Fumosa is in the regular education setting. The program is an extension of the regular education classes. (T. 370)

Ms. Fumosa testified that one indicator of reading difficulties may be a child that has phonological awareness problems. Letter reversals is also a red flag but common at the kindergarten, first grade levels. (T. 239, 240) In the beginning of the '04 – '05 school year the teacher, Mrs. Collins noticed some observations regarding J's reading. In September '04 Mrs. Collins gave the Developmental Reading Assessment (DRA). (T. 321) At that point in the year, the parents didn't want J pulled out for support. (T. 242) The parents notified the school that J would be going for outside services. (Exh. U, T. 247, 323)

Ms. Fumosa did not work with J during kindergarten. (T. 248) In Ms. Fumosa's opinion J would be a child that she would recommend for Phonological Awareness program in kindergarten. (T. 253)

Ms. Fumosa does not recommend students to the CSE, she reports her findings to the teacher who would refer the child to the Committee. (T. 254)

In November '04, the parent wanted to go ahead with the reading program. (T. 355) Ms. Fumosa testified that she worked with J every day after November the first grade, '04 – '05 school year. (T. 256) J's area of weakness was decoding. (T. 260) J's strength was comprehension. (T. 261) In January, J was at an frustrated 1st grade level in sight words, in June she was at an instructional 1st grade level. J's comprehension was

independent on level one. (T. 340) In January J was not fluent and reading very choppy. By June she was able to instructionally decode a 1st grade passage and her comprehension was independent. (T. 343)

During the year the parents asked Ms. Fumosa to contact J's tutor. The tutor provided information on the skills she was working on so that they could coordinate activities. Ms. Fumosa would explain what she was working on so the tutor would form some of her instructions. (T. 284)

J made tremendous progress based on Ms. Fumosa's Quality Reading Inventory assessments (QRI). (Exh. U1, T 291) It is administered one to one. (T. 299) By June 13, 2005 Ms. Fumosa administered two QRIs.

In January, J had five miscues on the first grade level and in June she made two miscues. (T. 301)

*Mr. G*, the parent testified he recognized that J had some king of a disability late in kindergarten and then early in the first grade. (T. 573) J had a hard time reading simple words, difficult time expressing her thoughts and was falling behind her siblings and her peers. (T. 573)

In first grade, J was being tutored two to three times a week. (T. 574)

Mr. G testified that the fundamental reason he does not agree with the district's recommendation was because the IEP did not address all of J's weaknesses. The type of program was something different than what other outside professionals had recommended. There was no mathematical areas addressed in this particular IEP. (T. 609) Additionally, J would be out for one and a half hours per day for services when she needed a much more intensive program. The overriding factors were the students that

8

were in the special education class did not have the same learning disabilities that J had.
(T. 610)

A decision regarding the tuition at Windward had to be made by August 1st. (T. 611)

J has been making tremendous strides in her ability to read, comprehend and communicate her thoughts. (T. 617)

Highlighted Parent's documents admitted into evidence:

*Parent's Exh. 4, District's Exh B* -    On the IEP dated August 9, 2005 the district recommended that J attend a special class in English Language Arts and Math 15:1 ratio daily, two hours for English Language Arts and one hour for Math.    The IEP states "Student's weak short term auditory memory negatively impacts academic performance";

Current Academic Levels/Abilities states: "Student presents with average receptive and expressive language skills with a relative weakness in short term auditory memory which may cause difficulty with the ability to learn new written or spoken vocabulary. Student can write independently, but cannot always read back which she has written. She is impulsive and fidgety when writing. Student has difficulty with remembering addition and subtraction concepts, as well as utilizing vocabulary in math word problems." (Exh. 4 p.2 of 6)

Listed on the 9/9/05 IEP are Standardized test results, CELF. J's social and emotional levels and abilities are within age appropriate expectations. (Exh. 4 p. 3 of 6)

*Parent's Exh. 10* - The IEP dated June 13, 2005 the CSE recommend "Special Class English Language Arts in a 12:1 ratio once daily for one hour 30 minutes";

Current Levels/Abilities is identical to the 9/9/05 IEP except the last sentence does not appear.

Under "Attendance" the parents were present. "Ms. McKeever indicated that the scores on speech and language evaluation were in the average range and working memory was average. Did not notice any word retrieval difficulties. A Collins reports that J's

9

comprehension skills are above average and she follows directions. She needs assistance on task and need to become more independent. She can write independently but cannot always read back what she wrote. See impulsivity and fidgeting in writing. Seems to be something "not clicking" with decoding. M. Fumusa indicates that J had made tremendous progress since January. She is internalizing and applying strategies being taught."

*Parent Exh 19, District's Exhibit O* - The Briarcliff Manor Union Free School District

Speech and Language Assessment was conducted in May 2005 by Alyssa McKeever

M.A., CCC-SLP

Under "Observations" Ms. McKeever stated that "J explained to the examiner that she

would be attending a different school next year and then would come back to Todd."

The results of the CELF-4 testing is as follows:

| | |
|---|---|
| Core Language | average |
| Receptive Language | above average |
| Expressive Language | average |
| Language Content | above average |
| Language Structure | average |
| Working memory | average |
| Concepts & following directions | above average |
| Word classes | high average |
| Sentence structure | average |
| Number repetition | average |
| Familiar sequence | average |
| Word structure | high average |
| Recalling sentences | average |
| Formulated sentences | average |
| Expressive vocabulary | above average |

CTOPP
| | |
|---|---|
| Phonological memory | average |
| Rapid naming | average |
| Create another word | average |
| Blending words | average |
| Sound matching | low average |
| Memory for digits | below average |
| Nonword repetition | average |
| Rapid color naming | low average |
| Rapid object naming | average |

Ms. McKeever in her report states "Overall, J presents as a child with average

receptive and expressive language skills with a relative weakness, although still

considered age appropriate, in auditory memory skills."

*Parent's Exh 24, District's Exh Q -*   A psychologist Dr. Sylvia H. Epstein psychological

evaluation dated 2/3, 2/8, 2/14/05 was admitted into evidence.  The summary of test

results are as follows:  Weschsler Intelligence Scale:

| | |
|---|---|
| Verbal Comprehension | average |
| Perceptual reasoning | average |
| Working memory | average |
| Processing Speed | superior range |
| Full Scale IQ | bright normal range |

Results on the Ravens, a non verbal measure of reasoning abilities were at the 90th
percentile and "suggest that she has more potential then demonstrated on the WISC-IV."
(Exh. 24 p. 3)
Educational Achievement Reading Readiness: "J is able to sound blend, recognize the
missing elements of words, discriminate word pairs and identify the differences in
pictures, letters and words.  She had a hard time when presented with the Reversal
Frequency Test and was asked to cross out the incorrect symbols...J lacks mastery on the
easiest consonant vowel consonant words.  As a result, she has not automatic way of
attacking regularly appearing words.  Even in context, she was unable to read the easiest
passage....
Arithmetic: "J has good understanding of basic concepts and applications but she has a
hard time with simple basic addition."
Emotional Functioning: "J is well aware of her struggle to achieve and seems most
concerned about 'homework'." (Exh. 24 p. 4)
Summary: " J...has the readiness skills necessary for beginning reading.  Despite her
good intelligence, she has a weak short term auditory memory and has not acquired the
basic decoding skills usually mastered in first grade."    J is a candidate for daily,
individual, intensive, (three hours a day), Lindamood Bell or Orton Gillingham
remediation."  (Exh. 24 p. 5)


*Parent's Exh H* - A letter from Michael Traister, MD (Pediatric & Adolescent Medicine)

dated August 14, 2005 states in part:

11

"However, during First Grade, academic year 2004 -2005, J experienced great difficulty in learning to read.... I had previously referred J to Glen Kreielsheimer, PhD for a complete psycho-educational testing. It is quite apparent after this evaluation that J suffers from a learning disorder, DYSLEXIA. (315.02 developmental dyslexia)

THE DISTRICT'S CASE

*Alison Collins,* a regular education teacher at Todd Elementary School testified on behalf of the school district.

J was her student during the '04 – '05 school year. There were 20 or 21 students and Ms. Collins and an aide. (T. 670)

In the fall, J was always a very had working and motivated student. She exhibited some difficulties in blending words together. She knew some of the sounds and the letters but had trouble putting it together and saying the words completely. She seemed to have a difficult time with some of the reading. (T. 674) J was able to complete her work with help. She needed some support. (T. 675)

A Reading Assessment, Developmental Reading Assessment (DRA) and phonemic scoring sheet were done on the same day, September 24, 2004. (T. 680) The child does the writing themselves. The assessments are administered on each child individually. (T. 678) J tested on a pre-primer level. (T. 696) J had difficulty with level 3, it was instructional however she did not have fluency. (T. 697) J seemed to be struggling with reading. J tested with 83 percent accuracy. (T. 872) Ms. Collins believed J could definitely use some support based on the assessment and classroom observations. (T. 705) Ms. Collins contacted the parents but they were concerned about the amount of time out of the class and declined the reading support program. (T. 709)

12

J lacked confidence in some areas.  It wasn't something Ms. Collins was concerned about.  (T. 746)  J was a bit quiet and shy but it did not prevent her from making friends or socializing in the class.  (T. 747)

On October 13th, J was given a writing assessment.  (T. 702)  In January J showed growth in the areas of details and spelling.  (T. 734)

In January '05 the Form A, Level P Informal Reading Inventory (IRI) was given.  J frustrated on level one so Ms. Collins went to the next lower level, pre-primer.  (T. 701)  J frustrated on decoding.  (T. 712)

Ms. Collins spoke with J's tutor about her progress and the work she was doing in class.  (T. 714)  The tutor used very similar methods to Ms. Collins.  (T. 886)

J's writing got better in January.  J was stronger in math than she was in reading.  (T. 720)  J had one or two reversals which is typical and she seemed to be meeting the expectations.  (T. 721)   There was no prompting on the assessment tests.  (T. 854)

In June '05 J knew some of her math facts automatically but she still needed to use the number line.  She knew her coins.  (T. 723)   The Committee's analysis of the DBQ in June '05 was that J was doing fine.  (T. 730)  In the June assessment J was on a first grade reading level.  (T. 947)

J started the school year in a pre-primer level and she left, her DRA level was the first grade which was appropriate.  She grew in the areas of writing, reading and spelling.  (T. 737)  J was having difficulty completing her work on time.  (T. 752)  J's weakness was handwriting.  She had some difficulty with both letter and number formation.  (T. 859)  J's handwriting made some improvement over the year.  (T. 904)

13

*Claudia Sullivan* testified on behalf of the district.  Ms. Sullivan is a second grade special education teacher at the Todd Elementary School.  (T. 787)  Ms. Sullivan's master's degree was based on Orton-Gillingham.  (T. 801)

Ms. Sullivan testified in last year's class the children were either learning disabled or speech and language impaired.  (T. 789)  In the class Ms. Sullivan has another certified teacher with her.  (T. 790)  Ms. Sullivan would have been J's teacher for language arts and math.  (T. 796)

Highlighted District's documents admitted into evidence:

*District's Exh 5* - A letter from the parents to the district dated August 11, 2005.  The letter states in part "Our object is to meet J's educational needs in an orderly manner.  We will not be intimidated into a meeting because of its convenience..."

*District's Exh. 9* -  A letter from the parents to the district dated August 2, 2005.  The letter in part states that "We have received your IEP regarding our daughter J and have determined that it is inadequate in meeting her needs...J is also weak in basic mathematical functions...You will recall at our meeting on June 13, 2005 that our preference is to keep J at Todd School...Her progress in first grade was marginal...."

*District's Exh. 12* - On the Special Programs Progress Report J received the following scores in January: "usually" on listens effectively, follows directions, works independently, organizes self and materials and shows self confidence; "consistently" on works cooperatively in groups.  J received the following scores in June:  "consistently on listens effectively, follows directions, works independently, organizes self and materials and "usually" on shows self confidence.

14

*District's Exh 14* -   A letter dated June 21, 2005 from the parents to the district.  The

parents *inter alia* state that included in the letter is a review by Carol Leeds Riven.  "She

discusses J's learning disability as dyslexia, her progress over the year and

recommendations regarding future programs."

*District's Exh 18* - Ms. Deborah Ciardully observed J on May 4, 2005 and wrote a report.

Her report indicates "she appeared a bit fidgety...J did not participate in the group

discussion."


## DISCUSSION

The Parent requests reimbursement for tuition for the 2005 – 2006 school year

and compensatory education for '04 – '05.

A board of education may be required to pay for educational services obtained for

a student by the student's parents, if the services offered by the board of education were

inadequate or inappropriate, the services selected by the parents were appropriate, and

equitable considerations support the parents' claim (School Committee of the Town of

Burlington v. Department of Education, Massachusetts, 471 U.S. 359 [1985]).

The first issue to be addressed is whether the parents were given the statutory

notice of the CSE meeting of August 9th.

State regulation requires that a minimum of five days notice be given of a CSE

meeting (8 NYCRR 200.5 [a][3]). (c) *Notice of meetings.*

(1) Whenever the committee on special education proposes to conduct a meeting related
to the development or review of a student's IEP, or the provision of a free appropriate
public education to the student, the parent must receive notification in writing at least five
days prior to the meeting. The meeting notice may be provided to the parent less than five

15

days prior to the meeting to meet the timelines in accordance with Part 201 of this Title and in situations in which the parent and the school district agree to a meeting that will occur within five days. The parent may elect to receive the notice of meetings by an electronic mail (e-mail) communication if the school district makes such option available.

Mr. G testified that on August 1st a decision regarding the tuition at Windward had to be made. (T. 611)  On August 2nd [Tuesday] the parents wrote to the district after receiving the IEP and in the letter state that the recommended program is inadequate in meeting J's needs and her progress in first grade was marginal.  The parents specify a weakness in basic mathematical functions and state that J will be attending a private school.

Upon receipt of the letter, the district attempts to reconvene another CSE.  Ms. Lavin's secretary called and Mrs. G who gave the date of August 9th. (T. 533)  Mr. G testified that he believed his wife was asked to consent to an August 9th CSE date.  (T. 600)  Mrs. G testified she never received a telephone call prior to the August 9th date.  (T. 642)  Mr. G testified the family was going on vacation on August 14th. (T. 529, 534)  The date the parents requested was after school started and any change to the IEP had to be made before the school year started.  (T. 533)   The parent testified he received the August 4 and August 5 letter on Friday, August 5, 2006. (T. 602)  Therefore the parents received the notice four days prior to the CSE meeting.

The parent testified that he did not attend the August 9th CSE meeting because the reading tutor Carol Riven and Dr. Epstein were unavailable on that date.  (T. 594)  It is unclear why the parent needed a reading tutor to address math and why Dr. Epstein would participate in the August meeting but not in June meeting.

I find the parent's testimony regarding notice of the August 9th hearing to be confusing and not credible.

16

However, the notice was clearly not served within the statutory time period and therefore defective.

To meet its burden of showing that it had offered to provide a FAPE to a student, the board of education must show (a) that it complied with the procedural requirements set forth in the IDEA, and (b) that the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Bd. of Educ. v. Rowley, 458 U.S. 176, 206, 207 [1982]). Not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]). If a procedural violation has occurred, relief is warranted only if the violation affected the student's right to a FAPE (J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 [2d Cir. 2000]), e.g., resulted in the loss of educational opportunity (Evans v. Bd. of Educ., 930 F. Supp.83, 93-94 [S.D.N.Y. 1996]), seriously infringed on the parents' opportunity to participate in the IEP formulation process (see W.A. v. Pascarella, 153 F. Supp.2d 144, 153 [D. Conn. 2001]; Brier v. Fair Haven Grade Sch. Dist., 948 F. Supp. 1242, 1255 [D. Vt. 1996]), or compromised the development of an appropriate IEP in a way that deprived the student of educational benefits under that IEP (Arlington Cent. Sch. Dist. v. D. K., 2002 WL 31521158 [S.D.N.Y. Nov. 14, 2002]).

The District must provide a reasonable opportunity for parental participation in IEP meetings, but may conduct such meetings without parental participation if it is unable to convince a parent to attend and has made reasonable attempts to gain parental participation. 20 U.S.C. § 1414(d)(1)(B)(I); 34 C.F.R. § 300.345(d).

The procedural error of written notice four days prior to the meeting instead of five days when the parents had actual notice prior to five days did not compromise the

student's ability to receive FAPE. The August 9th IEP indicates that the parents were contacted by phone and declined to participate. (Parent's Exh. D)    The parent's testimony regarding the district's recommendation is implausible. The parent states the IEP did not address all of J's weaknesses, the type of program was something different than what other outside professionals had recommended, there was no mathematical areas addressed in this particular IEP, (T. 609) J would be out for one and a half hours per day for services when she needed a much more intensive program but the overriding factors were the students that were in the special education class did not have the same learning disabilities that J had. (T. 610)

The parent's claim of lack of participation of writing the goals and objectives during the June CSE meeting contradicts their own letter sent to the district dated June 21, 2006. (Parent's Exh. M)

The parent failed to establish that the Windward school is appropriate because there was not one document offered into evidence reflecting J's current program at the Windward school, including class size, classwork or evaluation. No one from the Windward school testified. Kathleen Kelly, the parent's educational evaluator observed J at Windward school one time for two hours and fifteen minutes. (T. T. 48, 53) Ms. Kelly's testimony was inconclusive based on a two hour observation during an entire school year. Her reports from J's teacher could not be challenged. Although the parents testified as to J's progress, the parent testified that he compared J to her siblings and peers or other Brownies. (T. 574, 619) The parents reliance on Dr. Epstein's evaluation is unsupported by the results of that evaluation.

18

During the hearing there was testimony suggesting that J with a dyslexic disability. The parents had an independent evaluation by a psychologist Dr. Sylvia H. Epstein. The results reported by Dr. Epstein on the Weschsler Intelligence Scale subtests in three areas are average, one superior range and one bright normal range. In Arithmetic: "J has good understanding of basic concepts and applications but she has a hard time with simple basic addition." Despite these test results, Dr. Epstein recommends " J…has the readiness skills necessary for beginning reading. Despite her good intelligence, she has a weak short term auditory memory and has not acquired the basic decoding skills usually mastered in first grade." J is a candidate for daily, individual, intensive, (three hours a day), Lindamood Bell or Orton Gillingham remediation. (id) Dr. Epstein's recommendation does not comport with the results of the evaluation.

Ms. McKeever, a Speech and Language Pathologist tested J in May 2005. On the CELF testing J scored in 9 subtest areas average; 4 subtest areas above average; 2 subtest areas high average. On the CTOPP testing J scored in 6 subtest areas average; 1 subtest area below average and 2 subtest areas low average. Overall Ms. McKeever found J as a child with average receptive and expressive language skills with a relative weakness, although still considered age appropriate, in auditory memory skills.

What is most puzzling is a letter from J's pediatrician Dr. Michael Traister dated August 14, 2005 referring to Glen Kreielsheimer, PhD who does a complete psycho-educational testing and from the testing Dr. Traister concludes J has dyslexia (315.02 developmental dyslexia). Dr. Traister never testified nor is there an evaluation from Dr. Kreielsheimer in evidence.

Carol Riven, J's reading tutor during the '04 – '05 school year did not testify however Parents Exh. N is a statement dated June 16, 2005 wherein Ms. Riven states "It takes a dyslexic child much longer to work independently; Jillian is working on an instructional level. As a dyslexic youngster:..." There has been no testimony or evidence Ms. Riven bases her conclusions that J is dyslexic submitted.

There is no evidence in the record nor testimony that J is dyslexic. Both the parent and the district's evaluations do not reflect a below average student.

The district's recommendation for reading and arithmetic in a separate setting would address J's need appropriately. It is unclear how restrictive the Windward's school environment since there was no testimony regarding class profiles, program or instruction.

The petitioner's request for compensatory education is unwarranted. Compensatory education is relief awarded under the IDEA to remedy past violations. *See Phil v. Mass. Dep't. of Educ.,* 9 F.3d 184, 188 (1st Cir.1993).

It is hereby ORDERED the parent's request for tuition reimbursement and compensatory education is denied.

Dated: January 14, 2007

MARY NOE ESQ.

20

Impartial Hearing Officer

**<u>PLEASE TAKE NOTICE</u>**

Within 30 days of the receipt of this decision, the parent and/or Board of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act. Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and forms for filing an appeal are included with this decision.

21

PARENT'S EXHIBIT

| | | |
|---|---|---|
| A | Demand for Due Process | 2 pages |
| B | IEP '05 –'06 | 6 |
| C | Letter 7/22/05 | 6 |
| D | K. Kelly Observation | 2 |
| E | Letter 12/21/05 | 1 |
| F | Notice 8/30/05 | 1 |
| G | Letter 8/18/05 | 2 |
| H | Letter 8/14/05 | 1 |
| I | Letter 8/11/05 | 1 |
| J | Notice 8/5/05 | 1 |
| K | Letter 8/4/05 | 1 |
| L | Letter 8/2/05 | 1 |
| M | Letter 6/21/05 | 2 |
| N | Observation by Riven | 1 |
| O | Letter 6/8/05 | 9 |
| P | Notice 6/7/05 | 1 |
| Q | Dr. Epstein's Psych. Eval | 6 |
| R | Work Product | 2 |
| S | K. Kelly's Resume | 1 |
| T | Invoice, check | 6 |
| U | Notes | |
| U1 | Phonological Awareness | 7 |
| V | Notes | |
| W | Assessments 1/05 | 3 |
| X | Assessments 6/9/05 | 4 |
| Y | CSE Procedure | |
| Z | *ID only* Notes | |
| AA | *ID only* | |

DISTRICT'S EXHIBITS

| | | |
|---|---|---|
| 1 | School calendar | 1 |
| 2 | Class profile | 12 |
| 3 | Withdrawn | |
| 4 | Letter 8/18/05 | 8 |
| 5 | Letter 8/11/05 | 2 |
| 6 | IEP 8/9/05 | 6 |
| 7 | Notice 8/5/05 | 1 |
| 8 | Letter 8/4/05 | 1 |
| 9 | Letter 8/2/05 | 2 |
| 10 | Notice 7/22/05 | 7 |
| 11 | Report | 1 |
| 12 | Progress Report | 1 |
| 13 | Report Card | 2 |

| | | |
|---|---|---|
| 14 | Letter | 3 |
| 15 | Parent Member declined | 1 |
| 16 | Notice 6/7/05 | 2 |
| 17 | Notice 6/1/05 | 2 |
| 18 | Classroom Observation | 1 |
| 19 | Assessment 5/05 | 8 |
| 20 | Memo 3/18/05 | 1 |
| 21 | Consent 3/17/05 | 1 |
| 22 | Notice 3/17/05 | 3 |
| 23 | Letter 3/17/05 | 3 |
| 24 | Evaluation | 6 |
| 25 | Letter 12/14/04 | 1 |
| 26 | Physical Exam 10/29/04 | 1 |
| 27 | Letter 9/04 | 1 |
| 28 | | |
| 29 | | |
| 30 | Questions grade 1 | 6 |
| 31 | Reading Assessment 6/8/05 | 7 |
| 32 | Writing Assessment 6/7/05 | 2 |
| 33 | Reading List | 2 |
| 34 | Writing Assessment 1/11/05 | 1 |
| 35 | Writing Assessment 10/13/04 | 1 |
| 36 | Math Assessment 1/7/05 | 4 |
| 37 | DRA Assessment 9/24/04 | 1 |
| 38 | Score Sheet 9/24/04 | 1 |
| 39 | Reading Assessment 9/04 | 1 |
| 40 | Writing Rubric | 1 |
| 41 | Kindergarten Report card | 1 |
| 42 | Progress Report | 1 |
| 43 | Math Assessment 6/2/05 | 3 |

23

# EXHIBIT B



## 𝕿𝖍𝖊 𝖀𝖓𝖎𝖛𝖊𝖗𝖘𝖎𝖙𝖞 𝖔𝖋 𝖙𝖍𝖊 𝕾𝖙𝖆𝖙𝖊 𝖔𝖋 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐

### The State Education Department
#### State Review Officer

No. 07-017

**Application of a CHILD WITH A DISABILITY, by her parents, for review of a determination of a hearing officer relating to the provision of educational services by the Board of Education of the Briarcliff Manor Union Free School District**

**Appearances:**

Mayerson & Associates, attorney for petitioners, Gary S. Mayerson, Esq., of counsel

Kuntz, Spagnuolo, & Murphy, P.C., attorney for respondent, Leah L. Murphy, Esq., of counsel

### DECISION

Petitioners appeal from the decision of an impartial hearing officer which denied their request to be reimbursed for their daughter's tuition and transportation costs at the Windward School (Windward) for the 2005-06 school year. The appeal must be dismissed.

At the commencement of the impartial hearing on May 24, 2006, petitioners' daughter was seven years old and attending second grade at Windward where petitioners unilaterally placed their daughter on August 1, 2005 for the 2005-06 school year (see Tr. pp. 611-12). Windward has not been approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities (8 NYCRR 200.1[d], 200.7]). Petitioners' daughter reportedly has average receptive and expressive language skills with a relative weakness in auditory memory (Dist. Ex. 19 at p. 8; Parent Ex. O at p. 9). She demonstrates weaknesses in decoding (Tr. p. 306; Dist. Ex. 10 at p. 6) and spelling (Tr. pp. 727, 809) and requires a number line or other prompt to solve basic math facts (Tr. pp. 768-70, 945-46). The child is able to write independently but not always able to read back what she has written (Dist. Ex. 10 at p. 4). The child has difficulty with handwriting and letter formation (Tr. pp. 727, 774). She has difficulty completing her work on time and at times lacks self-confidence (Tr. pp. 750; Dist. Ex. 6 at p. 4; Parent Ex. B at p. 4). The child's private pediatrician reported that based on previous psychoeducational testing it was "quite apparent" that the child had "dyslexia"; however, the previous testing is not included in the record (Parent Ex. H). The child's eligibility for special education programs and classification as a student with a learning disability are not in dispute (see 8 NYCRR 200.1[zz][6]).

Petitioners' daughter was "screened" prior to the 2003-04 school year as part of respondent's process for all incoming kindergarten students (Tr. p. 432). No significant deficits or weaknesses were noted that would have led to the child being referred for special education services (Tr. pp. 433-35). In October 2003 the child was administered the Phonological Awareness Test as part of respondent's regular education kindergarten program (Tr. pp. 243-45). On the test protocol the examiner noted that the child had trouble identifying letter names and sounds (Tr. pp. 251-52; Parent Ex. U1). The child was referred to respondent's phonological awareness program, a kindergarten reading support program that addressed phonological awareness and prereading skills (Tr. pp. 245, 247-48, 350-51). Petitioners, however, declined to have their daughter participate in the program because they didn't want her pulled out of the regular classroom for a portion of the school day (Tr. pp. 351-52, 366). During the 2003-04 school year, the child received "building" level speech services 30 minutes a week to address articulation concerns (Dist. Ex. 42; see Tr. p. 434).

At the beginning of the 2004-05 school year, the child's first grade teacher conducted an assessment of the child's reading skills using the Developmental Reading Assessment (DRA) (Tr. pp. 678-79, 694). The child's instructional reading level was judged to be level 3, pre-primer (Tr. p. 696). The teacher reported that the child read word by word and her reading lacked fluency (Tr. p. 697). Based on additional assessment and observation the teacher reported that the child exhibited some difficulty in blending sounds, as well as difficulty with spelling and writing (Tr. pp. 674-75, 679-81). The teacher reported that the child needed to work on word spacing, handwriting and identifying vowel sounds, which was typical in the beginning of first grade (Tr. pp.680-81). The child's teacher concluded that the child could use some support in reading and that she was a "good candidate" for respondent's first grade reading support program (Tr. pp. 705-09). In or about September 2004 respondent's first grade teacher contacted petitioners to inform them that she thought the child might benefit from the reading support program (Tr. p. 708-09). At that time petitioners declined to have their daughter participate in the program, citing concerns about the amount of time the child would be out of the classroom (Tr. pp. 242, 708-09; see also Tr. pp. 321-24).

Petitioners sought the services of a private tutor and in September 2004 the child began receiving private reading instruction twice a week using an Orton-Gillingham program (Parent Ex. N; see Dist. Ex. 14 at p. 1). The tutor reported that the child had not mastered all her letter sounds, had little capability for blending and was not able to read sight words with consistent accuracy (Parent Ex. N). The child's classroom teacher maintained contact with her private tutor throughout the 2004-05 school year (Tr pp. 284, 714, 927-28).

Following a November 2004 parent-teacher conference, petitioners agreed to have their daughter participate in the first grade reading support program (Tr. pp. 296, 346-48). The program consisted of one daily 45-minute pull-out session of reading support in a group (Tr. pp. 257-58, 706). The child's classroom teacher reported that the child's reading skills were assessed in January 2005 using the Qualitative Reading Inventory (QRI) (Tr. pp. 296-97, 710-11). Administration of the QRI revealed that the child had difficulty decoding words and comprehending passages at the primer level (Tr. pp. 339, 711-712; Parent Ex. W). However, the child was able to read primer level sight words at the independent level (Tr. pp. 338-39; Parent Ex. W). The teacher reported that between September 2004 and January 2005 the child's writing

2

skills had improved and her ideas were a bit more elaborate (Tr. pp. 718, 734; Dist. Ex. 40). Although the child's spelling had improved (Tr. p. 734; Dist. Ex. 40), she continued to exhibit difficulty with spelling and letter formation (Tr. p. 718). The child was meeting grade level expectations in mathematics (Tr. pp. 720-21).

In February 2005 they sought a private psychological evaluation to assess the child's current level of functioning and intellectual potential (Dist. Ex. 24 at p. 2; Parent Ex. Q at p. 2). Administration of the Wechsler Intelligence Scale for Children - Fourth Edition (WISC-IV) yielded the following composite (and percentile) scores: verbal comprehension 106 (66th), perceptual reasoning 108 (70th), working memory 107 (68th), processing speed 126 (96th), and full scale IQ score of 114 (82nd) (id.). The child's test scores were in the average to superior range of intellectual functioning (id.). The Wide Range Achievement Test - Revised (WRAT-R) was administered to the child to measure her academic achievement skills (Dist. Ex. 24 at p. 3; Parent Ex. Q at p. 3). The child achieved standard (and percentile) scores of 94 (34th) for reading, 101 (53rd) for spelling and 108 (70th) for arithmetic (id.). The private psychologist reported that as measured by the WRAT-R and Gallistel Ellis Test of Coding Skills, the child's performance on measures of structural analysis indicated that she lacked mastery of the easiest consonant vowel consonant words and as a result had no automatic way of attacking regularly appearing words (Dist. Ex. 24 at p. 5, Parent Ex. Q at p. 5).

According to the private psychologist, petitioners' daughter was unable to reproduce the Bender Gestalt designs in a satisfactory manner, but her recall of five out of nine was "good" (Dist. Ex. 24 at p. 4; Parent Ex. Q at p. 4). The child struggled with impulsivity, integration of the figures and angularization (id.) The private psychologist also noted that the results of the Boston Naming Test precluded word finding difficulties, but the child struggled to express herself and searched for words in general conversation (id.). In addition, the child had difficulty repeating sentences and word sequences (Dist. Ex. 24 at pp. 2, 3). Assessment of the child's math skills using the Key Math test yielded percentile (and grade equivalent) scores of 79 (2.1) for basic concepts, 79 (1.1) for operations, and 55 (1.9) for applications (id.). The private psychologist reported that petitioners' daughter had a "good understanding" of basic mathematical concepts and applications, but that she had a "hard time" with simple basic addition (Dist. Ex. 24 at p. 5; Parent Ex. Q at p. 5). The private psychologist indicated that despite the child's intelligence, she had a weak short-term auditory memory and had not acquired the basic decoding skills usually mastered in first grade and he offered diagnoses of "reading disorder" and "disorder of written language" (Dist. Ex. 24 at p. 6; Parent Ex. Q at p. 6). The psychologist opined that the child needed to be taught to read and write using a rule-based, sequenced, structured, linguistic phonetic, multisyllabic approach (id.). In addition, the private psychologist opined "that the child [was] a candidate for daily, individual, intensive, (three hours a day), Lindamood Bell or Orton[-]Gillingham remediation" (id.).

By letter dated March 17, 2005, petitioners referred their daughter to respondent's committee on special education (CSE) for an initial evaluation (Dist. Ex. 23). An observation of petitioners' daughter was conducted on May 4, 2005 (Dist. Ex. 18). During the observation the child was noted to have difficulty copying words correctly to her paper and required the teacher's assistance to complete her work (id.).

3

That same month respondent's speech-language pathologist conducted a speech and language assessment of the child (Dist. Ex. 19 at p. 1; Parent Ex. O at p. 2). Respondent's speech-language pathologist administered the Clinical Evaluation of Language Fundamentals - Fourth Edition (CELF-IV) and the Comprehensive Test of Phonological Processing (CTOPP) (id.). Results on the CELF-IV included standard (and percentile) scores of 106 (66th) in the Core Language Index, 113 (81st) in the Receptive Language Index, 101 (53rd) in the Expressive Language Index, 119 (90th) in the Language Content Index, 103 (58th) in the Language Structure Index, and 100 (50th) in the Working Memory Index (Dist. Ex. 19 at pp. 2-3; Parent Ex. O at pp. 3-4). Administration of the CTOPP yielded the following composite (and percentile) scores: phonological awareness 100 (50th), phonological memory 91 (27th) and rapid naming 91 (27th). The speech-language pathologist characterized the child's performance on tasks of phonological memory as "weak" and noted a deficit in this area could affect both listening and reading comprehension for complex sentences (Dist. Ex. 19 at p. 6). The speech-language pathologist also identified rapid naming as an area of relative weakness for the student (Dist. Ex. 19 at pp. 7, 8). The therapist noted that the efficient retrieval of phonological information was necessary to decode unfamiliar words and therefore affected reading fluency (Dist. Ex. 19 at pp. 6, 7-8; Parent Ex. O at pp. 7, 8-9). Respondent's speech-language pathologist concluded that the child's cumulative scores in the areas of general receptive and expressive language skills were in the average range, with testing revealing a relative weakness in short-term auditory memory (Dist. Ex. 19 at p. 7; Parent Ex. O at p. 8). She recommended that information be presented to the child in smaller units, repeated and rephrased as necessary, and that the child be provided with multimodal methods of teaching reading instruction (Dist. Ex. 19 at p. 8; Parent Ex. O at p. 9).

Respondent's CSE, by letter dated June 7, 2005, scheduled an initial CSE meeting for petitioners' daughter on June 13, 2005 (Parent Ex. P). According to CSE meeting minutes, the reading support teacher reported that the child had made "tremendous progress" since January and that she was internalizing and applying strategies being taught (Dist. Ex. 10 at p. 6; Parent Ex. C at p. 5). The child's classroom teacher indicated that the child had difficulty with decoding, could write independently but not always read back what she had written, and needed to become more independent (id.). The CSE recommended that petitioners' daughter be classified as a student with a learning disability and that she attend second grade in a general education program at its elementary school with a 12:1 special class in English/language arts for an hour and a half per day during the 2005-06 school year (Dist. Ex. 10 at pp. 3-4; Parent Ex. C at pp. 2-3). The June 13, 2005 individualized education program (IEP) indicated that the child should be taught using a program with a multimodal approach throughout the day with new information "chunked" into smaller components (Dist. Ex. 10 at p. 3; Parent Ex. C at p. 2).

The child's classroom teacher reported that by the end of the 2004-05 school year the child's DRA level was at the first grade level, which was appropriate (Tr. pp. 737, 947-48; Parent Ex. X). The teacher described the child's writing as more creative and reported that over the course of the school year the child's spacing and ability to correctly spell sight words in writing had improved (Tr. pp. 726-27). She noted that the child continued to need some assistance with the formation of letters and some spelling (Tr. p. 727). According to the teacher the child had a "good handle" on place value, could identify coins and was able to tell time (Tr. p. 723). The

child knew some of her math facts automatically; however, still needed to use a number line (Tr. p. 723).

By letter dated June 16, 2005, the private special educator, who had been providing private reading instruction to the child since September 2004, stated that petitioners' daughter had "made strides" in learning phonograms; however, as her classroom teacher had pointed out, she was the only child in her class who could not do her seatwork independently (Parent Ex. N). The private special educator opined that petitioners' daughter should "be given the benefit of reading instruction utilizing a sequential Orton-Gillingham program" (id.).

By letter dated August 2, 2005 to respondent's director of pupil personnel services, petitioners advised that they disagreed with their daughter's June 13, 2005 IEP and were withdrawing the child from the school district (Dist. Ex. 9 at p. 1; see Dist. Ex. 10 at pp. 3-7; Parent Ex. C at pp. 2-6). Petitioners' letter stated that the IEP neither recommend Lindamood-Bell or Orton-Gillingham instruction nor sufficiently rigorous English/language arts instruction to address their daughter's reading needs (Dist. Ex. 9 at p. 1). They also asserted that the IEP did not address their daughter's needs in basic mathematical functions (id.). The letter also advised that petitioners intended to re-enroll their child in respondent's school district at the earliest opportunity possible (id.).

For the purpose of discussing petitioners' concerns about the proposed IEP, an assistant to respondent's director of pupil personnel services called petitioners on August 3, 2005 and left a voice message suggesting possible dates for reconvening a CSE meeting (Tr. pp. 172-75, 178, 416; see Dist. Ex. 8). The director of pupil personnel services called petitioners the following day, August 4, 2005, and spoke with the child's father. During that telephone conversation, the parties agreed that both petitioners and respondent would be available on either Tuesday or Wednesday the following week for a CSE meeting (Tr. p. 179-80; see Parent Ex. V at p. 1). Respondent's director of pupil personnel services, by letter dated August 4, 2005, advised petitioners that she tentatively arranged for a CSE meeting to be conducted on Tuesday, August 9, 2005 (Dist. Ex. 8). By letter dated August 5, 2005, respondent advised petitioners of the time that the August 9, 2005 CSE would take place (Dist. Ex. 7). Respondent's director of pupil personnel services spoke to the child's father again on August 8, 2005 (Tr. p. 182). During this telephone conversation, the child's father requested an adjournment of the CSE meeting until sometime in September, indicating that he wanted the child's private tutor to participate, that the private tutor was not available until late in August, and that family was going on vacation on August 14, 2005 (Tr. p. 181-82). The father further noted that because petitioners' daughter was not going to attend respondent's recommended placement he did not "see any sense of being there" (Tr. p. 182-83, 414-16; Parent Ex. V at p. 2). According to respondent's director of pupil personnel services, during this conversation she advised the child's father that respondent was prepared to meet on August 9, 2005 having made arrangements for the special education teacher to return from Cape Cod, that the child's private tutor and petitioners could participate by telephone, that respondent was interested in revising the IEP to provide additional services to address petitioners' concerns, that respondent was required to have a revised IEP completed before the start of the school year, and that respondent was willing to convene two CSE meetings, one on August 9, 2005 and the other in September 2005, if necessary (Tr. pp. 181-82, 195-96, 414-18; 492-93, 534). Respondent's director of pupil personnel services also advised

that the child's private tutor and her first grade teacher at respondent's school were in constant communication and that they were on the "same page" regarding the child's program (Tr. p. 183; Parent Ex. V at p. 2).

Respondent's CSE reconvened on August 9, 2005 to address petitioners' concerns with their daughter's June 13, 2005 IEP (Dist. Ex. 6 at p. 4; Parent Ex. B at p. 4). The August 9, 2005 CSE attendance notes indicate that petitioners were contacted by telephone, but declined to participate at the August 9, 2005 CSE meeting (Dist. Ex. 6 at p. 4; Parent Ex. B at p. 4; see Parent Ex. V at p. 2). The child's father also conveyed over the telephone that he wanted the private psychologist that evaluated the child to be present for the CSE meeting (Tr. p. 417).

The August 9, 2005 CSE meeting continued in the absence of the child's parents. For the 2005-06 school year, respondent's CSE recommended that petitioners' daughter remain classified as a student with a learning disability (Dist. Ex. 6 at p. 1; Parent Ex. B at p. 1). The CSE recommended that she attend second grade in a general education program at its elementary school with a 15:1 special class in English/language arts for two hours per day (Dist. Ex. 6 at p. 1; Parent Ex. B at p. 1), which was half an hour more than what had been recommended by the CSE at its June 13, 2005 CSE meeting (see Dist. Ex. 10 at p. 3; Parent Ex. C at p. 2). The CSE additionally recommended that petitioners' daughter attend a 15:1 special class in math for an hour per day (Dist. Ex. 6 at p. 1; Parent Ex. B at p. 1). The August 9, 2005 IEP noted that the child should receive instruction in an educational program that used a multimodal approach with new information "chunked" into smaller components and that there should be immediate positive reinforcement throughout the day (id.).

By letter dated August 11, 2005, petitioners informed respondent that they would be seeking an award of tuition reimbursement for the 2005-06 school year (Dist. Ex. 5 at p. 1; Parent Ex. I).

By due process complaint notice dated December 7, 2005, petitioners requested an impartial hearing for the purpose of, among other things, obtaining tuition reimbursement at Windward for the 2005-06 school year and compensatory education (Parent Ex. A). Petitioners contended, among other things, that respondent improperly convened a CSE meeting without parental participation and that respondent's recommended educational program failed to "adequately and meaningfully" address their daughter's educational needs (Parent Ex. A at p. 2). The impartial hearing commenced on May 24, 2006 and concluded on November 1, 2006, after six days of testimony. The impartial hearing officer rendered a decision on January 14, 2007.

The impartial hearing officer determined that respondent's CSE failed to notify petitioners at least five days prior to the August 9, 2005 CSE meeting of its intent to review their daughter's program and placement (IHO Decision at pp. 16-17; see 8 NYCRR 200.5[c]). However, the impartial hearing officer concluded that this error did not deny the child a free appropriate public education (FAPE)[1] (IHO Decision at pp. 17-18). She found that the child's

---

[1] The term "free appropriate public education" means special education and related services that -
    (A) have been provided at public expense, under public supervision and direction, and without charge;
    (B) meet the standards of the State educational agency;
    (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and
    (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

father's testimony regarding notice of the August 9, 2005 CSE meeting not credible (IHO Decision at p. 16). She declined to conclude that petitioners lack of attendance at the August 9, 2005 CSE meeting denied the child a FAPE. She also found petitioners' claim that they were denied effective participation in writing the goals and objectives during the June 13, 2005 CSE meeting to be unpersuasive (IHO Decision at p. 18). Substantively, the impartial hearing officer found that respondent's recommended educational program for the 2005-06 school year was reasonably calculated to enable the child to receive educational benefit by appropriately addressing her needs in reading and arithmetic (IHO Decision at p. 20). The impartial hearing officer also concluded that petitioners failed to demonstrate that Windward was an appropriate placement for the 2005-06 school year (IHO Decision at p. 18). The impartial hearing officer did not make a determination regarding whether equitable considerations supported petitioners' request for reimbursement. In addition, the impartial hearing officer denied petitioners' claim for compensatory education (IHO Decision at p. 20).

Petitioners contend on appeal that the impartial hearing officer erred in concluding both that respondent offered the child a FAPE for the 2005-06 school year and that petitioners failed to demonstrate that Windward was an appropriate placement for the 2005-06 school year. Petitioners assert that respondent failed to offer a FAPE to their daughter for the 2005-06 school year, that Windward was an appropriate placement for the 2005-06 school year, that equitable considerations support a claim for tuition reimbursement, and they request reimbursement for their daughter's tuition and transportation costs at Windward for the 2005-06 school year.

First, I note that petitioners do not appeal from the part of the impartial hearing officer's decision which denied their request for compensatory education (see IHO Decision at p. 20). An impartial hearing officer's decision is final and binding upon the parties unless appealed to the State Review Officer (34 C.F.R. § 300.510[a]; 8 NYCRR 200.5[k]). Consequently, this part of the decision is final and binding (Application of a Child with a Disability, Appeal No. 06-094; Application of a Child Suspected of Having a Disability, Appeal No. 06-092; Application of a Child with a Disability, Appeal No. 06-085; Application of a Child with a Disability, Appeal No. 04-024; Application of a Child with a Disability, Appeal No. 03-108; Application of a Child with a Disability, Appeal No. 02-100; Application of a Child with a Disability, Appeal No. 02-073).

The central purpose of the Individuals with Disabilities Education Improvement Act (IDEA) (20 U.S.C. §§ 1400-1482)[2] is to ensure that students with disabilities have available to them a FAPE (20 U.S.C. § 1400[d][1][A]; see Schaffer v. Weast, 126 S. Ct. 528, 531 [2005]; Bd. of Educ. v. Rowley, 458 U.S. 176, 179-81, 200-01 [1982]; Frank G. v. Bd. of Educ., 459 F.3d 356, 371 [2d Cir. 2006]). A FAPE includes special education and related services designed to meet the student's unique needs, provided in conformity with a comprehensive written IEP (20

---

(20 U.S.C. § 1401[9]).

[2] On December 3, 2004, Congress amended the IDEA; however, the amendments did not take effect until July 1, 2005 (see Individuals with Disabilities Education Improvement Act of 2004 (IDEA 2004), Pub. L. No. 108-446, 118 Stat. 2647). As the relevant events in the instant appeal took place after the effective date of the 2004 amendments, the provisions of the IDEA 2004 apply and the citations contained in this decision are to the amended statute.

U.S.C. § 1401[9][D]; 34 C.F.R. § 300.17; see 20 U.S.C. § 1414[d]; 34 C.F.R. § 300.22).[3]  The federal and state statutes and regulations concerning the education of children with disabilities provide for a collaborative process between parents and school districts in planning and providing appropriate special education services (see Schaffer, 126 S. Ct. at 532; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192-93 [2d Cir. 2005]).

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359 [1985]; Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Cerra, 427 F.3d at 192).  In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (Burlington, 471 U.S. at 370-71).  "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP" (id. at pp. 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 C.F.R. § 300.148).

Pursuant to the IDEA, reimbursement for parental private school placement may be reduced if parents do not provide notice of the unilateral placement at the most recent CSE meeting prior to their removal of the child from public school, or by written notice ten business days before such removal (see 20 U.S.C. § 1412[a][10][C][iii][I]).  Under this statutory provision, a reduction or denial in tuition reimbursement is discretionary (Application of the Bd. of Educ., Appeal No. 03-062; Application of a Child with a Disability, Appeal No. 01-054; Application of a Child with a Disability, Appeal No. 00-027); however, at least one circuit court of appeals has denied tuition reimbursement for lack of prior notice, noting that the provision "serves the important purpose of giving the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a free appropriate public education can be provided in the public schools" (Greenland Sch. Dist. v. Amy N., 358 F.3d 150, 160 [1st Cir. 2004]; see also Ms. M. v. Portland Sch. Committee, 360 F.3d 267 [1st Cir. 2004]).

The first step in reviewing a tuition reimbursement case is to determine whether the district offered to provide a FAPE to the student (see Mrs. C. v. Voluntown, 226 F.3d 60, 66 [2d Cir. 2000]).  A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; Cerra, 427 F.3d at 192).  While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate

---

[3] The Code of Federal Regulations (34 C.F.R. Parts 300 and 301) has been amended to implement changes made to the Individuals with Disabilities Education Act, as amended by the Individuals with Disabilities Education Improvement Act of 2004.  The amended regulations became effective October 13, 2006.  In this case, none of the new provisions contained in the amended regulations are applicable because all the relevant events occurred prior to the effective date of the new regulations.  However, for convenience, citations herein refer to the regulations as amended because the regulations have been reorganized and renumbered.

under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]; Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]). If a procedural violation has occurred, relief is warranted only if the violation affected the student's right to a FAPE (J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 [2d Cir. 2000]). The IDEA directs that, in general, a decision by an impartial hearing officer shall be made on substantive grounds based on a determination of whether or not the child received a FAPE (20 U.S.C. § 1415[f][3][E][i]). Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a child did not receive a FAPE only if the procedural inadequacies (a) impeded the child's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE to the child, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; see 34 C.F.R. § 300.513[a][2]; Matrejek v. Brewster Cent. School Dist., 2007 WL 210093, at *2 [S.D.N.Y. Jan. 9, 2007]). Also, an impartial hearing officer is not precluded from ordering a school district to comply with IDEA procedural requirements (20 U.S.C. § 1415[f][3][E][iii]).

The IDEA sets forth procedural safeguards that include providing parents an opportunity "to participate in meetings with respect to the identification, evaluation, and educational placement of the child" (20 U.S.C. § 1415[b][1]). Federal and state regulations governing parental participation require that school districts take steps to ensure that parents are present at their child's IEP meetings or are afforded the opportunity to participate (34 C.F.R. § 300.322; 8 NYCRR 200.5[d]; see Mr. & Mrs. M v. Ridgefield Bd. of Educ., 2007 WL 987483 (D.Conn. Mar. 30, 2007). In deciding whether parents were afforded an opportunity to participate in the development of their child's IEP, courts have considered the extent of the participation (Cerra, 427 F.3d at 193 [finding meaningful parental participation when the student's mother attended numerous CSE meetings and a CSE meeting transcript reflected that she "participated actively" in the development of her daughter's IEP and was "frequently consulted for input about the CSE's proposed plan"]).

By definition, the IEP must be a written statement (20 U.S.C. § 1414[d][1][A][i]), and must be in effect at the beginning of each school year (20 U.S.C. § 1414[d][2][A]; see also 34 C.F.R. § 300.342[a]; Cerra, 427 F.3d at 194 [". . . the District fulfilled its legal obligations by providing the IEP before the first day of school."]). A district's failure to provide a child's parents with a timely IEP may afford a basis for concluding that the district did not offer an appropriate placement to the child (Application of the Dept. of Educ., Appeal No. 06-057; Application of a Child with a Disability, Appeal No. 06-030; Applications of the Board of Educ. and a Child with a Disability, Appeal Nos. 00-091 and 01-018; Application of a Child with a Disability, Appeal No. 99-81).

The Second Circuit has determined that "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression'" and if the IEP affords the student with an opportunity greater than mere "trivial advancement" (Cerra, 427 F.3d at 195, quoting Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]), in other words, is likely to provide some "meaningful" benefit (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]). The IDEA, however, does not require school districts to develop IEPs that maximize the potential of a student with a disability (Rowley, 458 U.S. at 197 n.21, 199; see Grim, 346 F.3d at 379; Walczak, 142 F.3d at

9

132).   The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. §§ 300.114, 300.116; 8 NYCRR 200.6[a][1]).  The burden of persuasion in an administrative hearing challenging an IEP is on the party seeking relief (see Schaffer, 126 S. Ct. at 537 [finding it improper under the IDEA to assume that every IEP is invalid until the school district demonstrates that it is not]).

I will first address the procedural claims raised with respect to the August 9, 2005 CSE meeting.  The impartial hearing officer determined that respondent's CSE did not provide written notice to petitioners, at least five days prior to the August 9, 2005 CSE meeting, of its intent to review their daughter's program and placement (IHO Decision at pp. 16-17; see 8 NYCRR 200.5[c]).  The impartial hearing officer concluded that petitioners did not receive five days written notice, but that this error did not constitute a denial of the child's right to a FAPE (IHO Decision at pp. 17-18). I agree.  Under the circumstances here, where the parties initially agreed by telephone on August 4, 2005 that August 9, 2005 was an agreeable date and discussed the purpose of the CSE meeting, and written notice was sent August 4, 2005, I find the delay in providing written notice of the CSE meeting to be de minimus error which did not deny the child a FAPE (20 U.S.C. § 1415[f][3][E][ii]; see 34 C.F.R. § 300.513[a][2]).

Petitioners contend that they were deprived of their right to meaningfully participate at the August 9, 2005 CSE meeting because the meeting took place without petitioners being present.  If parents are unable to be physically present at a meeting, the district must use other methods to ensure their participation, such as telephone or video conference calls (34 C.F.R. § 300.322[c]; 8 NYCRR 200.5[d][1][iii]).  A school district may only conduct a meeting without the parents' participation if it is unable to convince the parents that they should attend; in which case the district must have a detailed record of its various attempts to arrange a mutually agreed upon time and place for the meeting (34 C.F.R. § 300.322[d]; 8 NYCRR 200.5[d][3], [4]; see Application of a Child with a Disability, Appeal No. 03-082).

Given the totality of the circumstances presented in this case involving the formulation of an educational program for the child's 2005-06 school year, I concur with the impartial hearing officer and conclude that respondent's CSE did not deny petitioners' child a FAPE by convening the August 9, 2005 CSE meeting in the absence of the child's parents.  First, I note that the June 13, 2005 IEP formed the basis of the August 9, 2005 IEP and that petitioners effectively participated in the June 13, 2005 CSE meeting in which their child was determined eligible for special education services and a program for the 2005-06 school year was formulated (Parent Ex. M).  The record reflects that not only did petitioners participate in the June 13, 2005 CSE meeting, but that their concerns which were raised were addressed.  For example, the record shows that initially the June 13, 2005 CSE members determined that the child was ineligible for special education services, but at the urging of petitioners the members reconsidered and acquiesced to petitioners' request for a determination of eligibility for special education services (Parent Ex. M at pp. 1-2).  In addition, upon learning of petitioners' discontentment with the IEP formulated as a result of the June 13, 2005 CSE meeting, and upon learning of petitioners' intent to make a unilateral private placement, respondent appropriately scheduled another CSE meeting for the purpose of addressing petitioners' additional concerns prior to the removal of the child from the public school (see Greenland, 358 F.3d at 160).  Respondent contacted petitioners by telephone and arranged a mutually agreed upon time and place for the CSE meeting.  Upon learning of

10

petitioners' subsequent request for an adjournment, in part because of an unavailability of the parents' experts to attend the meeting, respondent offered to make arrangements to allow petitioners and their experts to participate by telephone.  Petitioners declined the offer. Petitioners also declined respondent's offer to convene two CSE meeting, one in August 2005 and one in September 2005 for the purpose of facilitating petitioners' concern regarding meeting attendance.  Respondent also notified petitioners prior to the August 9, 2005 CSE meeting that the child's IEP would be revised consistent with petitioners' request for additional math instruction and their request for increased reading instruction.  In addition, respondent spoke with the child's father by telephone as the August 9, 2005 CSE meeting was convening in an attempt to secure parental participation; however, the child's father declined to participate. Significantly, as discussed above, the record also reflects that petitioners declined participation in the August 9, 2005 CSE meeting because in their view the anticipated private placement obviated the need for a CSE meeting.

The August 9, 2005 CSE meeting did take place and resulted in the formulation of an IEP that implemented parent concerns expressed at the June 13, 2005 CSE meeting and additional concerns expressed subsequent to the June 13, 2005 CSE meeting.  Under the circumstances, particularly given the parties' interest in revising the June 13, 2005 IEP, the need to have the revised IEP in place prior to the 2005-06 school year, the parents availability on August 9, 2005 and their unavailability for an extended time thereafter, I do not find that respondent acted inappropriately in declining the adjournment request.  I find under the circumstances presented herein that the convening of the August 9, 2005 CSE meeting in the absence of parent attendance did not impede the child's right to a FAPE, did not significantly impede petitioners' opportunity to participate in the decision making process regarding the provision of a FAPE to their daughter, and did not cause a deprivation of educational benefits (see 20 U.S.C. § 1415[f][3][E][ii]; see also 34 C.F.R. § 300.513[a][2]). [4]

Petitioners also contend that the respondent failed to substantively offer a FAPE to their daughter for the 2005-06 school year.  I concur with the impartial hearing officer that respondent offered the child an appropriate program for the 2005-06 school year (see IHO Decision at p. 20).  An appropriate educational program begins with an IEP which accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs, and provides for the use of appropriate special education services (Application of the Bd. of Educ., Appeal No. 06-076; Application of a Child with a Disability, Appeal No. 06-059; Application of the Bd. of Educ., Appeal No. 06-029; Application of a Child with a Disability,

---

[4] The case presented herein is factually distinguishable from a recent United States District Court of Connecticut case where the District Court concluded that the school district impermissibly conducted a CSE meeting in the parent's absence after the district's failure to respond to a parent's request for an alternative meeting date (Mr. & Mrs. M v. Ridgefield Bd. of Educ., 2007 WL 987483 at * 6 [D.Conn., Mar. 30, 2007]).  The following facts present in the instant case were not present before the Court in Ridgefield: 1) the parents indicated that there was no need for a subsequent CSE meeting given the upcoming private placement, 2) the school district established a meeting date based upon an initial agreement with the parents, 3) the scheduled CSE meeting which formulated the final IEP for an upcoming school year was a continuation of a prior CSE meeting in which the parents participated, 4) the availability of meeting dates was limited due to parent vacation plans, parent's expert's vacation plans, and the need to have a finalized IEP in the fast approaching upcoming school year, 5) the second CSE meeting was scheduled for the specific purpose of revising an IEP to incorporate specific requests put forth by the parents, 6) the school district offered an alternate September CSE date in addition to the August date, and 7) the parents were actually available for the August 9, 2005 CSE meeting.

11

Appeal No. 04-046; <u>Application of a Child with a Disability</u>, Appeal No. 02-014; <u>Application of a Child with a Disability</u>, Appeal No. 01-095; <u>Application of a Child Suspected of Having a Disability</u>, Appeal No. 93-9).

The private psychologist who evaluated the child in February 2005 indicated that although the child's test scores were in the average to superior range of intellectual functioning (Dist. Ex. 24 at p. 2; Parent Ex. Q at p. 2), she had a weak short-term auditory memory and had not acquired the basic decoding skills usually mastered in first grade (Dist. Ex. 24 at p. 6; Parent Ex. Q at p. 6). The private psychologist opined that petitioners' daughter had a "good understanding" of basic mathematical concepts and applications, but that she had a "hard time" with simple basic addition (Dist. Ex. 24 at p. 5; Parent Ex. Q at p. 5). By the end of the 2004-05 school year the child's instructional reading level, as measured by the DRA, was at the first grade level (Tr. p. 737; <u>see also</u> Tr. pp. 343, 947-48; Parent Ex. X). The child continued to demonstrate some difficulty with decoding (Tr. p. 306; Dist. Ex. 10 at p. 6) and also with spelling (Tr. pp. 727, 809). According to the classroom teacher, the child continued to need assistance with the formation of letters and help with handwriting skills (Tr. pp. 727, 774). The child's ability to solve basic equations involving addition and subtraction was inconsistent (Tr. pp. 768-70; Dist. Ex. 43); however, given a number line or something to prompt her, the child was able add and subtract math facts up to twelve (Tr. pp. 945-46). The child had difficulty completing her work on time (Tr. p. 750). With regard to social-emotional functioning, the child's teacher reported that the child was shy, but happy and willing to participate (Tr. p. 924). She acknowledged that the child lacked confidence at the beginning of the year but indicated by the end of the year it was not a problem (Tr. pp. 746-47, 925-26).

As noted above, petitioners rejected their daughter's June 13, 2005 IEP and indicated that the IEP did not contain Lindamood-Bell or Orton-Gillingham instruction to address their daughter's reading needs as recommended by petitioners' private evaluators (Dist. Ex. 9 at p. 1). Respondent's CSE reconvened on August 9, 2005 to address petitioners concerns with their daughter's June 13, 2005 IEP (Dist. Ex. 6 at p. 4; Parent Ex. B at p. 4). The August 9, 2005 IEP indicated that information needed to be presented to the child in small units and repeated and rephrased if necessary (Dist. Ex. 6 at p. 2; Parent Ex. B at p. 2) and that the English/language arts and math program should be taught using a multimodal approach with new information "chunked" into smaller components (Dist. Ex. 6 at p. 1; Parent Ex. B at p. 1). In addition, the August 9, 2005 IEP noted that verbal directions should be paired with verbal cues when possible (Dist. Ex. 6 at p. 3; Parent Ex. B at p. 3). The August 9, 2005 CSE recommended annual goals with objectives in the areas of reading for word recognition, decoding skills, and comprehension skills necessary to read and understand information (Dist. Ex. 6 at pp. 4-6; Parent Ex. B at pp. 4-6). This is consistent with the evaluative data that was available to the August 9, 2005 CSE (<u>see</u> Dist. Ex. 24 at p. 6; Parent Ex. Q at p. 6; <u>see also</u> Dist. Ex. 19 at p. 8; Parent Ex. O at p. 9). For the 2005-06 school year, respondent's CSE recommended that petitioners' daughter attend second grade in a general education program at its elementary school with a 15:1 special class in English/language arts for two hours per day (Dist. Ex. 6 at p. 1; Parent Ex. B at p. 1). This was half an hour more than what was recommended by the CSE at its June 13, 2005 CSE meeting (Dist. Ex. 10 at p. 3; Parent Ex. C at p. 2). The August 9, 2005 IEP indicated that the recommended second grade special education teacher had intensive training in Lindamood-Bell and Orton-Gillingham instruction (Dist. Ex. 6 at p. 4; Parent Ex. B at p. 4; <u>see</u> Tr. pp. 376-77).

Respondent's recommended second grade special education teacher (see Tr. p. 376) testified that she would have been the child's English/language arts and math special education teacher for the 2005-06 school year (Tr. p. 796). The recommended second grade special education teacher further testified that when the child entered her class she would have administered her own assessment to determine whether the child had mastered letters and sounds and whether she recognized words that began with those sounds (Tr. pp. 797-98). The recommended second grade special education teacher testified that her master's degree was "based" upon the Orton-Gillingham method (Tr. p. 801) and that she was certified in Lindamood-Bell (Tr. p. 819-20. Respondent's recommended second grade special education teacher testified that she used an "Orton-Gillingham approach" to reading in her class because it was structured and systematic and there would be immediate feedback and gratification (Tr. pp. 800-01). She further noted that the approach included components related to reading, writing, spelling and handwriting (Tr. p. 802).

Petitioners also rejected their daughter's June 13, 2005 IEP by indicating that the IEP did not address their daughter's needs in basic mathematical functions (Dist. Ex. 9 at p. 1). Respondent's CSE reconvened on August 9, 2005 to address this concern (Dist. Ex. 6 at p. 4; Parent Ex. B at p. 4). I agree with the impartial hearing officer that the special education program proposed in the August 9, 2005 IEP addressed the child's arithmetic needs (see IHO Decision at p. 20). The August 9, 2005 IEP indicated that the child had difficulty with remembering addition and subtraction concepts and utilizing vocabulary in math word problems (Dist. Ex. 6 at p. 2; Parent Ex. B at p. 2) and that she needed strategies to remember addition and subtraction concepts (Dist. Ex. 6 at p. 3; Parent Ex. B at p. 3). The August 9, 2005 CSE recommended an annual goal for mathematics and the child's IEP included objectives related to learning addition facts, understanding subtraction and time concepts and understanding computational and problem solving vocabulary (Dist. Ex. 6 at pp. 5-6; Parent Ex. B at pp. 5-6). This is consistent with the evaluative data that was available to the August 9, 2005 CSE (see Dist. Ex. 24 at p. 5; Parent Ex. Q at p. 5). For the 2005-06 school year, respondent's CSE recommended that petitioners' daughter attend a 15:1 special class in math for an hour per day (Dist. Ex. 6 at p. 1; Parent Ex. B at p. 1). Respondent's recommended second grade special education teacher (see Tr. p. 796) testified that her recommended math class used the same curriculum as the regular education program, but suggested she employed more manipulatives and hands on activities (Tr. pp. 806-07; see also Dist. Ex. 6 at p. 4). Despite petitioners absence from the August 9, 2005 CSE meeting, respondent's CSE added a special class in math that was requested by petitioners (see Dist. Ex. 9 at p. 1) and added an annual goal with objectives for the special class in math (Tr. p. 193; see Dist. Ex. 6 at pp. 1, 5-6; Parent Ex. B at pp. 1, 5-6).

Petitioners further contend their daughter's August 9, 2005 IEP does not address their daughter's social and emotional needs and allege that respondent's CSE erroneously concluded that there were no social and emotional needs to be addressed through special education services. The private psychologist indicated that the child was a friendly, cooperative youngster who sustained excellent eye contact and noted that the child was comfortable conversing about a variety of topics, which demonstrated the enriched environmental experiences to which she had been exposed (Dist. Ex. 24 at p. 2; Parent Ex. Q at p. 2). Respondent's school psychologist indicated to the August 9, 2005 CSE that although petitioners' daughter was eager to please, she was not confident and should be monitored for the onset of self-esteem concerns (Dist. Ex. 6 at

p. 4; Parent Ex. B at p. 4). Respondent's school psychologist noted that the child responded to positive praise and needed to be encouraged and supported (id.). Although the August 9, 2005 IEP indicated that there were no social and emotional needs to be addressed through special education services (Dist. Ex. 6 at p. 3; Parent Ex. B at p. 3), the IEP indicated that the child should be monitored for self-esteem concerns (Dist. Ex. 6 at p. 4; Parent Ex. B at p. 4) and should receive immediate positive reinforcement throughout the day (Dist. Ex. 6 at p. 1; Parent Ex. B at p. 1). I note that petitioners, who were present at the June 13, 2005 CSE meeting, did not object or represent to the June 13, 2005 CSE that their daughter exhibited any social or emotional needs that required special education services (see Dist. Ex. 10 at pp. 3-7; Parent Ex. C at pp. 2-6; see also Dist. Ex. 9 at p. 1). Petitioners have failed to demonstrate that respondent's CSE erroneously concluded that there were no social and emotional needs to be addressed through special education services at the time the August 9, 2005 IEP was formulated.

Based upon the information before me, I find that the program proposed in the August 9, 2005 IEP, at the time it was formulated, was reasonably calculated to enable the child to receive educational benefit (Viola v. Arlington Central School District, 414 F. Supp. 2d 366 at 382 [S.D.N.Y. 2006] [citing to J.R. v. Bd. of Educ. of the City of Rye Sch. Dist., 345 F. Supp. 2d 386, 395 n.13 [S.D.N.Y. 2004]; see Cerra, 427 F.3d at 195; see also Mrs. B., 103 F.3d at 1120; Application of a Child with a Disability, Appeal No. 06-112; Application of a Child with a Disability, Appeal No. 06-071; Application of the Bd. of Educ., Appeal No. 06-010; Application of a Child with a Disability, Appeal No. 05-021). In light of the foregoing, I concur with the impartial hearing officer for the reasons set forth above, that respondent offered the child an appropriate program for the 2005-06 school year. Having determined that the challenged IEP offered the child a FAPE for the 2005-06 school year, I need not reach the issue of whether Windward was appropriate, and the necessary inquiry is at an end (Voluntown, 226 F.3d at 66; Walczak, 142 F.3d at 134; Application of a Child with a Disability, Appeal No. 05-038; Application of a Child with a Disability, Appeal No. 03-058).

I encourage the parties to work cooperatively in planning and providing appropriate special education services to meet the needs of the child.

I have reviewed the petitioners' remaining contentions and find them to be without merit.

**THE APPEAL IS DISMISSED.**

Dated:     **Albany, New York**
           **April 16, 2007**                    _____
                                                 **PAUL F. KELLY**
                                                 **STATE REVIEW OFFICER**

14

# EXHIBIT C

1 of 1 DOCUMENT

Copyright 2007 Factiva ®, from Dow Jones
All Rights Reserved



factiva.

(Copyright (c) 2007, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL

The Wall Street Journal

July 24, 2007 Tuesday

**SECTION:** Pg. A1

**LENGTH:** 2347 words

**HEADLINE:** Staying The Course: Schools Beat Back Demands For Special-Ed Services --- Parents Face Long Odds Amid Cost Concerns;
Seeking a Home Tutor

**BYLINE:** By Daniel Golden

**BODY:**

EAST ISLIP, N.Y. -- Paul McGlone, an iron worker, and his wife, Tricia, became worried in 2006 that their autistic son knew fewer letters in kindergarten than he had in preschool.

When the East Islip school district refused their request for at-home tutoring by an autism specialist, they exercised their right under federal special-education law to an administrative hearing. There, a hearing officer ordered East Islip to pay for seven hours a week of home therapy. The McGlones hired a tutor, and their son "started to click again," his mother says.

Then the district appealed the decision to Paul F. Kelly, the New York state review officer for special-education cases. He denied any reimbursement for home services. "The child's progress was consistent with his abilities," Mr. Kelly found in February. The family canceled the tutoring.

The McGlone case is part of a pattern that has many parents and advocates for the disabled in an uproar. They say administrative reviews in many parts of the U.S. overwhelmingly back school districts in disputes over paying for special-education services. State education departments, which have an interest in keeping down special-education costs, typically train or hire the hearing officers. Also, recent U.S. Supreme Court decisions and changes to federal law have made it harder for parents to win cases.

Although relatively few disputes between parents and school districts reach the hearing stage, the decisions set ground rules for how much extra assistance districts must provide disabled students, who comprise 14% of all public-school students. In recent years, schools have "mainstreamed" more students with disabilities in regular classrooms, hoping to benefit the children through interaction with nondisabled peers while saving money at the same time.

The battles reflect tension over the high cost of special education. In 1999-2000, the latest year for which figures are available, national spending on special education reached $50 billion, according to the Center for Special Education Finance, a nonprofit research group. In 2005-06, New York City's public school system alone spent $390 million on private education for disabled students considered unsuited to public school. Such tuition can cost $50,000 a year or more per pupil.

Staying The Course: Schools Beat Back Demands For Special-Ed Services --- Parents Face Long Odds Amid Cost Concerns; Seeking a Home Tutor The Wall Street Journal July 24, 2007 Tuesday

New York's Mr. Kelly is a particular target of special-education parents' anger. A study by Pamela Steen, a Patchogue, N.Y., lawyer for parents, found that he granted full or partial relief to districts in 60 of their 70 appeals, or 86%, in 2006 and 2007. Andrew Cuddy, an Auburn, N.Y., lawyer who represents parents, says Mr. Kelly is "being dictated to" by the state education department to save money.

Last week, about 20 lawyers for parents met to discuss possible legal action against Mr. Kelly. Advocates for the disabled have complained about him to Gov. Eliot Spitzer. John Farago, a City University of New York law professor and a New York hearing officer, says Mr. Kelly is "rewriting the rule book" to challenge precedents that enabled parents to put children in private schools at public expense.

A spokesman said Mr. Kelly declined to comment because he serves in a quasijudicial capacity. Kathy Ahearn, state education department counsel, said Mr. Kelly decides each case on "its own unique facts" and the department doesn't influence his rulings.

Under the 1975 federal law now known as the Individuals with Disabilities Education Act, parents who believe public schools fail to provide their disabled children with a "free appropriate" education may seek redress in a hearing before an independent arbiter.

In some states, lawyers or retired school administrators work part-time as hearing officers. Elsewhere, a full-time official handles special-education hearings as part of a broader caseload. In New York and Pennsylvania, initial decisions may be appealed to a second tier of administrative review. Once they exhaust these reviews, parents may pursue their case in state or federal court.

Administrative review was conceived as a faster and cheaper way of resolving special-education wrangles than going directly to court. But school districts soon considered it a financial nightmare. When they lost, they often had to pay not only private tuitions but also parents' legal bills.

In 2004, Congress amended the disabilities act to require parents to attend a mandatory "resolution session" with school officials before a hearing. It also allowed a district to recover its legal costs from parents if it wins at hearing and the complaint is deemed frivolous.

Two U.S. Supreme Court decisions also lengthened odds against parents. In 2005, the court ruled that parents seeking relief must bear the "burden of persuasion" in hearings. That means when both sides' evidence is equally compelling, the hearing officer should rule in the district's favor. Previously, in about 15 states, precedent or state law placed the burden on districts, says education professor Perry Zirkel of Lehigh University in Bethlehem, Pa.

At hearings, parents rely on expert witnesses, such as child psychologists, to offset testimony from teachers and other school staff. But the Supreme Court ruled last year that, even if parents win hearings, they can't recoup witnesses' fees -- often $100 an hour or more -- from districts.

The number of hearings nationwide dropped 31% to 4,170 in 2005-06 from 6,038 the year before. Publicly funded placements in private schools, which had climbed to 73,149 in 2004 from 52,012 in 1996, fell to 71,082 in 2005, the latest year tallied by the U.S. Department of Education.

The Supreme Court's burden-of-persuasion precedent played a role last year when Carolyn and Charles Johnson of East Islip challenged their school district, on Long Island's southern side. The district had determined that the Johnsons' son, Andrew, a lean, restless six-year-old whom his mother calls "a friendly kid with no friends," didn't qualify for special education.

Only 9.6% of the district's students were in special education in December 2005, below a statewide average of 12.3%. The average special-education student cost East Islip $21,847 in 2004-05, compared with $9,550 for general students. Guercio & Guercio, a law firm that represents East Islip, said the district "is fully committed to providing an appropriate education to all of its students" and offers services to children with disabilities even if they aren't in special education.

Six health-care professionals agreed that Andrew, who suffers from a form of autism called Asperger's Syndrome, needed help with social skills. His kindergarten teacher testified that he slapped classmates, leveled their building-block towers, grabbed puzzle pieces out of their hands, and threw pretzels and Play-Doh across the room.

Staying The Course: Schools Beat Back Demands For Special-Ed Services --- Parents Face Long Odds Amid Cost
Concerns; Seeking a Home Tutor The Wall Street Journal July 24, 2007 Tuesday

The district argued that Asperger's wasn't hampering Andrew academically, and his misbehavior wasn't unusual for
kindergarten. Hearing officer Harry Kershen, a retired school administrator, came down on East Islip's side, citing the
Supreme Court decision. Andrew has "certain quirks," but "his behavior wasn't all that off the wall," Mr. Kershen says.

Mr. Kelly, the New York state reviewer, upheld the ruling, leaving Andrew in a regular classroom without the aide
the Johnsons sought. Mr. Kelly wrote that the record showed Andrew has "excellent work habits." The Johnsons ap-
pealed to federal district court in Central Islip, N.Y., in May.

Mr. Johnson, himself a middle-school principal in the Bronx, believes the district was ignoring his son's social
needs. "Kids don't kill themselves because they can't pass algebra," he recalls telling district officials. "They kill them-
selves because they don't have friends."

New York State Assemblywoman Catherine Nolan says the Supreme Court's ruling has had a "chilling effect." A
bill she filed to return the burden of persuasion to districts has passed the New York legislature but hasn't been sent to
the governor yet. She believes the court meant its ruling to apply only to states that don't have their own laws on the
matter.

Many districts are also limiting outside experts' access to classrooms. In California, a psychologist hired by parents
of an autistic boy requested 90 minutes to observe an elementary-school program where the Capistrano school district
wanted to place the child. After the district gave the psychologist 20 minutes, the parents sought a hearing. This past
March, a federal court in Los Angeles reversed a hearing officer's ruling and ordered the district to reimburse the family
for privately funded educational expenses.

In Reading, Mass., experts may observe for only 45 to 60 minutes, accompanied by school personnel. They must
submit a resume and references to the district, and hand over copies of notes. "A lot of these evaluators are hired guns,"
says former Reading special-education director Stephen Gannon, who developed its policy.

The federal government doesn't track the outcomes of administrative hearings. But in most states that keep count,
districts usually win. In New Jersey, districts prevailed in 27 of 28 hearings in 2005-06. In California, parents only won
11 of 119 hearings in that year. Districts prevailed in 77 cases, while the rest had mixed outcomes.

One Florida hearing officer was accused of reading during testimony for the parents. "Like some teenage girl read-
ing a Harlequin romance novel during homeroom," the officer "attempted to hide the book behind a report cover," the
parents' lawyer in the case wrote in a motion. The officer denied the allegation but recused herself from the case. She
decided at least 25 special-education cases before retiring last fall, always in favor of the district.

School-board lawyers say they're winning because special-education services have improved. "Ten or more years
ago, school districts frequently did not have adequate programs," says Charles Weatherly, whose Atlanta firm represents
districts in several states and has also trained hearing officers. "Now that they have discovered the expense of litigation
and of funding private placements, they're putting more money into programming."

Some parents and advocates for the disabled dispute that explanation. Former Pennsylvania hearing officer Linda
Stengle, whose contract was not renewed last year, contends in a pending federal lawsuit against the state that its Office
for Dispute Resolution "instructed hearing officers to selectively apply federal and state guidelines so that they always
benefited school districts over parents." The office denies the allegations.

After hearing reviewers in Pennsylvania were accused of bias, the state overhauled its system for choosing them.
Until recently, Pennsylvania had four appeals panels, each with a fixed roster of three administrative judges, to review
initial rulings. In a federal lawsuit filed in 2005, lawyer Dennis McAndrews accused one of the four panels of bias, say-
ing it decided 45 of 47 appeals for districts between August 2003 and August 2005.

Prof. Zirkel, the education professor at Lehigh University, was a member of that panel. He wrote most of its deci-
sions, including one limiting the special-education services Mr. McAndrews's client could demand. Prof. Zirkel says his
record over a longer period was less lopsided.

In May, the U.S. District Court in Philadelphia sided with Mr. McAndrews, ordering the state to take another look
at the case. Around that time, the state dissolved the four panels. Now, a computer randomly assigns three judges to
each case and picks which one will write the decision.

In New York, parents prevailed in 54% of issues adjudicated at hearings in 2005-06, according to state data. But the
picture changes when either side appeals to Mr. Kelly. After a stint at Syracuse University teaching disability law and

Staying The Course: Schools Beat Back Demands For Special-Ed Services --- Parents Face Long Odds Amid Cost Concerns; Seeking a Home Tutor The Wall Street Journal July 24, 2007 Tuesday

helping students represent the indigent, he became the state review officer in January 2003. While granting districts most of their appeals in 2006-07, he sided in full or part with parents filing appeals only 27% of the time, according to Ms. Steen, the lawyer who has studied his record.

When lawyers working for Mr. Kelly prepared decisions in favor of parents, he often overruled them, according to two former staff members.

New York created Mr. Kelly's office in 1990 after a federal court ruled it was a conflict of interest for the state education commissioner to judge appeals. The state reimburses districts for some special-education costs. Although the state education department employs Mr. Kelly, he is required to act independently of it.

Mr. Cuddy and other parents' attorneys say Mr. Kelly's independence is compromised by his relationship with Kathleen Surgalla, an assistant counsel for the state education department. Ms. Surgalla has trained the part-time officers who conduct the initial hearings and handled other special-education matters. Mr. Kelly and Ms. Surgalla live together in an Albany suburb, voter-registration records show.

Mr. Kelly and Ms. Surgalla declined to comment through a department spokesman. Ms. Ahearn said department employees have an "obligation to keep business separate from personal. . . . I feel comfortable and certain that there's no inappropriate conversation or influence going on."

After Mr. Kelly denied home-based autism therapy to the McGlones' son, they considered moving out of East Islip. Then the district's new special-education director promised them therapy at home this summer and a one-on-one aide in the school year beginning this fall. So far, the therapy is going well, says Ms. McGlone. In the first two weeks, her son has mastered four more letters of the alphabet, compared with seven in the just-concluded school year, she says.

"He has the ability to learn to read, and that could change his whole world," she says.

(See related letters: "Letters to the Editor: For Parents of Children with Special Needs, Public School Offers No Relief" -- WSJ July 31, 2007)



License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** July 31, 2007